UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE NOVEMBER TEAM, INC.; ANAT GERSTEIN, INC., BERLINROSEN PUBLIC AFFAIRS, LTD.; RISA HELLER COMMUNICATIONS LLC; and MERCURY LLC,<br><br>                                Plaintiffs,<br><br>                        -against-<br><br>NEW YORK STATE JOINT COMMISSION ON PUBLIC ETHICS; and DANIEL J. HORWITZ, DAVID ARROYO, HON. JOSEPH COVELLO, MARVIN E. JACOB, SEYMOUR KNOX IV, HON. EILEEN KORETZ, GARY J. LAVINE, HON. MARY LOU RATH, DAVID A. RENZI, MICHAEL A. ROMEO, HON. RENEE R. ROTH, MICHAEL K. ROZEN, DAWN L. SMALLS, and GEORGE H. WEISMAN, in their official capacities as members of the New York State Joint Commission on Public Ethics,<br><br>                                Defendants. | No. 16 Civ. _____ |

Plaintiffs The November Team, Inc., Anat Gerstein, Inc., BerlinRosen Public

Affairs, Ltd., Risa Heller Communications LLC, and Mercury LLC (collectively, "plaintiffs"),

by their attorneys, Emery Celli Brinckerhoff & Abady LLP, for their Complaint against

defendant New York State Joint Commission on Public Ethics (the "Commission"), allege as

follows:

## PRELIMINARY STATEMENT

1.      This is a case about bureaucratic overreach – and about the immediate and serious

threat to First Amendment freedom created by such overreach.  The New York State Joint

Commission on Public Ethics is a state agency with an important, but narrow, mandate as it

relates to lobbying activity in this State: to oversee disclosure for persons and entities who

engage in "lobbying," as that term is defined in state law.  In a recent action, the Commission has used its power to issue advisory opinions to expand the definition of "lobbying" to reach communications on public issues with members of the press.  It requires public relations entities engaged in these core First Amendment activities to report their press communications to the Commission on pain of civil fines or criminal referral.  The newly expanded definition covers the activities of virtually every public relations firm in the State.  Among such firm are the plaintiffs named here, public relations professionals who have conscientiously elected not to engage in lobbying as statutorily defined.  These plaintiffs, and others similarly situated, will, under a new advisory opinion, be deemed to be engaging in "lobbying" under a new definition, created by bureaucratic fiat, that defies the constitutional limits on lobbying disclosure requirements set forth 62 years ago in *United States s. v. Harris*, 347 U.S. 612 (1954).  The Commission's action is a wholesale violation of the First Amendment's speech and press provisions.  Although the Commission was repeatedly warned that such an action was unconstitutional, its response was to forge ahead, heedless of the impact on free speech and, by extension, on public debate of critical issues.

2.     The Commission's Opinion 16-01 (the "Opinion"), approved by the Commission on January 26, 2016, violates the First and Fourteenth Amendments of the United States Constitution by unlawfully subjecting public relations firms like the plaintiffs to a disclosure and punishment regime designed for true lobbyists, when all that they are doing is speaking to the press about public issues.  The result is that such firms, their clients, and members of the press are deterred, chilled, and silenced in violation of their First Amendment rights.

3.     This complaint, arising from the Commission's unlawful acts, seeks a declaration that the Opinion violates the First Amendment and an order enjoining any action to enforce it.

## PARTIES

4.     Plaintiff The November Team, Inc. ("TNT") is a public relations firm located in White Plains, NY.  TNT provides communications advice and services to private clients; it does not engage in "lobbying" as that term is defined in the New York Lobbying Act and was understood prior to the issuance of the Opinion.

5.     Plaintiff Anat Gerstein, Inc. ("AGI") is a public relations firm located in New York, NY.  AGI provides communication advice and services to private clients; it does not engage in "lobbying" as that term is defined in the New York Lobbying Act and was understood prior to the issuance of the Opinion.

6.     Plaintiff BerlinRosen ("BR") is a public relations firm located in New York, NY.  BR provides communication advice and services to private clients; it does not engage in "lobbying" as that term is defined in the New York Lobbying Act and was understood prior to the issuance of the Opinion.

7.     Plaintiff Risa Heller Communications is ("RHC") is a public relations firm located in New York, NY.  RHC provides communication advice and services to private clients; it does not engage in "lobbying" as that term is defined in the New York Lobbying Act and was understood prior to the issuance of the Opinion.

8.     Plaintiff Mercury LLC ("Mercury") is a public relations firm located in New York, NY.  Mercury provides communication advice and services to private clients; for some of its clients, it does not engage in "lobbying" as that term is defined in the New York Lobbying Act and was understood prior to the issuance of the Opinion.

9.     Plaintiffs TNT, AGI, BR, RHC and Mercury shall be referred to collectively as the "PR Firm Plaintiffs."  All of the PR Firm Plaintiffs represent clients and regularly interact

with the press—reporters, editors, editorial boards, and others—on behalf of those clients.  A substantial portion of this interaction occurs within the Southern District of New York.

10.     Defendant New York State Joint Commission on Public Ethics is an entity under New York State law with the power, *inter alia*, to "administer and enforce all the provisions" of the Lobbying Act.  N.Y. Leg. L. § 1-d.  The Commission consists of fourteen members, three appointed by the Temporary President of the Senate, three appointed by the Speaker of the Assembly, one appointed by the Minority Leader of the Senate, one appointed by the Minority Leader of the Assembly, and six appointed by the Governor and the Lieutenant Governor.  The Commission Chairperson is selected by the Governor.

11.     Defendant Daniel J. Horwitz, is Chairperson of the Commission.  He is sued in his official capacity.

12.     Defendants David Arroyo, Hon. Joseph Covello, Marvin E. Jacob, Seymour Knox IV, Hon. Eileen Koretz, Gary J, Lavine, Hon. Mary Lou Rath, David A. Renzi, Michael A. Romeo, Hon. Renee R. Roth, Michael K. Rozen, Dawn L. Smalls, and George H. Weisman are members of the Commission.  They are sued in their official capacities.

## JURISDICTION AND VENUE

13.     This case arises under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution.  This Court has original subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because Plaintiffs' claims arise under a law of the United States and seek redress of the deprivation, under color of State law, of rights guaranteed by the Constitution of the United States.

14.     This Court has jurisdiction over plaintiffs' state law claim under 28 U.S.C. §

1367(a) and the doctrine of pendent jurisdiction.

15.     The acts complained of occurred in substantial part in the Southern District of New York, and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).  The Opinion will affect and chill the PR Firm Plaintiffs' work and interactions with the press in the Southern District of New York.

## JURY TRIAL DEMAND

16.     Plaintiffs demand trial by jury in this action.

## FACTUAL ALLEGATIONS

### I.     The Lobbying Act: Stringent Requirements for Lobbyists, on Pain of Criminal Prosecution and Civil Fines

17.     New York State passed Legislative Law Article § 1-A, the "Lobbying Act," with a laudable goal: to "maintain the integrity of the governmental decision-making process in this state."  To further that goal, the Lobbying Act requires disclosure of "the identity, expenditures and activities" of lobbyists, *i.e.*, "persons and organizations retained, employed or designated" to influence legislation, executive orders, state and local rules, regulations, ordinances, rate making proceedings, and governmental procurement.  N.Y. Leg. L. §§ 1-a, 1-c.

18.     The Lobbying Act imposes significant burdens on lobbyists.  "Every lobbyist" who receives $5,000 or more for lobbying activity in any year shall file a biennial registration with the Commission.  N.Y. Leg. L. § 1-e.  The registration shall include the "name, address and telephone number of the lobbyist," and of the client, a copy of all written retainer agreements, a description of all oral retainer agreements, a description of all subjects "on which the lobbyist expects to lobby," a listing of all legislative bill numbers, executive orders, rules, regulations, ratemaking numbers, municipal ordinances and resolutions, and procurement contracts "on which the lobbyist expects to lobby," and the names of all persons and organizations "before

5

which the lobbyist is lobbying or expects to lobby."  N.Y. Leg. L. § 1-e(c)(5-6).  The lobbyist

must also provide a description of every subject of every transaction between the lobbyist and

state official, officer or employee.  N.Y. Leg. L. § 1-e(c)(8).  A separate registration, with all the

above information, must be filed for each client who retained the lobbyist.  N.Y. Leg. L. § 1-

e(c)(7).

19.     In addition, "any lobbyist" who receives $5,000 or more for lobbying activity in

any year shall file bi-monthly reports with the Commission.  N.Y. Leg. L. § 1-h.  These bi-

monthly reports shall include the "name, address and telephone number of the lobbyist," and of

the client, a description of all subjects "on which the lobbyist has lobbied," a listing of all

legislative bill numbers, executive orders, rules, regulations, ratemaking numbers, municipal

ordinances and resolutions, and procurement contracts "on which the lobbyist has lobbied," and

the names of all persons and organizations "before which the lobbyist has lobbied."  N.Y. Leg.

L. § 1-h(b).  The lobbyist must also list all "compensation paid or owed to the lobbyist, and any

expenses expended, received or incurred by the lobbyist for the purpose of lobbying," and as to

expenses, the "amount, to whom paid, and for what purpose."  *Id.*

20.     In addition, every client "retaining, employing or designating a lobbyist" must file

semi-annual reports with the Commission including the "name, address and telephone number of

the client," and of the lobbyist(s), a description of all subjects "on which the lobbyist has

lobbied," a listing of all legislative bill numbers, executive orders, rules, regulations, ratemaking

numbers, municipal ordinances and resolutions, and procurement contracts "on which the

lobbyist has lobbied," and the names of all persons and organizations "before which the lobbyist

has lobbied."  N.Y. Leg. L. § 1-j.  The client must also list all "compensation paid or owed to the

lobbyist, and any expenses expended, received or incurred by the lobbyist for the purpose of

6

lobbying," and as to expenses, the "amount, to whom paid, and for what purpose." *Id.*

21.    All of these reports require filing fees, and in case of late filing, additional late filing fees.

22.    "All statement and reports" required under the Lobbying Act must be made "under the penalties of perjury." N.Y. Leg. L. § 1-p.

23.    The Lobbying Act imposes significant penalties on anyone who violates the Act.

24.    *First*, it is a crime to violate the Lobbying Act.

25.    "Any lobbyist, public corporation, or client who knowingly and wilfully fails to file timely a report or statement" or "files false information . . . shall be guilty of a class A misdemeanor." N.Y. Leg. L. § 1-o(a)(i).

26.    Anyone who commits a second such violation within five years "shall be guilty of a class E felony." N.Y. Leg. L. § 1-o(a)(ii).

27.    *Second*, violators face severe financial penalties, which can be imposed civilly by the Commission itself.

28.    "A lobbyist, public corporation, or client who knowingly and wilfully fails to file a statement or report within the time required for the filing of such report . . . shall be subject to a civil penalty for *each* such failure or violation, in an amount not to exceed the greater of twenty-five thousand dollars or three times the amount the person failed to report properly or unlawfully contributed, expended, gave or received, to be assessed by the commission." N.Y. Leg. L. § 1-o(b)(i).

29.    The financial penalty for false reports is even greater: "A lobbyist, public corporation, or client who knowingly and wilfully files a false statement or report shall be subject to a civil penalty, in an amount not to exceed the greater of fifty thousand dollars or five

times the amount the person failed to report properly," again "to be assessed by the commission." N.Y. Leg. L. § 1-o(b)(i).

30.    In addition, "[a] lobbyist, public corporation, or client who knowingly and wilfully fails to retain [required] record[s]," for example, retainer agreements or expense records, "shall be subject to a civil penalty in an amount of two thousand dollars per violation to be assessed by the commission." N.Y. Leg. L. § 1-o(b)(vi).

## II.    The Commission: Interpreter and Enforcer

31.    The Lobbying Act gives the Commission significant power.

32.    The Commission has the power to "administer and enforce all the provisions" of the Lobbying Act. N.Y. Leg. L. § 1-d.

33.    The Commission audits lobbyists. *Id.*

34.    The Commission receives and reviews "all statements and reports" required under the Lobbying Act. N.Y. Leg. L. § 1-p(b).

35.    In addition, as noted above, the Commission has the power to assess financial penalties if the Commission finds a person or entity to be in violation of the Lobbying Act.

36.    If the Commission deems a violation of the Lobbying Act to be "willful," the Commission reports those violations "to the attorney general or other appropriate authority" for possible criminal prosecution. N.Y. Leg. L. § 1-p(b).

37.    Finally, and most relevant here, the Commission "issue[es] advisory opinions" as to the meaning of the Lobbying Act, N.Y. Leg. L. § 1-d, and "shall publish a statement on lobbying regulations setting forth the requirements" of the Lobbying Act, including "an explanation of the registration and filing requirements and the penalties for violation thereof, together with such other information as the commission shall determine," N.Y. Legis. L. § 1-r.

**III.**   ***United States v. Harriss:*** **The Supreme Court Imposes Strict Requirements on Lobbying Disclosure Laws**

38.     The Lobbying Act and the work of the Commission must be evaluated against the backdrop of the leading constitutional case on lobbying disclosure rules: *United States v. Harriss*, 347 U.S. 612 (1954).

39.     In *Harriss*, the Supreme Court evaluated the constitutionality of the Federal Regulation of Lobbying Act, which purported to apply to "any person . . . who by himself, or through any agent or employee or other persons in any manner whatsoever, directly or indirectly, solicits, collects, or receives money or any other thing of value to be used principally to aid, or the principal purpose of which person is to aid, in the accomplishment of any of the following purposes: (a) The passage or defeat of any legislation by the Congress of the United States. (b) To influence, directly or indirectly, the passage or defeat of any legislation by the Congress of the United States." *Id.* at 618-19.

40.     The defendants in *Harriss* allegedly failed to report the solicitation and receipt of contributions, as well as expenditures, to influence certain agricultural legislation.  "Some of the alleged expenditures consist of the payment of compensation to others to communicate face-to-face with members of Congress, at public functions and committee hearings, concerning legislation affecting agricultural prices; the other alleged expenditures relate largely to the costs of a campaign to induce various interested groups and individuals to communicate by letter with members of Congress on such legislation."  The defendants allegedly "arranged to have members of Congress contacted on behalf of these views, either directly by their own emissaries or through an artificially stimulated letter campaign." *Id.* at 615-17.  The last point—the "artificially stimulated letter campaign," in which the lobbyist generates the letter campaign, drafts the letters, and collects signatures for the letter campaign to be sent directly to a

legislator—has since become known as "grassroots communication" or "grassroots lobbying."

41.    To save the statute from a First Amendment and Due Process challenge, the

Supreme Court drastically narrowed the scope of the law's disclosure requirements: "(1) the

'person' must have solicited, collected, or received contributions; (2) one of the main purposes of

such 'person,' or one of the main purposes of such contributions, must have been to influence the

passage or defeat of legislation by Congress;" and most important, "(3) the intended method of

accomplishing this purpose must have been through direct communication with members of

Congress." *Id.* at 623

42.    "Construed in this way," the statute "me[t] the constitutional requirement of

definiteness," and did "not violate the freedoms guaranteed by the First Amendment—freedom

to speak, publish, and petition the Government." *Id.* at 624-25.

**IV.    The Commission's January 26, 2015 Opinion**

43.    For many years, the Commission has interpreted the Lobbying Act to capture so-

called "grassroots lobbying."   In New York, that term has been interpreted to apply any time a

person or entity subject to the Lobbying Acts disclosure rules (*i.e.*, having received or spent or

having anticipated receiving or spending $5,000 in compensation in a calendar year) calls upon

members of the public to contact their legislators to support or defeat the passage of legislation

(the "call to action").

44.    On January 26, 2015, the Commission issued Advisory Opinion 16-01:

"Reporting obligations under the Lobbying Act for a party who is compensated for consulting

services in connection with lobbying activity" (the "Opinion").  *See* Ex. A (Attached).[1]

45.    Section III of the Opinion dramatically expands the Lobbying Act, sweeping tens

of thousands of people who have nothing to with lobbying into its scope.  Far from limiting itself

---

[1] Plaintiffs only challenge Section III of the Opinion in this lawsuit.

to  requiring disclosure when a person engages in grassroots lobbying "calls to action" directed

at the public, the Opinion purports to require disclosure of interactions between citizens and *the*

*press*, and thereby threatens to disclose confidential sources and communications with editors

and reporters, leaves plaintiffs and others guessing as to the Lobbying Act's sweep and scope,

and, worst of all, subjects citizens to potential criminal penalties for engaging in core political

speech protected by the First Amendment unless they disclose such conduct to the Commission.

46.     Specifically, the Opinion dramatically expands the narrow "grassroots

communication" form of lobbying discussed in *Harriss* to include activities that neither the

Supreme Court nor any other court has ever considered to be lobbying.  Under the Opinion, a

public relations firm, a media consultant, or any consultant is engaged in "lobbying" if s/he

"contacts a media outlet in an attempt to get it to advance the client's message."  Ex. A at 9.

The Opinion goes on to say: "Any attempt by a consultant to induce a third-party—whether the

public or the press—to deliver the client's lobbying message to a public official would constitute

lobbying."  Ex. A at 9.

47.     With these sweeping statements, the Commission's Opinion converts the entire

public relations industry in New York State into "lobbyists" subject to Commission's disclosure

and regulatory regime.  *All* PR consultants work "to advance the client's lobbying message."

And virtually all PR consultants "contact[] media outlet[s] in an attempt to get the media outlet

to advance the client's message."

48.     In the Commission's view, when a PR consultant speaks to a "media outlet", or "a

third-party," or "the press," any of those people or entities may then, somehow or another,

directly or indirectly, through one or many third parties, eventually communicate a message, a

thought, or an opinion to some public official concerning some pending or potential legislative or

executive action.  Therefore, the Commission asserts, the PR consultant needs to register with the government, comply with an onerous regulatory regime, and reveal every communication with all these people and entities, all on pain of substantial fines and criminal prosecution.

49.    By way of example, if a PR consultant speaks to an editorial board about any issue being considered in a municipal or state legislature in New York (education, policing, housing, the budget, civil rights, etc.), the Commission has now declared that that is "lobbying," because that editorial board *might* print an editorial which *might* reflect the view of that PR consultant, which *might* affect the opinion of some legislator, somewhere.

50.    As another example, if a PR consultant pitches a story to a TV or newspaper reporter about any issue being considered in a municipal or state legislature in New York, the Commission has now declared that that too, is "lobbying," because the reporter *might* print an editorial which *might* reflect the view of that PR consultant which *might* affect the opinion of a legislator.

51.    The Opinion equates lobbyists who contact legislators to PR consultants who pitch stories to newspapers.  This view is untenable.

52.    First, the Opinion wrongly assumes that the editorial boards and reporters of, for example, the *New York Times* or the *New York Post*, are mere pawns of PR consultants, incapable of thinking for themselves, evaluating sources critically, or expressing their own views.  This infantilizing and offensive view of the fourth estate does not withstand even minimal scrutiny.

53.    Second, the Opinion assumes that the sole purpose of an editorial board or reporter is to influence governmental officials, as opposed to readers, viewers, the body politic, the public, and the country at large.  The *Times*, for example, has millions of subscribers and tens

of millions of web visitors, only a small fraction of whom work for New York State or City government.  Yet in the view of the Commission, the *Times* and all newspapers are not newspapers at all, but rather lobbying conduits, special channels for "lobbyists" to influence legislators.

54.     Third, the Opinion subjects reporters and media outlets to grotesque and unwarranted scrutiny, since the content, timing and source of information imparted to reporters and editorial writers would now be fair game for a Commission investigation of unregistered "lobbying."

**V.     The Commission's January 26, 2016 Meeting**

55.     Before issuing the Opinion, the Commission had an open meeting on January 26, 2016 to discuss the Opinion ("Open Meeting").[2]

56.     At the meeting, Commissioners and Commission staff repeatedly confirmed that the Opinion dramatically expands reporting requirements beyond the limits allowed by *Harriss*. Whereas the *Harriss* Court allowed regulation of attempts to influence legislation "through direct communication with members of Congress," *Harriss*, 347 U.S. at 623, the Opinion purports to regulate those paid "to try to sway *public opinion* through the editorial boards" and those who try "to influence *the paper[s]*."  The regulation is premised on the "assump[tion]" that any messages delivered to the media or to the public generally will "ultimately . . . be heard and received by public officials" considering legislation.

57.     The Commission acknowledged that there is no precedent in any other jurisdiction for the Opinion's sweeping attempt to regulate press communications. Open Meeting at 34:17-35:36.

---

[2] Available at http://www.jcope.ny.gov/public/open_meetings.html (to download, click on "Media Link" for the January 26, 2016 Commission Meeting).

58.     Beyond reaching consensus that the lobbying regulations will be enforced against anyone paid to influence public opinion through the media, the Commission provided no clarity about which specific communications between the press and PR consultants would constitute lobbying.

59.     Even Commission members and staff struggled to understand how and when the Opinion would apply, dismissing specific questions about its application as "hypotheticals" that could not be addressed without "real facts."  Open Meeting at 47:52

60.     While some members insisted that no lobbying takes place if a reporter seeks comment or attempts to fact check by speaking with a PR consultant, others simultaneously and absurdly indicated that that *anything* a PR consultant says to a member of the press would result in a need to register because any "good" consultant contacted by a reporter will use the opportunity to advance his client's message.  Open Meeting at 53:32.

61.     Even as it displayed its own confusion about how the Opinion would apply in specific cases, the Commission chillingly announced that anyone accused of failing to comply with it would be presumed to have acted with criminal reckless intent.

62.     The January 26, 2016 meeting makes plain what is already obvious from the face of the Opinion: The Opinion is hopelessly vague, fails to give citizens reasonable notice of what is and is not now "lobbying activity," imposes unreasonable burdens on PR firms that do nothing more than engaging in core First Amendment activity, and puts an entire industry into a dangerous, potentially criminal quagmire, where no one knows what is and is not lobbying, what the Commission will or will not penalize, or what the Commission will or will not refer for criminal prosecution.

**VI.     Consequences of the Opinion: An Attack on Free Speech and Freedom of the Press**

63.     This is no idle advisory opinion.  The Commission is a powerful entity.  As set forth above, it both interprets the Lobbying Act, *and* enforces the Act: It reviews, vets, and audits the lobbying reports; it assesses penalties; and it refers people for criminal prosecution.  The Commission will apply and enforce the Opinion, using whatever interpretation the Commission happens to give the Opinion at any given moment in any given case.  As the Commissioner members and staff frankly admitted at the meeting at which the Opinion was approved, "it's difficult to say beyond a general statement about what the intent of the Opinion is . . . , how [a] particular scenario may be captured."  Open Meeting at 31:45.  The First Amendment, our constitutional bulwark against state intrusion on our most precious freedom, does not permit that kind of vagueness in enforcement guidance.

64.     As a result, PR Firm Plaintiffs, and other PR and media firms and consultants in New York State (i) do not know whether and to what extent the Commission will apply the Lobbying Act to them; (ii) will be chilled rather than engage in core, protected political speech; (iii) will be afraid to contact editors, reporters, writers, and TV producers about issues of public concern; and (iv) will effectively be silenced, because anyone who would otherwise speak on protected matters will either be required to refrain from so speaking or submit to an unnecessary and burdensome disclosure and regulatory regime.

65.     Most of the PR Firm Plaintiffs, to date, and for their own business and other reasons, have made a conscious choice not to engage in lobbying as previously defined. Plaintiffs TNT, AGI, BR, and RHC do not engage in "direct lobbying"—*i.e.*, button-holing public officials to vote this way or that on legislation, to win or defeat enactment executive orders, rate-making rulings, or procurement contracts—nor do they engage in "grassroots communications," calling upon members of the public to "contact [their] legislators" or other

public officials about these matters.  Plaintiff Mercury engages in traditional lobbying activities for some clients but not for others.  At the same time, and as a core activity of their business, *all* of the PR Firm Plaintiffs regularly interact with members of the press on behalf of clients, including by providing information and seeking to persuade reporters, editorial writers, and media outlets generally to "cover" issues of concern to their clients.  It is the "bread and butter" of their practices—and part of the life's blood of the public discourse on issues being taken up by state and local governments across New York State.

66.    Throughout their existence, the PR Firm Plaintiffs have scrupulously followed the well-worn "rules of the road," limiting their conduct to PR activities and steering well clear of lobbying or, in Mercury's case, duly registering its activities under the Lobbying Act when it is hired to engage in traditional lobbying and to use paid media to target legislators in a "grassroots lobbying" effort.  Now, without having changed their practices at all, the PR Firm Plaintiffs and others similarly situated are subject to the full burden of the Lobbying Act's disclosure regime, including registration requirements, potential audits, and exposure to criminal and civil liability, even when the *only* thing they do on behalf of their clients is to discuss legislation or executive or agency action with reporters.   This is the immediate and irreparable impact of the Opinion.

67.    In addition, the Opinion will deprive the press—reporters, editors, producers—of information from many people in the PR community with important information to share about public issues, for fear their conversations and activities must now be reported to and monitored by the government.

68.    PR and media consultants often speak with editors and reporters anonymously, or on background, for any number of reasons.  Those private conversations are vital to raise and share important information and views with the press.  Yet under the Opinion, those

conversations will no longer be private, and therefore will no longer occur.

69.     As a result of all the above, the public will suffer.  The public will be deprived of stories, articles, blogs, webcasts, and editorials informed by a vital give-and-take between the press and the PR industry.

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – First Amendment Violation

70.     Plaintiffs reallege each and every allegation contained in all preceding paragraphs as if fully set forth herein.

71.     At all relevant times, defendant Commission acted under color of New York State law.

72.     Political speech is at the very core of protected activity under the First Amendment.  The majority of the speech between PR Firm Plaintiffs and the press is political speech on issues of public concern.

73.     The Opinion unduly restricts and chills protected speech by imposing a burdensome regulatory regime on anyone who would engage in it, with threats of civil penalties and criminal sanctions extant to a person or entity who fails to register.

74.     The Opinion unduly restricts and chills protected speech and freedom of the press, by requiring disclosure to the government of press sources, both confidential and non-confidential, without any justification.

75.     The Opinion unduly restricts and chills protected speech and freedom of the press, by giving the Commission virtually unfettered discretion to determine which interactions between PR consultants and the press are and are not lobbying, which interactions the Commission will or will not penalize absent disclosure, and which interactions the Commission will or will not refer for criminal prosecution absent disclosure.

76.     The existence of contacts between government officials and the press will not be subject to disclosure or the regulatory regime imposed by the Opinion.  The existence of contacts between PR consultants and the press—about the government or apparently any topic that could conceivably influence government—*will* be subject to disclosure and the regulatory regime imposed by the Opinion.  By privileging government speech over non-government speech without any justification, the Opinion engages in content and viewpoint discrimination, in violation of the First Amendment.

77.     By requiring PR consultants to pay the government filing and other fees simply for the privilege of advocating a position or speaking with the press, the Opinion violates freedom of speech and of the press.

78.     Additionally, because the Opinion gives a government agency substantial power to discriminate against disfavored speakers by suppressing their expression, the Opinion is facially unconstitutional.

79.     As a direct and proximate result of the foregoing, plaintiffs sustained the damages alleged herein.

### SECOND CLAIM FOR RELIEF
#### 42 U.S.C. § 1983 – Due Process Violation

80.     Plaintiffs reallege each and every allegation contained in all preceding paragraphs as if fully set forth herein.

81.     The Opinion is not sufficiently definite to give PR Firm Plaintiffs or other reasonable people fair notice whether or not their contemplated conduct is forbidden by the Opinion or the Lobbying Act.

82.     The Opinion does not set forth clear standards for enforcement.

83.     The PR Firm Plaintiffs do not know which of their interactions with the press will

require disclosure to the Commission.  The PR Firm Plaintiffs, and all PR firms who do work in New York State, are effectively left in a state of confusion and fear, uncertain whether and to what extent they must now register with the government or face financial penalties and potential criminal prosecution.

84.     Accordingly, the Opinion is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

85.     As a direct and proximate result of the foregoing, plaintiffs sustained the damages alleged herein.

## SECOND CLAIM FOR RELIEF
### N.Y. CPLR Article 78 – Arbitrary, Capricious, Legally Deficient Determination

86.     Plaintiffs reallege each and every allegation contained in all preceding paragraphs as if fully set forth herein.

87.     Part III of the Opinion is arbitrary and capricious and infected by errors of law. The Opinion does not further the purpose of the Lobbying Act, which was to address the concerns set forth in *United States v. Harriss*: to enable government officials to identify the sources of pressure applied to them, not to require reporting of private conversations between members of the public and members of the press

88.     Part III of the Opinion is further arbitrary and capricious and infected by errors of law because it would render the enforcement of the Lobbying Act unconstitutional, which is contrary to the purpose of the Act.

89.     As a direct and proximate result of the foregoing, plaintiffs sustained the damages alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request this Court to grant them the relief requested as follows:

(1)     Declaring that Section III of the Opinion violates the First and Fourteenth Amendments of the U.S. Constitution;

(2)     Enjoining defendant from enforcing Section III of the Opinion or enforcing the Lobbying Act as interpreted by Section III of the Opinion;

(3)     Awarding plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

(4)     Such other and further relief that the Court deems just and proper.

Dated: New York, New York
       March 8, 2016

                              EMERY CELLI BRINCKERHOFF &
                              ABADY LLP

                              _____
                              Andrew G. Celli, Jr.
                              Ilann M. Maazel
                              Hayley Horowitz
                              600 Fifth Avenue, 10th Floor
                              New York, NY 10020
                              (212) 763-5000

                              CENTER FOR COMPETITIVE POLITICS


                              _____/s_____
                              Allen Dickerson*
                              124 West S Street, Suite 201
                              Alexandria, VA 22314
                              (703) 894-6800
                              *Application for Admission Pro Hac Vice
                              Pending

                              *Attorneys for Plaintiffs*

# Exhibit A

## STATE OF NEW YORK
## JOINT COMMISSION ON PUBLIC ETHICS

**Advisory Opinion No. 16-01:**  **Reporting obligations under the Lobbying Act for a party who is compensated for consulting services in connection with lobbying activity**

### Introduction

Consultants offer a number of services that abut lobbying, but may not necessarily cross the line into lobbying. For example, consultants may offer services that may include communications and media relations, community organizing, coalition building, strategic planning, social media relations, grassroots advocacy, advertising, and electoral campaigns. However, despite the terms used to describe the services, some of this activity could constitute reportable lobbying under Legislative Law Article 1-A (the "Lobbying Act").

Principally, this analysis will address actions taken and roles played by consultants in two typical lobbying scenarios – as "facilitators" for direct lobbying to or before a public official, and as architects of grassroots lobbying campaigns to the public.

The State Temporary Commission on Lobbying (the "Lobbying Commission"), a predecessor agency of the New York State Joint Commission on Public Ethics ("JCOPE"), previously defined the activities under the Lobbying Act that may constitute grassroots lobbying through a series of Advisory Opinions discussed below. Since that time, however, the Lobbying Act has been amended more than once and the Lobbying Commission has been disbanded and ultimately replaced by JCOPE.

The Commission issues this Advisory Opinion in order to articulate when the Lobbying Act covers the services of consultants, and to clarify the test used to determine when grassroots advocacy constitutes reportable lobbying activity.

### Issues

I.   When a consultant (or other paid representative) contacts a public official on behalf of a client, for the purpose of enabling or otherwise facilitating lobbying activity, is that initial contact, *i.e.*, the "door opening", reportable under the Lobbying Act?

II.   When a consultant attends a meeting between a client (with or without a lobbyist) and a public official, is the consultant engaging in lobbying?

III.   Must consultants who create and implement grassroots lobbying campaigns on behalf of clients themselves register as lobbyists?

1

**Conclusions**

Pursuant to its authority under Lobbying Act § 1-d(f), the Commission renders its opinion that:

**I.**     Reportable lobbying[1] includes preliminary contact made with public officials to enable or facilitate the ultimate advocacy.

**II.**    Any direct interaction with a public official in connection with an advocacy campaign, including preliminary communications to facilitate or enable the eventual substantive advocacy, constitutes lobbying.

*Direct interaction* includes, but is not limited to: (i) verbal or written communications, including communications made for the purpose of facilitating access to a public official; (ii) attendance at a meeting with a public official; and (iii) presence on a phone call with a public official.

**III.**   A grassroots communication constitutes lobbying if it:

1. References, suggests, or otherwise implicates an activity covered by Lobbying Act Section 1-c(c).
2. Takes a clear position on the issue in question; and
3. Is an attempt to influence a public official through a call to action, *i.e.*, solicits or exhorts the public, or a segment of the public, to contact (a) public official(s);

A consultant's activity on a grassroots campaign can be considered reportable lobbying if the consultant controlled the delivery and had input into the content of the message.

Control of the *delivery* of a grassroots communication involves participation in the actual delivery of the message.

Input on the *content* of a grassroots message means participation in the formation of the message.

**Discussion**

*History and Precedent*

Lobbying was first regulated in New York state in 1977 with the enactment of the "Regulation of Lobbying Act"(L. 1977, Ch. 937). The statute defined "lobbying" or "lobbying activity" as:

[A]ttempts to influence the passage or defeat of any legislation by either house of the legislature or the approval or disapproval of any legislation by the governor, or the adoption or rejection of any rule or regulation having the force and effect of law or the

---

[1] *See* Lobbying Act § 1-c(c)(i)-(x)

outcome of any rate making proceeding by a state agency. *Section 3(b) of Ch. 937, L. 1977.*

This legislation also created the first iteration of the State's lobbying regulatory body, with the creation of the Temporary Commission on the Regulation of Lobbying. This Commission was subsequently reconstituted in 1981 as the similarly-named Temporary Commission on Lobbying, which would remain in place until 2007.[2]

These commissions are charged in their respective enabling statutes with the interpretation of the laws governing lobbying, through the issuance of advisory opinions.[3]

The definition of lobbying provides what kind of activity can be lobbying ("attempts to influence"), as well as the contexts in which it can occur (*i.e.*, legislation, rulemakings, and rate makings).

However, it was not until the Lobbying Commission's Opinion No. 21 (79-1) in 1979 that a New York state regulator addressed what specific conduct constituted an "attempt to influence" under the Act. In that opinion, a committee of the state bar association both: (1) challenged the "attempts to influence" language of the statute as vague and unqualified; and (2) asked whether this language included interactions other than "direct contact with legislators, the Governor, or regulatory agency decision makers".

On both questions the Lobbying Commission turned to the U.S. Supreme Court's seminal 1953 lobbying-related decision, United States v. Harriss (347 U.S. 612). *Harriss* upheld a constitutional challenge to the Federal Lobbying Act, the Court held that the definition of lobbying captured "direct pressures exerted by lobbyists themselves…or through an artificially stimulated letter campaign." *Harriss* at 620. Justifying the potential infringement of protected speech, the Court noted that "[Congress] has … merely provided for a modicum of information from those who for hire attempt to influence legislation or who collect or spend funds for that purpose. It wants only to know who is being hired, who is putting up the money, and how much…". TCOL Op. No. 21 (79-1), quoting *U.S. v. Harriss*.

The Lobbying Commission stated that it was acting to "conform with Federal case law", *i.e.*, *Harriss* and, as a result, "lobbying activity" under the New York state statute is through direct verbal, written, or printed communications with legislators, including "contacts with those staff members of the decision maker to whom authority to decide had been delegated and to those staff members upon whom the decision maker relies for informed recommendations on matters under consideration." Lobbying Commission Op. No. 21 (1979).

In the months immediately following the publication of this opinion, the Lobbying Commission notified the Commission on Independent Colleges and Universities ("CICU") of potential reporting obligations under the law, should [CICU] exceed the $1,000 lobbying spending

---

[2] The Lobbying Commission was merged with the State Ethics Commission in 2007, into the Commission of Public Integrity ("COPI"), as part of the Public Employee Ethics Reform Act, Ch. 14, L. 2007. COPI was subsequently replaced by the Joint Commission on Public Ethics in 2011's Public Integrity Reform Act, Ch. 399, L. 2011. All prior opinions referenced in this document were issued by the Lobbying Commission, unless otherwise noted.
[3] See § 4(c)(6), Ch. 937, L. 1977; § 4(c)(6), Ch. 1040, L. 1981; Legislative Law Article 1-A, § 1-d(f).

threshold then in effect. CICU subsequently registered as a lobbying organization and sought a declaratory judgment in the District Court that the lobbying statute was "in its entirety, null and void, unconstitutional and of no force and effect".[4] The constitutional challenge argued that the law was an overbroad constraint on the rights to speech, petition the government, and association, because it attempted to regulate "any action which could conceivably impact upon government action, no matter how remote".[5] The Court dismissed the plaintiffs' arguments, noting that the Supreme Court had limited the definition of lobbying in *Harriss* and pointed to the Lobbying Commission's decision to apply *Harriss* to its own activities.[6]

In applying *Harriss* to the New York lobbying laws, the *CICU* court ratified the boundaries that the Lobbying Commission had imposed on itself (in Op. No. 21). Further, an ensuing progeny of decisions by the Lobbying Commission created a series of general rules about what constituted lobbying activity under *Harriss* and state law, and applied the rules in the context of "grassroots" lobbying.

After CICU, the Commission issued the first opinion applying criteria to grassroots lobbying. The Commission found in Op. No. 36 (82-2) that **lobbying included not only the direct contacts with a public official, but also exhortations to the public to contact the public official, *i.e.*, a call to action**, with regard to specific pending legislation.

The Commission was later presented with the question whether a consultant that carries out the *mailing* function of a grassroots campaign (assuming the requisite "call to action" is present) is required to register as a lobbyist. The Commission found that **lobbying occurs when a consultant controls message delivery, and that control results in direct contact with a public official** ("A lobbyist cannot be allowed to avoid registering with the Commission simply by changing how contact with legislators is made. Any attempt by a lobbyist to influence the passage or defeat of any legislation…is lobbying irrespective of how contact is made.")[7] However, the Commission clarified that the consultant's activity must include participation in both the content and delivery of a grassroots lobbying campaign to trigger the disclosure requirements. In that case, the delivery of pamphlets – without input, editing, reviewing, or other connection to the content of the message – was not lobbying activity.

The Lobbying Commission further clarified that an advertisement that includes a public "call to action" need not necessarily identify a bill number for the advertisement to constitute lobbying. In evaluating radio advertisements encouraging the public to contact the Governor regarding proposed Indian casino gaming issues, the Commission wrote, "[t]he company's reliance on the omission of a bill number to avoid the requirement of disclosure is misplaced; it is the clear attempt to stimulate a grassroots lobbying effort in regard to pending legislation that controls the question." (Opinion No. 44 (00-3)). The Commission also articulates a three-part test for all lobbying – direct or grassroots: "**Lobbying, under New York law, occurs when the activity in**

---

[4] Commission on Independent Colleges and Universities v. New York Temporary State Commission on Regulation of Lobbying, 534 F. Supp. 489, 491, (N.D.N.Y 1982).

[5] *Id*. at 496.

[6] *Id*. at 497, citing Lobbying Commission Op. No. 39 (97-1).

[7] Lobbying Commission Op. No. 39 (97-1) (1997).

**question relates to pending legislation, a position is stated, and the activity is an attempt to influence decision makers**…Direct contact is not required."[8] (emphasis added)

Finally, and as discussed below, the definition of "lobbying" or "lobbying activities" has expanded from the initial 1977 version[9]: in 1999, the legislature added certain actions by municipalities to the contexts in which lobbying can occur; in 2005, the definition was expanded to cover attempts to influence governmental procurements and tribal-state compacts (or Class III gaming actions);[10] and most recently, in 2011, PIRA further amended the definition (to its current state) to specify that an attempt to influence passage or defeat of legislation included the introduction or intended introduction of such legislation.[11]

### Issue Analysis

I.   *When a consultant (or other paid representative) contacts a public official on behalf of a client, for the purpose of enabling or otherwise facilitating lobbying activity, is that initial contact, i.e., the "door opening", reportable under the Lobbying Act?*

JCOPE is cognizant and respectful of the fact that the scope of the Lobbying Act is limited to those circumstances enunciated in Section 1-c(c) of the Lobbying Act.  However, advocacy has evolved, requiring JCOPE to address activities that are clearly within the ambit of the Lobbying Act, but not been previously considered.

JCOPE finds that **reportable lobbying[12] includes preliminary contact** made with public officials to enable or facilitate the ultimate advocacy. This initial contact does not have to involve the substantive concerns of the client, but can simply be to schedule a future meeting for the client with the public official. It can also include a consultant introducing his client to a public official prior to a meeting.

While one may call himself a consultant, when that individual communicates with a public official (or her staff) on behalf of a client – for the purpose of enabling the client to explicitly advocate before the public official – the lobbying has begun. *But for the access* to the public official, the ensuing advocacy could not take place.

---

[8] *Id.*

[9] The original definition of lobbying covered "attempts to influence the passage or defeat of any legislation by either house of the legislature or the approval or disapproval of any legislation by the governor, or the adoption or rejection of any rule or regulation having the force and effect of law or the outcome of any rate making proceeding by a state agency".

[10] Ch. 15, L. 2005.

[11] Part D, Ch. 399, L. 2011.

[12] As discussed above, the Lobbying Act defines "lobbying" or "lobbying activities" as any attempt to influence the enumerated activities in Section 1-c(c)(i)-(x). However, lobbying requires reporting only if the potential lobbyist or client expends, incurs, or receives more than $5,000 in annual compensation and expenses for lobbying (hereinafter, "reportable lobbying"). For purposes of this opinion, all references to and discussions of the applicability of the Lobbying Act presume that the $5,000 monetary threshold has been met.

JCOPE is not attempting to regulate personal social conversation among those who happen to also work in and around government – but rather to ensure that those who are compensated for their political connections are exposed to the requisite sunlight.

To hold otherwise allows a class of individuals to operate in the same sphere as lobbyists, yet be exempted from specific statutes designed to promote transparency about attempts to influence public officials. For example, JCOPE holds that just as it is presumptively impermissible for a lobbyist to give a gift to a public official,[13] a consultant who "opens doors" should be subject to the same restrictions. Similarly, the prohibition on a lobbyist receiving a fee contingent on the success of the lobbying[14] should apply to a consultant as well. **[15]**

**For these reasons, JCOPE finds that anyone who makes contact with a public official, including preliminary communications to facilitate or enable the eventual substantive advocacy, is engaging in lobbying.**

A consultant must report these activities if he *knows or has reason to know* that lobbying will occur before the public official. The consultant cannot employ a "willful blindness" strategy in order to create plausible deniability as to any lobbying that follows.

    II.   *When a consultant attends a meeting between a client (with or without a registered lobbyist) and a public official, is the consultant engaging in lobbying?*

As noted above, reportable lobbying begins on first contact with the public official, even if that contact is only an introduction or securing a future meeting for a client. However, the question remains whether a consultant's attendance at a lobbying meeting (or participation on a call), even if only to make initial introductions or observe, constitutes reportable lobbying activity. Based on the new rules above, it follows that an individual who subsequently has *direct interaction* with a public official in connection with reportable lobbying may also be required to register as a lobbyist.[16]

> *For purposes of this opinion,* direct interaction *includes, but is not limited to (i) verbal or written communications, including communications made for the purpose of facilitating access to a public official; (ii) attendance at a meeting with a public official; and (iii) presence on a phone call with a public official.*

Just as JCOPE determined, *supra,* that using a consultant's *access* to facilitate advocacy is part of lobbying, **it is also the case that a consultant's *presence* can be part of lobbying.** These situations are all part and parcel of trading on relationships and influence. To be clear,

---

[13] Lobbying Act Section 1-m

[14] Lobbying Act Section 1-k

[15] Regardless of whether the registration requirements – and thus these prohibitions – apply, consulting services procured as part of a lobbying campaign will be disclosed as reportable expenses in the filings submitted by another lobbyist or client.

[16] This should not be interpreted to require clerical or administrative staff who make scheduling calls for consultants to be listed as additional lobbyists. The activity is attributed to the consultant – the actions of clerical staff are a reportable non-lobbying salary expense (which can be reported in the aggregate).

consultants should not be barred from these practices – the Legislature clearly found lobbying to be part of a fundamental exercise of rights under the Constitution[17]; but, at the same time, these transactions should merit that "modicum of information from those who for hire attempt to influence legislation" that the Supreme Court called for in *Harriss*. **To that end, a consultant who has direct interaction (as defined above) with a public official at any point in the reportable lobbying effort is subject to the Lobbying Act.**

There may be individuals who attend meetings with public officials, *e.g.*, architects, scientists, or engineers, to address technical questions. They have no role in the strategy, planning, messaging, or other substantive aspect of a meeting. Since these attendees are not trading on access, influence, or relationships, they are not subject to the attendant lobbying reporting rules.

III. *Must consultants who create and implement grassroots lobbying campaigns on behalf of clients themselves register as lobbyists?*

**Grassroots Lobbying**

As noted above, the Lobbying Commission's adoption of *Harriss* (via Lobbying Commission Opinion No. 21) first determined that lobbying activity can occur via direct contact with public officials, or through what the *Harriss* court called "artificially stimulated letter campaigns".

However, the Lobbying Commission continued to refine its position on these indirect methods of lobbying. For example, the Lobbying Commission stated that a communication that addresses specific pending legislation, takes a position on the issue, and solicits the public to contact a public official, *i.e.*, includes a call to action, constitutes lobbying activity.[18]

Further, it stated that a communication that included the following attributes would constitute lobbying activity, specifically that the communication:

(1) related to pending legislation;

(2) took a position; and

(3) was an attempt to influence decision makers.[19]

Finally, the Lobbying Commission found that an individual or organization that participates in the formation of the content and delivery of such a communication may be lobbying ("Lobbying activity requires some participation in both message content and delivery. A company that has complete control over mailing in furtherance of a grassroots lobbying effort would be a lobbyist

---

[17] Section 1 of Ch. 937, Laws of 1977 ("…the operation of responsible democratic government requires that the fullest opportunity be afforded to the people to petition their government for the redress of grievances and to express freely to appropriate officials their opinions on legislation and government operations").
[18] Lobbying Commission Op. No. 36 (82-2).
[19] Lobbying Commission Op. No. 44 (00-3).

only if that company participated in the formation of the message itself or was given some control over reviewing or editing the client's message.")[20]

Since these opinions were published, however, the statutory reach of the Lobbying Act has increased. In PIRA, the Lobbying Act was expanded to cover not only attempts to influence the passage, defeat, enactment, or veto of legislation, but also the "introduction or intended introduction of legislation".

This opinion attempts to account for this expanded scope by forming a new grassroots lobbying test, as well as a determination of the applicability of the Lobbying Act to consultants who participate in these grassroots lobbying campaigns.

The existing requirements for a communication to: (1) include call to action; (2) take a position on an issue; and (3) attempt to influence decision makers are still applicable regardless of the breadth of covered activities under Section 1-c(c) However, given the expansions to the statutory definition of "lobbying", the "current pending legislation" element must be redefined.

JCOPE finds that the communication need only *relate to a Section 1-c(c) activity*. It need not reference a bill number, but a bill (or its defeat) must be the intended byproduct of the lobbying. Similarly, it need not identify an executive order or regulation, but it must be clear that an executive order or regulation is the subject of the lobbying. In sum, a grassroots communication constitutes lobbying if it:

1. **References, suggests, or otherwise implicates an activity covered by Lobbying Act Section 1-c(c).**
2. **Takes a clear position on the issue in question; and**
3. **Is an attempt to influence a public official through a call to action, *i.e.*, solicits or exhorts the public, or a segment of the public, to contact (a) public official(s);**

**Application to Consultants**

With the above grassroots criteria in mind, JCOPE **affirms while clarifying the position of its predecessor from Op. No. 39**, and finds that a consultant's activity on a grassroots campaign can be considered reportable lobbying if the consultant **controlled the delivery of the message and had input into its content**.

**Control of the delivery** of a grassroots communication requires participation in the *actual* delivery of the message to the audience, whether verbally or in writing. The delivery can be either to a targeted audience, or to the public in general, *e.g.*, as a spokesperson.

The speaker/author should be identifiable as a person/entity distinct from their client, who is speaking for the client's benefit. A public relations consultant who speaks to a group to advance the client's lobbying message would be participating in actual delivery of a message. Further, a public relations consultant who contacts a media outlet in an attempt to get it to advance the client's message in an editorial would also be delivering a message. That said, this is in no way

---

[20] Lobbying Commission Op. No. 39 (97-1).

intended to restrict a reporter's ability to gather information or to seek comment from representatives of advocacy groups as part of reporting the news. Rather, this is intended to generate transparency in the activities of paid media consultants who are hired to proactively advance their client's interests through the media. Any attempt by a consultant to induce a third-party – whether the public or the press – to deliver the client's lobbying message to a public official would constitute lobbying under these rules.

**Input into the content** of a grassroots communication means participation in forming the message. The determining factor is shaping the content of the communication. It involves more than mere proofreading, but at the same time does not require full decision-making authority, *i.e.*, a client having the "final say" in a work product does not exempt the role played by the consultant in creating the message.

If a consultant's participation in a grassroots campaign constitutes control over delivery and input into content, the activity becomes reportable lobbying for the consultant and may require registration and reporting.

*Exceptions*

In reiterating that the conduct must involve participation in both the content and delivery, JCOPE notes that each of the following activities or roles would not alone be lobbying under this test:

1. Billboard or sign owners;
2. Copy editing;
3. Advertisement writers;
4. Storyboard artists;
5. Film crews;
6. Photographers;
7. Video editors;
8. Website managers, hosts, or internet service providers;
9. Media outlets or broadcasters; [21]
10. Media buyers or placement agents;
11. Secretaries, clerical, and ministerial staff.

Additionally, existing exceptions and limitations in the Lobbying Act would also apply, ensuring that attorneys who draft opinions, research, or memos[22]; non-lobbying staff; or others are not unnecessarily captured by the law.

**Conclusion**

JCOPE has identified a class of participants in lobbying efforts who, while potentially engaging in lobbying activities, have called themselves something other than lobbyists. Through this opinion, JCOPE has means to clarify the criteria when those activities require registration and

---

[21] See also Lobbying Act Section 1-c(c)(B).
[22] Lobbying Act Section 1-c(c)(A).

reporting under the Lobbying Act, and when those activities need only be disclosed as expenses incurred by another lobbyist.