UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE NOVEMBER TEAM, INC.; ANAT GERSTEIN, INC., BERLINROSEN PUBLIC AFFAIRS, LTD.; RISA HELLER COMMUNICATIONS LLC; and MERCURY LLC,

Plaintiffs,

-against-

NEW YORK STATE JOINT COMMISSION ON PUBLIC ETHICS; and DANIEL J. HORWITZ, DAVID ARROYO, HON. JOSEPH COVELLO, MARVIN E. JACOB, SEYMOUR KNOX IV, HON. EILEEN KORETZ, GARY J. LAVINE, HON. MARY LOU RATH, DAVID A. RENZI, MICHAEL A. ROMEO, HON. RENEE R. ROTH, MICHAEL K. ROZEN, DAWN L. SMALLS, and GEORGE H. WEISMAN, in their official capacities as members of the New York State Joint Commission on Public Ethics,

Defendants.

No. 16 Civ. _____

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

Center for Competitive Politics
124 West S Street, Suite 201
Alexandria, Virginia 22314
(703) 894-6800

# TABLE OF CONTENTS

**PAGE NO.**


TABLE OF AUTHORITIES ........................................ iii-vi

PRELIMINARY STATEMENT ........................................ 1

FACTS ........................................ 5

I. Plaintiffs: Public Relations Firms & Their Work ........................................ 5

A. Earned Media ........................................ 6

B. Plaintiffs Are Not "Lobbyists"—And That is By Design ........................................ 8

C. Leading Public Relations Trade Associations Oppose the Advisory Opinion ...... 10

II. The Statutory Scheme in New York State ........................................ 12

A. Registration Requirements and Expenses ........................................ 12

B. The Powerful Role of the Joint Commission on Public Ethics ........................................ 13

C. Penalties for Violating the Lobbying Act ........................................ 14

III. The Advisory Opinion: By Administrative Fiat, the Commission Expands the Lobbying Act ........................................ 15

ARGUMENT ........................................ 18

I. Plaintiffs Will Succeed on the Merits ........................................ 19

A. Core Political Speech Is at the Heart of the First Amendment; Any Regulation of Such Speech Is Subject to "Exacting Scrutiny" ........................................ 19

B. A Narrow Exception for Lobbyists Who Apply Direct Pressure to Legislators.... 21

1. The *Rumely* Test: "Direct" Representations to Congress ........................................ 21

2. The *Harriss* Test: "Direct Communication" Confirmed ........................................ 22

3. The *CICU* Test: "Direct Communication" Applied ........................................ 23

C. Messages to the Public and to the Press Are Protected ........................................ 25

D. The Opinion Flies In The Face of the First Amendment Jurisprudence ................ 28

1. The Opinion Subjects Plaintiffs to a Burdensome Regulatory Regime..... 28

2. The Opinion Infringes on Plaintiffs' Associational Rights........................31

3. The Opinion Infringes on Plaintiffs' Right to Anonymous Speech...........32

4. The Opinion Unlawfully Discriminates Against Paid Speech..................33

5. The Opinion Infringes on Freedom of the Press.......................................34

E. The Opinion Is Unconstitutionally Vague and Violates Due Process.....................37

1. A Statute that Imposes Criminal Sanctions for Ill-Defined Conduct Violates Due Process ....................................................................37

2. It Is Impossible to Tell What Constitutes Reportable "Lobbying" Under the Opinion.................................................................................38

II. Plaintiffs' Claims Present a Fair Ground for Litigation, and the Balance of Hardships Tips in Their Favor ...........................................................................................41

III. Absent an Injunction, Plaintiffs Will Suffer Irreparable Harm.........................................42

CONCLUSION.........................................................................................................44

# TABLE OF AUTHORITIES

**PAGE NO.**

**Federal Cases**

*Abbott Lab. v. Gardner*,
387 U.S. 136 (1967) ........ 40

*ACLU of N.J. v. N.J. Elec. Law Enf't Comm'n*,
509 F. Supp. 1123 (D.N.J. 1981) ........ passim

*Baker v. F & F Inv.*,
470 F.2d 778 (2d Cir. 1972) ........ 35, 36

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) ........ 10

*Buckley v. Valeo*,
24 U.S. 1 (1976) ........ passim

*Cantwell v. Connecticut*,
310 U.S. 301 (1940) ........ 37, 40

*Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley*,
454 U.S. 290 (1981) ........ 20, 31

*Citizens United v. FEC*,
558 U.S. 310 ........ 20, 34

*City of Chicago v. Morales*,
527 U.S. 41 (1999) ........ 38

*Comm'n on Indep. Colleges & Univs. v. N.Y. Temp State Comm'n on Regulation of Lobbying,*
534 F. Supp. 489 (N.D.N.Y. 1982) ........ passim

*Elrod v. Burns*,
427 U.S. 347 (1976) ........ 42

*Fair Political Practices Comm'n v. Super. Ct. of L.A. Cnty.*,
25 Cal. 3d 33 (1979) ........ 30

*FEC v. Cent. Long Island Tax Reform Immediately Comm.*,
616 F.2d 45 (2d Cir. 1980) ........ 20, 32, 39, 41

*FEC v. Mass. Citizens for Life*,
479 U.S. 238 (1986) ........ 30

*First Nat'l Bank of Boston v. Bellotti,*
435 U.S. 765 (1978) ........ 26

*Fla. League of Prof'l Lobbyists, Inc. v. Meggs*,
87 F.3d 457 (11th Cir. 1996) ........ 40

*Garrison v. State of La.*,
379 U.S. 64 (1964) ........ 1

*Gibson v. Fla. Legislative Comm.*,
372 U.S. 539 (1963) ........ 33

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ........ 37

*Haitian Ctrs. Council, Inc. v. McNary*,
969 F.2d 1326 (2d Cir. 1992) ........ 18

*Hsu ex rel. Hsu v. Roslyn Union Free Sch. Dist., No. 3*,
85 F.3d 839 (2d Cir. 1996) ........ 42

*Hustler Magazine, Inc. v. Falwell*,
485 U.S. 46 (1988) ........ 1

*Krislov v. Rednour*,
226 F.3d 851 (2d Cir. 2000) ........ 32

*Lerman v. Bd. of Elecs. in City of N.Y.*,
232 F.3d 135 (2d Cir. 2000) ........ 32

*Louisiana ex rel. Gremillion v. NAACP*,
366 U.S. 293 (1961) ........ 20

*McIntyre v. Ohio Elecs. Comm'n*,
514 U.S. 334 (1995) ........ 20, 32

*Mills v. Alabama*,
384 U.S. 214 (1966) ........ 19, 31, 35

*Mitchell v. Cuomo*,
748 F.2d 804 (2d Cir. 1984) ........ 42

*N.J. State Chamber of Commerce v. N.J. Elec. Law Enf't Comm'n*,
82 N.J. 57 (1980) ........ 21, 25, 30

*N.Y. Civil Liberties Union, Inc. v. Acito*,
459 F. Supp. 75 (S.D.N.Y. 1978) ........ 30, 31, 39

*N.Y. Times v. Sullivan*,
376 U.S. 254 (1964) ........ 35

*NAACP v. Alabama*,
357 U.S. 449 (1958) ........ 20, 33

*NAACP v. Button*,
371 U.S. 415 (1963) ........ 33, 37, 40, 42

*Polymer Tech. Corp. v. Mimran*,
37 F.3d 74 (2d Cir. 1994) ........ 18

*Roth v. United States*,
354 U.S. 476 (1957) ........ 19

*Sale v. Haitian Ctrs. Council, Inc.*,
509 U.S. 918 (1993) ........ 18

*Sampson v. Buescher*,
625 F.3d 1247 (10th Cir. 2010) ........ 26, 31

*Shelton v. Tucker*,
364 U.S. 479 (1960) ........ 20

*Speiser v. Randall*,
357 U.S. 513 (1958) ........ 41

*Talley v. California*,
362 U.S. 60 (1960) ........ 20

*Thomas v. Bd. of Educ.*,
607 F.2d 1043 (2d Cir. 1979) ........ 20

*Time Warner Cable of N.Y. City v. Bloomberg L.P.*,
118 F.3d 917 (2d Cir. 1997) ........ 18

*Tunick v. Safir*,
209 F.3d 67 (2d Cir. 2000) ........ 42

*United Mine Workers, v. Dist. 12 Ill. State Bar Ass'n*,
389 U.S. 217 (1967) ........ 20

*United States v. C.I.O.*,
335 U.S. 106 (1948) ........ 21

*United States v. Cuthbertson*,
630 F.2d 139 (3d Cir. 1980) ........ 36

*United States v. Harriss*,
347 U.S. 612 (1954) ........ passim

*United States v. Nat'l Comm. for Impeachment*,
469 F.2d 1135 (2d Cir. 1972) ........ 34, 39

*United States v. Robel*,
389 U.S. 258 (1967) ........ 21

*United States v. Rumely*,
345 U.S. 41 (1953) ........ 21, 22, 28

*Von Bulow ex rel. Auersperg v. Von Bulow*,
811 F.2d 136 (2d Cir. 1987) ........ 35, 36

**<u>Statutes and Rules</u>**

2 U.S.C.A. § 441 ........ 19

N.Y. Exec. Law § 94 ........ 13, 14

N.Y. Penal Law § 70.00 ........ 15

N.Y. Penal Law § 80.00 ........ 15

N.Y. Leg. Law § 1-a ........ 12, 21, 24

N.Y. Leg. Law § 1-c ........ 12, 22

N.Y. Leg. Law § 1-d ........ 13, 14

N.Y. Leg. Law § 1-e ........ 12, 13, 29

N.Y. Leg. Law § 1-f ........ 13

N.Y. Leg. Law § 1-h ........ 12, 13, 29

N.Y. Leg. Law § 1-j ........ 13

N.Y. Leg. Law § 1-o ........ 12, 14, 15

N.Y. Leg. Law § 1-s ........ 13

**<u>Other Authorities</u>**

*Improving the Leg. Process*, 56 Yale L. J. 304 (1947) ........ 27

Plaintiffs The November Team, Inc., Anat Gerstein, Inc., BerlinRosen Public Affairs, Ltd., Risa Heller Communications LLC, and Mercury LLC (collectively, "plaintiffs"), by and through their attorneys, submit this Memorandum of Law in Support of Their Motion for a Temporary Restraining Order and Preliminary Injunction. Plaintiffs seek an order enjoining the New York State Joint Commission on Public Ethics from taking any enforcement action against plaintiffs based on its Advisory Opinion 16-01 insofar as it construes the New York Lobbying Act, N.Y. Leg. Law §§ 1-a–1-v, to apply to public relations consultants and others who do not engage in lobbying as traditionally defined.

## PRELIMINARY STATEMENT

If the Framers of the Bill of Rights had one concern above all others, it was to preserve the right of citizens to freely discuss and debate issues of public concern, including in the press. Such a right is literally "the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964). Without "uninhibited, robust, and wide-open" debate, *id*., and the "free flow of ideas and opinions on matters of public interest and concern," *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988), our system cannot properly function. It is for this reason that the Framers adopted the free-speech and free-press protections in the First Amendment. And it is for this reason that legislative or administrative acts that affect, burden, or restrict such freedoms are subject to the most stringent level of judicial scrutiny.

This case stands at the intersection of a citizen's right to free speech, the press's freedom to report and comment on such speech, and the narrow circumstances in which courts have upheld laws and rules that require the disclosure of lobbying activity. It raises the simple question whether a state agency can, consistent with the First Amendment, declare that private communications *with the press* constitute "lobbying," and then mandate persons who so

communicate to submit to a burdensome regulatory regime that exposes them to criminal prosecution or fines for non-compliance.

The answer, emphatically, is "no."

Over the course of the last six decades, courts reviewing statutes and rules that require the disclosure of lobbying activity have articulated two core principles: *First*, because disclosure requirements burden political speech—the highest form of protected speech in our system—they are subject to strict First Amendment scrutiny. *Second*, such requirements will be upheld only to the extent that they capture "direct communication" with government officials (so-called "buttonhole lobbying"), or "artificially stimulated" propaganda campaigns that exhort the public to directly contact government officials (so-called "grassroots lobbying"). *United States v. Harriss*, 347 U.S. 612, 620 & n.10 (1954).

Under New York's Lobbying Act, the New York State Joint Commission on Public Ethics (the "Commission") and its predecessors have long required that persons paid to "buttonhole" public officials or to manage "grassroots lobbying" campaigns register and disclose their activities. Plaintiffs do not challenge this practice. But the Commission's Advisory Opinion 16-01 (the "Opinion"), issued on January 26, 2016, goes far beyond these traditional parameters. *See* Ex. 1.[1] The Opinion mandates that anyone paid to communicate *with reporters or editorial writers* on matters that might implicate legislation, executive orders, or government procurements is a "lobbyist" and, as such, must comply with the same burdensome disclosure requirements, and risk the same draconian sanctions, as actual lobbyists. This expansive (indeed,

[1] Citations in the form of "Ex. ___" are to exhibits to the Declaration of Andrew G. Celli, Jr., dated March 8, 2016, submitted in support of plaintiffs' motion for a temporary restraining order and preliminary injunction ("Celli Declaration"). Exhibit 1 to the Celli Declaration, Advisory Opinion 16-01, is also available online at http://www.jcope.ny.gov/advice/jcope/ (click on Opinion No. "16-01").

nonsensical) definition of "lobbying," which was created by administrative fiat, directly inhibits and chills the rights of public relations firms and their clients to participate in discussions of public matters with and in the press, to serve as anonymous sources to the press, and to exercise their core speech and associational rights free from government inspection or the threat of prosecution or sanction. *See* Arg. Part I-D, *infra*.

Plaintiffs are public relations firms of various sizes and capacities that represent a range of clients, from large corporations and nonprofit institutions, to smaller businesses, trade associations, and individuals, including actual and prospective candidates for public office. Plaintiffs' role as PR professionals is not to contact legislators or other government officials, or to orchestrate "grassroots lobbying" campaigns imploring others to do the same. Rather, their job is to present the substantive views and perspectives of their clients *to the public*, *through the press*, including by communicating directly with members of the Fourth Estate. Plaintiffs' job, in short, is to obtain "earned media"—*i.e.*, press coverage, whether in the form of straight reportage or editorial endorsement—for their clients' views. *See* Facts Part I-A, *infra*.

The Commission's effort, via the Opinion, to convert this basic public relations activity—*i.e.*, speech aimed at the general public via the press—into "lobbying" is subject to exacting scrutiny, and violates the First Amendment and the Due Process Clause in a number of distinct ways. *See* Arg. Part I-A–I-D

*First*, the Opinion subjects public relations firms engaging in core political speech to a regulatory regime that requires public disclosure of associational interests, policy goals, and financial arrangements—and exposes them to the risks of criminal prosecution or financial sanctions—all in a context where such firms have *no* direct contacts with government officials and make *no* effort to inveigle others to contact such officials. Because the zone of activities

now triggering disclosure is so capacious—it would include *any* contacts with the press on *any* subject related to legislation, executive orders, or procurements, by *any* person paid in excess of $5,000 during a calendar year—the case law, including *United States v. Harriss*, 347 U.S. 612 (1954), forbids the imposition of disclosure requirements in this context. *See* Arg. Part I-C, *infra*.

*Second*, the regulatory regime that the Opinion seeks to impose on plaintiffs and other PR professionals is profoundly burdensome and chilling in its effect. Not only does it require detailed disclosures about both plaintiffs' businesses and the businesses and interests of their clients, on multiple occasions throughout the calendar year; it also exposes PR firms (and, potentially, media outlets) to intrusive investigations and the risk of criminal and civil sanctions. Especially in the absence of the justifications for lobbying disclosure set out in *Harriss*—namely, so that government officials can know and evaluate the sources of "direct pressures" targeted specifically at their offices, and of the money funding those pressures, 347 U.S. at 620, 625—such burdens, on their own, require the invalidation of the Opinion. *See* Arg. Part I-D, *infra*.

*Third*, the Opinion is overbroad, not narrowly tailored to its purported purpose, and unconstitutionally vague. In response to an inquiry about which press contacts, precisely, would trigger registration, the Commission's Chair announced a policy of what can only be described as "we'll know it when we see it." This occurred while the Commission was publicly telling PR firms that failure to register their public relations efforts after January 26 was a *per se* "willful" violation of the registration requirements, and thus a misdemeanor. The First Amendment and the Due Process Clause do not admit to such sloppy thinking, or to such cavalier threats of criminal prosecution; the Opinion must be struck down. *See* Arg. Part I-E, *infra*.

*Fourth*, and finally, plaintiffs readily satisfy the requirements for a temporary restraining order and preliminary injunction. It is well-settled that intrusions on First Amendment speech rights constitute "irreparable harm" *per se*. And, in light of the foregoing legal analysis, plaintiffs are more than likely to prevail on the merits of this facial challenge to the Opinion. *See* Arg. Parts II, III, *infra*. For these reasons and more, this court should temporarily restrain and preliminarily enjoin enforcement of Advisory Opinion 16-01 insofar as it construes the Lobbying Act to apply to public relations consultants and others who do not engage in lobbying as traditionally defined.

## FACTS

### I. Plaintiffs: Public Relations Firms & Their Work

The November Team, Inc. ("The November Team"), Anat Gerstein, Inc. ("AGI"), BerlinRosen Public Affairs, Ltd. ("BerlinRosen"), Risa Heller Communications LLC ("RHC"), and Mercury LLC ("Mercury") are public relations firms operating in the State of New York. The five firms run the gamut in terms of size and services offered. On one end of the spectrum, Mercury employs approximately 140 people in eighteen offices in New York and around the world, and BerlinRosen employs 74 PR professionals in New York, Washington D.C., and Los Angeles. On the other end, RHC has just four employees in its New York City office, and The November Team is a three-person shop based in Westchester County.[2] The five firms serve quite different sets of clients as well. For instance, AGI primarily serves large and small nonprofit institutions in the greater New York area, while Mercury's client list runs from Fortune 100 companies to officeholders and candidates for public office.[3] The five firms are also known

---

[2] Ex. 9 (Mercury Decl.) ¶ 3; Ex. 7 (BerlinRosen Decl.) ¶ 3; Ex. 8 (RHC Decl.) ¶ 3; Ex. 5 ("Nov. Team Decl.") ¶ 3.
[3] Ex. 6 (AGI Decl.) ¶¶ 3-4; Ex. 9 (Mercury Decl.) ¶ 4.

for different specialties. AGI, for example, is best known for its issues campaigns and branding of nonprofits, while RHC is highly regarded in the field of "crisis communications."[4]

What all five plaintiffs share, however, is a deep professional commitment to the practice of public relations, and, specifically, to serving clients who are interested, as BerlinRosen puts it, in being part of "the public conversation" about matters of government, policy, and politics.[5]

### A. Earned Media

"Public relations" has many aspects, but the crux of it is the practice of seeking "earned media" for one's clients.[6] "Earned media" refers to news stories or editorials that media outlets produce about a PR firm's clients, or the issues they care about, with input from, and often at the urging of, a PR professional. To win "earned media," public relations professionals contact members of the press—both news reporters and editorial writers—or respond to inquiries from them, and seek to persuade them to report on issues or, in the case of editorial writers, to adopt the positions that their clients wish to advance.[7]

"Earned" media communications can include everything from issuing press releases, holding press conferences, and organizing press availabilities (making spokespersons or the client available to speak with reporters or editorial writers), to sending personalized letters or emails, or making dedicated calls, to specific reporters or editorial writers to discuss issues of concern to the clients.[8] For all five plaintiff firms—and indeed all firms in the industry—such

---

[4] Ex. 6 (AGI Decl.) ¶ 4; Ex. 8 (RHC Decl.) ¶ 3.
[5] Ex. 7 (BerlinRosen Decl.) ¶ 1.
[6] Ex. 10 (PR Council Decl.) ¶ 13; Ex. 11 (PRSA Decl.) ¶ 12.
[7] Ex. 5 (Nov. Team Decl.) ¶ 5; Ex. 6 (AGI Decl.) ¶ 5; Ex. 7 (BerlinRosen Decl.) ¶ 3; Ex. 8 (RHC Decl.) ¶ 5; Ex. 9 (Mercury Decl.) ¶ 6.
[8] Ex. 5 (Nov. Team Decl.) ¶ 5; Ex. 6 (AGI Decl.) ¶ 5; Ex. 7 (BerlinRosen Decl.) ¶ 3; Ex. 8 (RHC Decl.) ¶ 5; Ex. 9 (Mercury Decl.) ¶ 6.

work is an essential service for their clients.[9] As a consequence, all of the plaintiffs proudly report that they have successfully won interviews for their clients with virtually every major media outlet in the country, and have personally interacted with thousands of reporters and editorial writers over the years to advance the causes and issues that their clients care about.[10]

When a public relations professional contacts a reporter or editorial writer on behalf of a client, the media representative is either immediately told, or invariably asks, on whose behalf the PR professional is speaking and what that client's "angle" or interest is in the issue. This is part of a reporter's or editorial writer's evaluation of a "story" or editorial pitch. Journalists want to know, and have a right to know, who is advancing a particular issue and why.[11] Such "disclosure" to the media—often on a confidential basis—is an ethical injunction for PR professionals, as the leading industry trade associations, the Public Relations Council ("PRC"), the Public Relations Society of America ("PRSA"), and the Arthur W. Page Society ("AWP") all attest.[12]

That said, not every public relations client wishes its interests, goals, and associations to be *publicly* identified and discussed; sometimes, confidentiality is desirable, even important. There are many legitimate reasons for this, some philosophical, some political, some strategic, and some tactical. To use a simple example, some business clients don't wish to be publicly identified as supportive of a particular proposal because that support will be read as a clue about their future business intentions. Likewise, some political clients may want their communications with journalists on particular issues obscured for fear of retaliation by those in

---

[9] Ex. 10 (PR Council Decl. ¶¶ 12-13).
[10] Ex. 5 (Nov. Team Decl.) ¶ 4; Ex. 6 (AGI Decl.) ¶ 4; Ex. 7 (BerlinRosen Decl.) ¶ 3; Ex. 8 (RHC Decl.) ¶ 4; Ex. 9 (Mercury Decl.) ¶ 7.
[11] Ex. 5 (Nov. Team Decl.) ¶ 6; Ex. 6 (AGI Decl.) ¶ 6; Ex. 7 (BerlinRosen Decl.) ¶ 4; Ex. 8 (RHC Decl.) ¶ 6; Ex. 9 (Mercury Decl.) ¶ 7.
[12] Ex. 10 (PRC Decl.) ¶ 7; Ex. 11 (PRSA Decl.) ¶¶ 6, 8; Ex. 12 (AWP Decl.) ¶ 7.

government who disagree with their positions, or so that they can effectively negotiate compromises with other players in the political system.[13] In some cases, clients who receive funding from the government—as many nonprofit institutions do—prefer anonymity for fear of retaliation for openly taking positions that may be considered controversial or critical of the government.[14] In other cases, individuals and smaller entities might not want to draw the publicity and controversy associated with public campaigns. For example, Mercury was retained by a coalition of businesses to wage a public information campaign against a move to allow wine sales in grocery stores. Some smaller members of the coalition preferred that their customers not know that they were part of that effort.[15]

### B. Plaintiffs Are Not "Lobbyists"—And That is By Design

The other salient characteristic that most of the plaintiffs share is that they have made a conscious decision *not* to engage in "lobbying," either in the form of direct contacts with public officials ("buttonhole lobbying"), or efforts to inveigle members of the public to directly contact government officials through a "call to action" ("grassroots lobbying").[16]

Four of the plaintiffs—The November Team, BerlinRosen, AGI, and RHC—do not engage in lobbying activity for *any* of their clients. All four share the same basic rationale for this decision: namely, the existence of a burdensome and intrusive regulatory regime applicable to lobbyists in New York State.[17] The New York system, operated by the Commission, requires lobbyists to comply with detailed and intrusive reporting requirements that essentially turn private business entities (and their clients) into highly regulated entities whose

[13] Ex. 7 (BerlinRosen Decl.) ¶ 5; Ex. 8 (RHC Decl.) ¶ 7; Ex. 9 (Mercury Decl.) ¶ 8.
[14] Ex. 6 (AGI Decl.) ¶ 7.
[15] Ex. 9 (Mercury Decl.) ¶ 4.
[16] Ex. 5 (Nov. Team Decl.) ¶ 7; Ex. 6 (AGI Decl.) ¶ 8; Ex. 7 (BerlinRosen Decl.) ¶ 7; Ex. 8 (RHC Decl.) ¶ 8.
[17] Ex. 5 (Nov. Team Decl.) ¶¶ 8-9; Ex. 6 (AGI Decl.) ¶¶ 9-10; Ex. 7 (BerlinRosen Decl.) ¶¶ 8-9; Ex. 8 (RHC Decl.) ¶¶ 9-10.

internal workings are disclosed at a granular level. Lobbyists must disclose the names and activities of their clients, their policy goals, their financial arrangements, and their expenditures—down to every $75 spent—in any lobbying effort. They must make multiple filings each calendar year, pay fees, and maintain certain files for years, including receipts for expenditures as little as $50. *See* Facts Part II, *infra*. For plaintiffs, and others similarly situated, compliance with the New York system would be costly; disclosure of the firms' clients, many projects, and financial arrangements would require staff, time, money, and effort, to say nothing of the filing fees and storage requirements.[18]

The fifth plaintiff, Mercury, engages in traditional lobbying activities for some clients, but not for others.[19] When it is hired by clients to engage in traditional lobbying and to use paid media to target legislators in a "grassroots lobbying" effort, it duly registers its activities under the Lobbying Act.[20] But the Commission's Opinion would extend the Lobbying Act's registration requirements to Mercury's activities even when the *only* thing it does on behalf of a client is to discuss legislation or executive or agency action with reporters.[21]

Submission to the New York Lobbying Act system would substantively impact the work of all five plaintiffs. It would require these firms to disclose sensitive information about their clients' interests and goals, and their own businesses, and would expose them to criminal and civil penalties in the event of non-compliance.[22] It would publicly expose the fact and subject matter of communications between these firms and the reporters they work with.

[18] Ex. 5 (Nov. Team Decl.) ¶¶ 8-9; Ex. 6 (AGI Decl.) ¶¶ 9-10; Ex. 7 (BerlinRosen Decl.) ¶¶ 8-9; Ex. 8 (RHC Decl.) ¶¶ 9-10.
[19] Ex. 9 (Mercury Decl.) ¶ 10.
[20] *Id.*
[21] *Id.* ¶ 11.
[22] Ex. 5 (Nov. Team Decl.) ¶ 12; Ex. 6 (AGI Decl.) ¶ 12; Ex. 7 (BerlinRosen Decl.) ¶ 11; Ex. 8 (RHC Decl.) ¶ 12; Ex. 9 (Mercury Decl.) ¶¶ 13-15.

Finally, because of the elasticity of the Opinion's parameters, plaintiffs have no way of knowing precisely which of their various activities would constitute reportable lobbying.[23]

### C. Leading Public Relations Trade Associations Oppose the Advisory Opinion

Plaintiffs are not alone in their deep concern about the Opinion and its implications; the three leading public relations trade associations in the United States—the Public Relations Society of America, the Public Relations Council, and The Arthur W. Page Society (collectively, the "Trade Associations")—all share this concern. The PRSA is the world's largest and foremost organization of public relations professionals; its members include more than 22,000 PR and communications professionals.[24] The PR Council is a trade association representing over 100 U.S. public relations firms of all sizes, including global, mid-size, regional, and specialty firms across every discipline and practice area.[25] The Arthur W. Page Society is a global membership organization of over 600 senior public relations and corporate communications executives and leading academics from the nation's top business and communications schools.[26]

The Trade Associations have submitted declarations setting forth their concerns about the impact of the Opinion on the work of PR professionals.[27] All agree that providing information to reporters, and seeking to persuade reporters, editorial writers, and media outlets

---

[23] Ex. 7 (BerlinRosen Decl.) ¶ 6; Ex. 9 (Mercury Decl.) ¶ 9.
[24] Ex. 11 (PRSA Decl.) ¶ 1.
[25] Ex. 10 (PRC Decl.) ¶ 2.
[26] Ex. 12 (AWP Decl. ¶¶ 1, 3)
[27] "[A]ttacks on overly broad statutes" on First Amendment grounds may rest on plaintiffs' demonstration that not only his own speech and association, but the "protected speech [and] association of others may be muted and perceived grievances left to fester because of the possible inhibitory effects" of the statute." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). Thus, plaintiffs "are permitted to challenge [the Opinion] not [only] because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression" or association. *Id.*

generally to cover issues of concern to their clients, is one of the core responsibilities of public relations professionals.[28] And all agree that, if the Opinion is allowed to take effect, their members and those members' clients will be deterred, chilled, or silenced in their communications with the press.[29]

The Trade Associations point to three issues raised by the Opinion. The first is that PR professionals often speak with editors and reporters anonymously in private conversations, and such anonymity is vital to the ability of PR professionals to communicate important information and views to the press and, ultimately, to the public.[30] Requiring public disclosure of these communications would inhibit discourse between the media and its sources on critical issues.[31] Second, the Trade Associations point out that New York's onerous reporting requirements for lobbyists would force public relations firms to create expensive compliance systems.[32] Third, the Trade Associations regard the Opinion as fatally ambiguous as to which core public relations activities would trigger registration requirements; they are concerned that PR professionals will be left unsure of whether and when they might be exposed to civil and criminal sanctions for failure to report.[33] These three aspects of the Opinion leave all PR professionals understandably concerned about contacting editors, reporters, writers, and TV produces about issues of public concern. In sum, they are so daunting, the Trade Associations say, that some public relations firms might simply cease to do business in New York State altogether.[34]

---

[28] Ex. 10 (PRC Decl.) ¶ 13; Ex. 11 (PRSA Decl.) ¶ 12; Ex. 12 (AWP Decl.) ¶ 11.
[29] Ex. 10 (PRC Decl.) ¶ 20; Ex. 11 (PRSA Decl.) ¶ 19; Ex. 12 (AWP Decl.) ¶ 17.
[30] Ex. 10 (PRC Decl.) ¶ 14; Ex. 11 (PRSA Decl.) ¶ 13; Ex. 12 (AWP Decl.) ¶ 17.
[31] Ex. 10 (PRC Decl.) ¶ 19; Ex. 11 (PRSA Decl.) ¶ 19; Ex. 12 (AWP Decl.) ¶ 17.
[32] Ex. 10 (PRC Decl.) ¶ 20.
[33] *Id.* ¶¶ 21-22.
[34] Ex. 10 (PRC Decl.) ¶¶ 20, 23; Ex. 12 (AWP Decl.) ¶ 17.

These concerns, together with reputational risk to plaintiffs created by the enforcement actions that could be brought under the Opinion, are what motivated plaintiffs to bring this action.

## II. The Statutory Scheme in New York State

In New York State, the Lobbying Act regulates the activities of, and mandates disclosure from, lobbyists. The Lobbying Act, N.Y. Leg. Law §§ 1-a–1-v, imposes reporting obligations on those who "petition their government" and "express . . . to appropriate officials their opinions on legislation and governmental operations," *id.* § 1-a. The statute defines the term "lobbyist" to mean a person or organization "retained, employed or designated by any client to engage in lobbying." *Id*. § 1-c(a). "Lobbying," in turn, is defined as "any attempt to influence" certain governmental actions, including the adoption or rejection of any law, rule, regulation, executive order, or procurement contract by the state legislature, governor, government agency, or public official. *Id.* § 1-c(c). Traditionally, "lobbying" has been interpreted to mean only "buttonholing" and "grassroots lobbying" efforts. *See* Arg. Part I-B.

### A. Registration Requirements and Expenses

The Lobbying Act "entails recordkeeping and accounting efforts," requires lobbyists to publicly report their activities, imposes fees, and is enforced with both criminal and monetary sanctions. *Comm'n on Indep. Colleges & Univs. v. N.Y. Temp State Comm'n on Regulation of Lobbying,* 534 F. Supp. 489, 491 (N.D.N.Y. 1982) ("*CICU*"); *see also* N.Y. Leg. Law §§ 1-e, 1-o.

For example, every lobbyist who incurs or receives more than $5,000 for lobbying efforts must file a statement of registration every two years and an expense report every two months. N.Y. Leg. Law §§ 1-e(a)(3); 1-h (a). Each registration statement and expense report must include, among other things, the name and contact information of the lobbyist and of the

client; a description of the subjects on which the lobbyist lobbies; and the names of the persons, agencies, or legislative bodies before which the lobbyist lobbies. *Id.* §§ 1-e(c), 1-h(b).

The bi-annual registration statement must also specify the terms of the lobbying retainer agreement and must attach a copy of any written agreement, which must also be preserved by the lobbyist for three years. *Id.* § 1-e(c)(3). The bi-monthly expense report must specify the compensation paid or owed to the lobbyist, and any expenses incurred or received by the lobbyist for lobbying efforts. *Id.* § 1-h(b)(5). For any single expense over $75, the expense report must detail the amount and to whom it was paid, for what purpose, and on whose behalf. *Id.* The lobbyist must keep on file for three years checks or receipts for any expense over $50. *Id.* § 1-h(b)(5)(v). If any of the information in a lobbyist's registration statement changes, the lobbyist must file an amendment within ten days of the change. *Id.* § 1-e(d).

Filing a lobbying registration statement or amendment costs $200, and lobbyists may incur fees of up to $25 per day for late-filed registration statements or expense reports. *Id.* §§ 1-e(e), 1-h(c)(3). Registration statements are kept on file and are made publicly available for six years after filing, and expense reports are kept on file and open to the public for three years. *Id.* §§ 1-e(b), 1-f, 1-h(c)(2), 1-s.

The Lobbying Act also requires any client who retains a lobbyist to file two reports each year, including the same information that appears in lobbyists' bi-monthly expense reports. *Id.* § 1-j.

### B. The Powerful Role of the Joint Commission on Public Ethics

The Joint Commission on Public Ethics enforces the Lobbying Act. N.Y. Leg. Law § 1-d. The fourteen members of the Commission are appointed variously by the majority and minority leaders of the state Assembly and Senate, and by the governor and lieutenant governor. N.Y. Exec. Law § 94(2).

Among other enforcement obligations, the Commission conducts audits by randomly selecting lobbyists' reports and registration statements and examining "books, papers, records or memoranda relevant and material to the preparation of the selected statements or reports, for examination by the commission." N.Y. Leg. Law § 1-d(b)(i), (ii). If the Commission finds reasonable cause to suspect that any statement or report is inaccurate or incomplete, it may also conduct hearings and compel testimony. *Id.* § 1-d(b)(iv). If the Commission finds a substantial basis to conclude that the lobbyist violated the Lobbying Act, it must publicly issue an investigation report detailing its findings. N.Y. Exec. Law § 94(14-c).

The Commission is also vested with a broader mandate to "administer and enforce" the Lobbying Act beyond its auditing obligations. N.Y. Leg. Law § 1-d(a). The Commission has the power to conduct hearings, subpoena witnesses, compel attendance and testimony, and "require the production of any books or records which it may deem relevant or material." N.Y. Exec. Law § 94(17)(c); *see also* N.Y. Leg. Law § 1-d(c).[35]

### C. Penalties for Violating the Lobbying Act

Under the New York system, lobbyists and clients who fail to file the required statements and reports face criminal and civil penalties. A lobbyist or client who "knowingly and wilfully" fails to timely file a required report or statement, or "knowingly and wilfully" files false or incomplete information "shall be guilty of a class A misdemeanor." N.Y. Leg. Law § 1-o(a)(i). A second "knowing[] and wilful[]" violation of the reporting requirements is a class E felony. *Id.* § 1-o(a)(ii). A lobbyist convicted of a class E felony for failure to report faces a

[35] In its administrative capacity, the Commission also has the power to issue advisory opinions. N.Y. Leg. Law § 1-d(f). Under the statute, however, an advisory opinion is binding only "with respect to the person to whom such opinion is rendered." *Id.*

mandatory minimum of one year in prison, can be incarcerated for up to four years, and can be required to pay a substantial fine. N.Y. Penal Law §§ 70.00(2)(e), 70.00(3), 80.00(1).

Civil penalties can also be imposed for violations of the reporting requirements. If the Commission finds that a lobbyist failed to file a timely report, it can impose penalties of up to $25,000 or three times the amount not reported. N.Y. Leg. Law § 1-o(b)(i). It can impose penalties of up to $50,000 or five times the amount not reported on any lobbyist who files inaccurate information. *Id.* § 1-o(b)(ii). Failure to retain records for designated periods, including receipts of expenditures over $50 for three years, can result in a $2,000 penalty per violation, again as determined by the Commission. *Id.* § 1-o(b)(vi).

## III. The Advisory Opinion: By Administrative Fiat, the Commission Expands the Lobbying Act

Prior to January 26, 2016, the Lobbying Act had applied only to people paid either to directly communicate with public officials on legislation and regulatory rules and procurements, or to conduct "grassroots lobbying" campaigns. *See CICU*, 542 F. Supp. at 495. This was the traditional definition of the term "lobbyist."

That all changed on January 26, 2016. The Advisory Opinion issued that day extended the reach of the Lobbying Act to public relations consultants. Specifically, the Opinion provides that, like those who directly contact public officials or who expressly implore members of the public to do so, persons and organizations who are "hired to proactively advance their client's interests *through the media*" and to "sway public opinion" must register and disclose as "lobbyists." Ex. 1 (Opinion) at 8; Ex. 4 (Open Meeting of the Commission, Jan. 26, 2016

("Open Meeting")) at 39:45.[36] The Opinion states that "a public relations consultant who contacts a media outlet in an attempt to get it to advance the client's message in an editorial" will be subject to the Lobbying Act—even if the consultant never directly contacts, and never exhorts others to directly contact, a public official. Ex. 1 (Opinion) at 8. Even "speak[ing] to a group to advance the client's lobbying message," the Opinion holds, constitutes lobbying. *Id.* Any legislation-, regulation-, or procurement-related effort "to try to sway public opinion through the editorial boards" now requires registration and disclosure under the Lobbying Act. Ex. 4 (Open Meeting) at 32:32.

The Commission's expansive interpretation of the term "lobbying" rests on the "assump[tion]" that messages delivered to the media or to the public generally will "ultimately . . . be heard and received by public officials" considering government action. Ex. 4 (Open Meeting) at 45:45. An example: A PR consultant, speaking on behalf of a client, advocates a law to combat global warming in a conversation with the editorial board of the *New York Times*; the *Times* urges action in an editorial read by two million people including, perhaps, a member of the New York State Legislature. Result: The PR consultant is now a "lobbyist." This is the rationale and the meaning of the Opinion.

"Any attempt by a consultant to induce a third-party—whether the public or the press—to deliver the client's lobbying message to a public official would constitute lobbying under these rules." Ex. 1 (Opinion) at 9. And any discussion of the merits of actual, pending, proposed, or possible legislative, executive, or administrative action would have to be reported to

[36] A recording of the Open Meeting is also available at http://www.jcope.ny.gov/public/open_meetings.html (to download, click on "Media Link" for the January 26, 2016 Commission Meeting).

the Commission on pain of criminal or civil penalties, whether or not the message was published somewhere or seen by a public official.

At the January 26, 2016 Open Meeting of the Commission at which the Opinion was adopted, Commission members and staff could not articulate how and when the Opinion would apply. For example, one commissioner said it *is* "lobbying" if the PR consultant initiates contact with an editorial board, but that it is *not* "lobbying" if the editorial board makes the first call. Ex. 4 (Open Meeting) at 29:10, 49:00. Another commissioner then repudiated the first-phone-call rule, saying it did not matter who made the call. *Id*. at 52:55. Amidst the confusion, the Commission punted when asked specific questions about the Opinion's application as "hypotheticals" that could not be addressed without "real facts." *Id*. at 47:52. In short, the Commission's apparent position is, "We'll know it when we see it."

Even as the Commission displayed confusion about what the Opinion means and how it would apply, its chair announced that anyone who violated the Opinion (as it may be interpreted by someone at some point in the future) would be presumed to have acted with criminal reckless intent. *Id*. at 1:10:29.

Prior to the adoption of the Opinion, Plaintiffs attempted repeatedly to warn the Commission that it was wading into unconstitutional waters. Through their counsel, Emery Celli Brinckerhoff & Abady LLP, BerlinRosen, AGI, RHC, and a fourth firm sent letters to the Commission on July 10, 2015 and December 1, 2015 pointing out the dangers and constitutional infirmities of an expanded definition of "lobbying."[37] The July 2015 letter pointed out to the Commission that its proposed definition of grassroots lobbying "reaches far beyond [the] legitimate government purposes" for lobbying disclosure requirements recognized in *Harriss* and

---

[37] Ex. 7 (BerlinRosen Decl.) ¶ 10.

*CICU*.[38] Their December 2015 letter reiterated that a lobbying registration regime that sweeps in PR activities, including "earned media" efforts, "would be both [an] impractical and [a] constitutionally infirm" invasion of free speech, association, and press freedoms.[39]

The Commission forged ahead. This action ensured.

## ARGUMENT

To obtain a preliminary injunction pursuant to Rule 65, plaintiffs must show: (1) either a likelihood of proving their claims by a preponderance of the evidence, or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in their favor; and (2) that they will likely suffer irreparable harm absent an injunction. *Polymer Tech. Corp. v. Mimran*, 37 F.3d 74, 77-78 (2d Cir. 1994); *see also Time Warner Cable of N.Y. City v. Bloomberg L.P.*, 118 F.3d 917, 923-24 (2d Cir. 1997) (applying fair ground for litigation standard to preliminary injunction against government); *Haitian Ctrs. Council, Inc. v. McNary*, 969 F.2d 1326, 1339 (2d Cir. 1992) (same), *vacated as moot sub nom. Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 918 (1993).

Given the plain violation of plaintiffs' First Amendment rights occasioned by the issuance and enforcement of Advisory Opinion 16-01, plaintiffs will likely succeed on the merits. First Amendment jurisprudence is clear that the imposition of a burdensome disclosure and regulatory regime upon communications with the press violates the First Amendment and cannot constitutionally be squared with the rationale permitting such disclosure for traditional lobbying. Likewise, in this case, the Opinion violates both the First Amendment and the Due Process Clause because it is overbroad and unconstitutionally vague. *See* Part I, *infra*.

---

[38] Ex. 2 at 3-4.
[39] Ex. 4 at 2.

Moreover, the hardship to defendants of a preliminary injunction is non-existent: Plaintiffs merely seek to enjoin the Commission from dramatically expanding the reach of a lobbying statute for the first time in 40 years. Absent a preliminary injunction, the hardship to plaintiffs will be great: Plaintiff public relations firms will be chilled in their First-Amendment-protected activities, and the Commission will be free to penalize plaintiffs and refer them for criminal prosecution for engaging in core political speech with the press. Finally, given the very significant constitutional issues at play in this case, irreparable harm is presumed under well-settled law. *See* Parts II, III, *infra*.

## I. Plaintiffs Will Succeed on the Merits

### A. Core Political Speech Is at the Heart of the First Amendment; Any Regulation of Such Speech Is Subject to "Exacting Scrutiny"

"'[T]here is practically universal agreement that a major purpose of the [First] Amendment was to protect the free discussion of governmental affairs.'" *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)), *superseded in unrelated part by* 2 U.S.C. § 441i(a). "The First Amendment affords the broadest protection to such political expression in order 'to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Id*. (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)).

In a dramatic break with past understandings, the Commission, via Advisory Opinion 16-01, seeks to capture within the Lobbying Act's regulatory regime speech that broadly concerns the operation of state and local government and the making of public policy at those levels, and the association of diverse parties (individuals and corporate clients, and their public relations consultants). Ex. 1 (Opinion) at 8-9. That the speech to which the Lobbying Act applies concerns actual, pending, or potential government action "only strengthens the

protection" afforded it: "Urgent, important and effective speech can be no less protected than impotent speech, lest the right to speak be relegated to those instances when it is least needed." *McIntyre v. Ohio Elecs. Comm'n*, 514 U.S. 334, 347 (1995).

Because the Opinion clearly burdens political speech and association, which are "among the most precious of the liberties safeguarded by the Bill of Rights," *United Mine Workers v. Dist. 12 Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967), the Opinion is "subject to exacting scrutiny." *Citizens United v. FEC*, 558 U.S. 310, 366. Such scrutiny requires the government to prove "a substantial relation between the disclosure requirement and a sufficiently important governmental interest"; put another way, the law must be "narrowly tailored" to serve its intended, "overriding" purpose. *Id*. at 366-67 (internal quotation marks omitted).[40]

Indeed, the case law is clear that the restriction must be so narrowly tailored that it is "the least restrictive means of furthering [the government] interests." *CICU*, 534 F. Supp. at 498 (citing *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290 (1981); *Louisiana ex rel. Gremillion v. NAACP*, 366 U.S. 293 (1961); *NAACP v. Alabama*, 357 U.S. 449; *Talley v. California*, 362 U.S. 60 (1960); and *Shelton v. Tucker*, 364 U.S. 479 (1960)).

This court "must remain profoundly skeptical of government claims that state action affecting expression can survive constitutional objections." *FEC v. Cent. Long Island Tax Reform Immediately Comm.*, 616 F.2d 45, 54 (2d Cir. 1980) (Kaufman, C.J., concurring) (quoting *Thomas v. Bd. of Educ.*, 607 F.2d 1043, 1047 (2d Cir. 1979)); *see also CICU*, 534 F.

---

[40] *See also McIntyre*, 514 U.S. at 347 ("When a law burdens core political speech, we apply exacting scrutiny, and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest." (internal quotation marks omitted)); *Buckley*, 424 U.S. at 64, 66 (same); *NAACP v. Alabama*, 357 U.S. 449, 463 (1958) (state laws that inhibit the exercise of First Amendment rights are unconstitutional unless they serve a "compelling" state interest"); *CICU*, 534 F. Supp. at 494 ("there must be a subordinating interest furthered by the legislation," and the government must have "chosen means that actually further that interest"); *ACLU of N.J. v. N.J. Elec. Law Enf't Comm'n*, 509 F. Supp. 1123, 1128-29 (D.N.J. 1981) (three-judge court) ("Any infringement on [First Amendment] rights must be based on a compelling governmental interest; even then, the state must demonstrate that it has chosen the least restrictive means to further such an interest.").

Supp. at 493 ("Laws which purport to regulate the content or quantum of speech must be strictly scrutinized by the courts."). Where compelled disclosure "encroach[es] on First Amendment rights," as here, "exacting scrutiny" of the government's asserted interest is required. *Buckley*, 424 U.S. at 64. "[T]he traditional presumption in favor of constitutional validity is not available." *N.J. State Chamber of Commerce v. N.J. Elec. Law Enf't Comm'n*, 82 N.J. 57, 70 (1980) (citing *United States v. C.I.O.*, 335 U.S. 106, 120 (1948) (Rutledge, J., concurring)).

**B. A Narrow Exception for Lobbyists Who Apply Direct Pressure to Legislators**

The Lobbying Act requires submission to a regulatory and disclosure regime for a narrow category of actors who "attempt[] to influence" public policy in very particular ways. N.Y. Leg. Law § 1-a. As set forth below, such a law burdens political speech and association and therefore must be narrowly drawn. *United States v. Robel*, 389 U.S. 258, 262 (1967).

The Supreme Court and other courts created a "bright line" rule concerning the regulation of lobbyists: Statutes that require disclosure of *direct contact* with public officials—d either by way of "buttonhole" lobbying or "grassroots" lobbying—are constitutional, while statutes that reach further are presumptively unconstitutional.

**1. The *Rumely* Test: "Direct" Representations to Congress**

In *United States v. Rumely*, the Supreme Court addressed the scope of Congress's authority to investigate "lobbying activities." 345 U.S. 41, 44-45 (1953). *Rumely* held that the definition of "lobbying activities" could *not*, consistent with the First Amendment, be construed to reach "attempts to saturate the thinking of the community" generally. *Id*. at 46, 47 (emphasis added; internal quotation marks omitted). To do so would raise "a serious doubt of constitutionality." *Id.* Instead, as a matter of "common sense," the Court held that the term must be narrowly interpreted to mean "representations made ***directly*** to the Congress"—i.e., direct communications with public officials. *Id.* (emphasis added). The Supreme Court was crystal

clear "that giving . . . the Government . . . the power to inquire into all efforts of private individuals to influence public opinion through books and periodicals, however remote the radiations of influence which they may exert upon the ultimate legislative process, raises doubts of constitutionality in view of the prohibition of the First Amendment." *Id.* at 46.

### 2. The *Harriss* Test: "Direct Communication" Confirmed

In *United States v. Harriss*, the Supreme Court evaluated the constitutionality of the Federal Regulation of Lobbying Act ("FRLA")—and followed the trajectory laid out in *Rumely*. In *Harriss*, the Court reviewed the FLRA's requirement that persons employed "[t]o influence, directly or indirectly, the passage or defeat of any legislation" must report their activities. *Harriss*, 347 U.S. at 619 (internal quotation marks omitted); *see also* N.Y. Leg. Law § 1-c (lobbying defined as "any attempt to influence" adoption of legislation or other specified government acts).

The *Harriss* Court held that the FLRA's definition of lobbying—**which is functionally identical to the New York State Lobbying Act's definition**—raised "constitutional doubts." *Id*. at 623. To avoid these doubts, the Court construed the FLRA narrowly, reading into the law "three prerequisites to coverage":

> (1) the 'person' [*i.e.*, the purported lobbyist] must have solicited, collected, or received contributions; (2) one of the main purposes of such 'person,' or one of the main purposes of such contributions, must have been to influence the passage or defeat of legislation by Congress; [and] (3) *the intended method of accomplishing this purpose must have been through* ***direct communication*** *with members of Congress.*

*Harriss*, 347 U.S. at 623 (emphasis added). Such "direct communication" might be "exerted by the lobbyist[s] themselves or through their hirelings," or through an "artificially stimulated . . . campaign" in which members of the public are exhorted to contact public officials directly. *Id*. at 620. In either circumstance, the Court held, in order to be regulated consistently

with the First Amendment, "lobbying" must entail "activities . . . directed to influencing legislation *through direct communication with [public officials]*." *Id*. at 622 (emphasis added). "Construed in this way," the Court held, the federal lobbying law met "the constitutional requirement of definiteness" and did "not violate the freedoms guaranteed by the First Amendment—freedom to speak, publish, and petition the Government." *Id*. at 624-25.

**3. The *CICU* Test: "Direct Communication" Applied**

The New York State Lobbying Act was passed against this constitutional backdrop. *See CICU*, 542 F. Supp. at 490. After its passage, the Lobbying Act was subjected to a facial challenge by CICU, an organization engaged in "lobbying activities involving direct contact with government officials in attempting to influence legislation and agency action." *Id*. at 496. Notwithstanding its acknowledgment that it had engaged in "direct communications" with public officials, CICU argued that the Lobbying Act was "an overbroad restriction of their First Amendment rights of freedom of speech, petition and association, [and] that it [was] void for vagueness." *Id*. at 492.

The CICU challenge failed: The *CICU* court upheld the Lobbying Act insofar as it applied to "lobbying as it is commonly defined, namely as direct communications with [government officials] by the lobbyists themselves," or through "a campaign to stimulate the public to directly contact legislators." *Id*. at 495 & n.6 (citing *Harriss*, 347 U.S. at 615, 620, 621 n.10). The *CICU* court repeated this point twice; it held the Lobbying Act constitutional only to the extent that it "requires that a person or entity, acting on behalf of another, disclose and report the sources and expenses involved in ***direct*** communication with government officials to influence legislative and administrative action, or in campaigns to exhort the public to make such ***direct*** contact as outlined in *United States v. Harriss*." *Id*. at 497-98 (emphasis added). If, on the other hand, the statute "was designed to reach any sort of indirect activity which might ultimately

impact upon the governmental decision-making process," or "any discussion of the merits of any governmental action that may ultimately affect or influence such action," the *CICU* court made clear that it would have struck the statute as both unconstitutionally overbroad and unconstitutionally vague. *Id*. at 496, 502.

In holding that the Lobbying Act could not, consistent with the First Amendment, reach beyond "direct communications" with public officials, the *CICU* court relied on "both the legislative history and the . . . Commission's interpretation of the law," as stated in an advisory opinion issued by the present Commission's predecessor. *Id*. at 502. That opinion indicated that "a person or entity, acting on another's behalf, is obliged to comply with this law only if there is a direct contact with governmental decision-makers, or a campaign to encourage the public to engage in direct contact." *Id*. Critically, the Court found "no indication that this New York legislation requires disclosure of indirect lobbying activities that go beyond those activities enumerated in the *Harriss* decision." *Id*. at 497; *see also id*. (Commission's advisory opinion indicated that "the lobby law [would] not be applied in any context outside the definition of lobbying contained in the *Harriss* case").

The *CICU* court was equally clear in its rationale: Only *direct* contact with lawmakers implicates the legislature's permissible purpose, to wit, "to preserve and maintain the integrity of the governmental decision-making process in this state," N.Y. Leg. Law § 1-a. *See CICU*, 534 F. Supp. at 495 (registration requirements for lobbyists justified by need for officials to "'evaluate'" the "'pressures to which they are regularly subjected'" (quoting *Harriss*, 347 U.S. at 625)). An interpretation that extends the reach of the statute beyond "direct communications" is inconsistent with the law's constitutionally permissible purpose.

### C. Messages to the Public and to the Press Are Protected

These seminal cases reflect a fundamental point: Lobbying disclosure laws have an important but narrow purpose. The purpose is to "identify and monitor the source and flow of money intended to influence or affect *the legislative and political process*," as opposed to public discourse more generally. *N.J. State Chamber of Commerce*, 82 N.J. at 72 (emphasis added). Lobbying registration requirements serve this purpose by enabling government officers to learn the identities and motives of those who petition them, *Harriss*, 347 U.S. at 625, and by allowing the public to understand who communicates with, and who applies pressure to, their representatives outside of the public view, *see N.J. State Chamber of Commerce*, 82 N.J. at 74. Requiring public relations consultants to register their "press contacts" with a government agency advances none of these objectives.

In *Harriss*, the Supreme Court was keenly focused on enabling government officials to identify the "sources" of "pressure" applied to them. Whether lobbyists pressure officials by "buttonholing" them directly, or by "initiat[ing] propaganda"— *i.e.*, by "artificial[ly] stimulat[ing]" letter writing or other grassroots lobbying campaigns, *Harriss*, 347 U.S. at 620 & n.10—the Court was concerned that public officials be able to readily identify the true source of the pressures they experience, namely, the client "behind" either the "buttonholing" lobbyist or the flood of "constituent" letters. Disclosure requirements address this problem, and are constitutional, to the extent that they enable "individual members" of government to "properly evaluate" the "myriad pressures to which they are regularly subjected," and the sources of money funding those pressures: "who is being hired, who is putting up the money, and how much." *Harriss*, 347 U.S. at 625; *see also CICU*, 534 F. Supp. at 498 ("The governmental interest here is in providing the public and government officials with knowledge regarding *the source* and *amount of pressure on government officials*." (emphasis added)).

This rationale simply does not apply to the circumstance of public relations professionals communicating with the press. Unlike in the situation of an "undisclosed lobbying-client principal" or a "man behind the curtain" orchestrating a letter-writing campaign, the identity of the speaker applying "pressure" through an editorial is clear: It is the editorial board, not the PR consultants and other interested parties the editorial board has consulted. The same is true for a news item. Because the media outlet itself determines whether to carry a story, who reports it, what is said, and how it is presented, the party "behind" a news item is the media outlet itself, not the sources the outlet consulted.

There is no risk that an official who reads an editorial or news item would mistake the editorial voice of a news outlet or a journalist as the spontaneous speech of a constituent. An editorial board will advance a position articulated by a PR consultant and its client *only* if it is independently convinced of the position's merits, and a news outlet will publish a news item only if independently determines that it is newsworthy: There is no "pulling-of-strings." Any "pressure" that a public official may feel as a result therefore comes from the news outlet, not from the PR consultant, or from her/his client, or, for that matter, from any other "source." The relevant actor—the newspaper or media outlet itself—is already fully disclosed; there is simply no need for a government mandate.

For the same reason, disclosure of press contacts does not directly further the public's knowledge of the "influences [that] are likely to be brought to bear" on a public official behind closed doors. *Sampson v. Buescher*, 625 F.3d 1247, 1255-56 (10th Cir. 2010) (finding no government interest in disclosing source of funds in support of or opposition to ballot *issues*, as opposed to *candidates*); *see also First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 790 (1978) ("The risk of corruption perceived in cases involving candidate elections simply is not present in

a popular vote on a public issue." (citations omitted)). When a public relations consultant communicates with the press, *nothing* is happening between the official and a lobbyist behind closed doors. It's all happpening right in the pages of the newspaper, or on the public broadcast.

Indeed, ironically, the very media activities that the Commission has targeted serve to *alleviate* rather than exacerbate the concerns that lobby disclosure laws were designed to address. Reporters consult multiple competing stakeholders, and rely on those views, as they choose when presenting issues to the public. When a PR consultant brings a government action to a newspaper's attention and encourages it to report on the matter, the message is tested by the media outlet, filtered, and subject to outright rejection. There is no guarantee that the message conveyed by a PR consultant will even published, much less adopted, and, even if it is, the media stands *between* the speaker (the public relations firm and its client) and the public official. This process improves both the balance and quantity of information that reaches the public. There is no risk that a person who encounters the resulting news item would mistake it for the unfiltered view of the general public or of constitents—as one might mistake an "artificially stimulated" letter campaign, *Harriss*, 347 U.S. at 620. In this respect, the media serves the important function of providing the public, *including* public officials, with "adequate" and "balanced" information that has passed through the lens of an independent arbiter. *Improving the Leg. Process*, 56 Yale L. J. 304, 309-10 (1947).

Where, as here, plaintiffs' activities are "not aimed at the legislature but are intended to educate the public generally," and are filtered through the independent press, "[t]he interest of the state in the regulation of such speech is diminished" and cannot justify a regulation that "might inhibit the protected communications of ideas relating to political issues." *ACLU of N.J.*, 509 F. Supp. at 1132-33.

### D. The Opinion Flies In The Face of the First Amendment Jurisprudence

With the Opinion, the Commission now attempts to erase 63 years of carefully crafted constitutional precedent. In effect, the Opinion eliminates the "direct contact"/"direct communication" principle that has long animated the jurisprudence, and seeks to write the traditional definition of "lobbying" out of the Lobbying Act. The Commission has done precisely what the Supreme Court forbade: required "inquir[y] into . . . efforts of private individuals to influence public opinion . . . however remote the radiations of influence which they may exert upon the ultimate legislative process." *Rumely*, 345 U.S. at 46. In New York State, speaking to the press is now "lobbying." Speaking to editorial boards and reporters is now "lobbying." Influencing broad public opinion is now, improbably enough, "lobbying."

The Opinion fails "exacting scrutiny" under the First Amendment for five reasons.

#### 1. The Opinion Subjects Plaintiffs to a Burdensome Regulatory Regime

*First*, the Opinion fails First Amendment scrutiny because it subjects a new class of people—people who do not engage in lobbying activities and have never been governed by the Lobbying Act—to the regulatory regime of the Lobbying Act. Plaintiffs are a bipartisan group of public relations firm whose business is not to contact legislators or to run "grassroots lobbying" campaigns, but to raise public awareness and sway public opinion generally on matters of public concern through communication with the media and through winning "earned media."

The Opinion would subject plaintiffs and all other firms similarly situated to a burdensome regulatory regime which was designed, as it happens, for entirely different purposes. Plaintiffs will be required to engage in reporting, recordkeeping, and accounting practices that are exceedingly invasive in the context of highly protected speech. In each year that a plaintiff is

paid $5000 or more by a client, it would have to file at least six reports, each time specifying the exact terms of its employment and accounting for every penny spent in granular $75 increments. N.Y. Leg. Law § 1-h(b)(5). For three years, plaintiffs would have to retain thousands of receipts reflecting any expense of a mere $50 or more. *Id.* § 1-h(b)(3)(v). All of this information would be made available to public scrutiny. Plaintiffs would also have to pay fees to the government for the privilege of speaking with editorial boards. N.Y. Leg. Law § 1-e(e). The Commission would have investigatory and enforcement power over PR professionals (and by necessity, the press representatives with whom they interact). The Commission could fine them or refer them for criminal prosecution if, in the Commission's view, plaintiffs willfully violated the Lobbying Act. Chillingly, the Commission has already announced it willingness to do so. Ex. 4 (Open Meeting) at 1:10:29.

Advisory Opinion 16-01 directly and significantly burdens the core of plaintiffs' business: contacting the media to address issues of public concern, including pending or possible legislative and executive action. Plaintiffs earn media coverage for their clients by convincing reporters and editors to cover relevant issues. Because plaintiffs' communications with the press are designed to reach the public but may indirectly sway public officials via changes in the public discourse, virtually *all* of their professional activities are potentially reportable to the government under the Opinion. Even worse, the Opinion leaves plaintiffs uncertain, on pain of criminal prosecution, which activities do or do not fall within the regime.[41]

Disclosure of plaintiffs' business interests, including publication of their contracts and expenses, would also jeopardize many of their professional relationships and in some cases silence them—and their clients—on matters of great public importance. For example, many of

---

[41] Ex. 7 (BerlinRosen Decl.) ¶ 6; Ex. 9 (Mercury Decl.) ¶ 9.

the nonprofit clients that employ AGI rely on government contracts to fund their activities and will be wary of lodging criticisms of policy if their activities must be reported to the government.[42] And The November Team fears losing corporate clients who will be pressured by political leaders when they learn of The November Team's representation of clients that oppose policies of the sitting government.[43]

Compliance with the Commission's disclosure regime "is not a trivial task." *N.Y. Civil Liberties Union, Inc. v. Acito*, 459 F. Supp. 75, 87 (S.D.N.Y. 1978). "[I]t ought not be assumed that any cumulative or incremental regulatory burdens" imposed by a disclosure law "would be inconsequential." *N.J. State Chamber of Commerce*, 82 N.J. at 68. "Various records must be maintained" for years; "reports must be filed; violators are subject to civil and even criminal penalties." *Acito*, 459 F. Supp. at 87. "The burden of compliance with these requirements may constitute a severe barrier to the exercise of free speech," *ACLU of N.J.*, 509 F. Supp. at 1130 n.18 (D.N.J. 1981). "In many instances, especially those involving relatively unsophisticated organizations, the thought of hiring an attorney and researching and complying with the law will cause the organization to simply refrain from any political activities rather than go through the compliance headache." *Acito*, 459 F. Supp. at 87. "Detailed record-keeping and disclosure obligations, along with the duty to appoint a treasurer and custodian of records, impose administrative costs that many small entities may be unable to bear." *FEC v. Mass. Citizens for Life*, 479 U.S. 238, 254 (1986) (plurality opinion); *see Fair Political Practices Comm'n v. Super. Ct. of L.A. Cnty.*, 25 Cal. 3d 33, 49 (1979) (striking down lobbyists' reporting requirements because they "constitute[d] an unnecessary curtailment of the right to petition").

---

[42] Ex. 6 (AGI Decl.) ¶ 7.
[43] Ex. 5 (Nov. Team Decl.) ¶ 11.

"[A]dministrative requirements, as applied to non-lobbying activities . . . impose a burden on the exercise of First Amendment rights but do not substantially further any state interest." *ACLU of N.J.*, 509 F. Supp. at 1133. For this reason, the Opinion, insofar as it construes the New York Lobbying Act, N.Y. Leg. Law §§ 1-a–1-v, to apply to public relations consultants and others who do not engage in lobbying as traditionally defined, is invalid.

### 2. The Opinion Infringes on Plaintiffs' Associational Rights

*Second*, the Opinion fails First Amendment scrutiny because, as now interpreted, the Lobbying Act's "reporting and disclosure requirements[,] which are backed by civil and criminal penalties," will chill the freedom of plaintiffs, their clients, and countless others to associate and communicate for the purpose of influencing public opinion on governmental affairs. *Acito*, 459 F. Supp. at 87 (citing *Mills*, 384 U.S. at 218). The Lobbying Act's "compelled disclosure, in itself . . . seriously infringe[s] on privacy of association and belief guaranteed by the First Amendment." *Buckley*, 424 U.S. at 64.

Because the Lobbying Act applies to "clients" and "lobbyists" who designate or are designated by each other—who, in other words, *associate politically*—the Opinion places special burdens on the right to associate to influence government action. *See Sampson*, 625 F.3d at 1254-55 (association rights unlawfully burdened where "a single natural person is not subject to the disclosure or reporting requirements imposed on ballot-issue organizations" (citing *Citizens Against Rent Control*, 454 U.S. at 296 ("There are, of course, some activities, legal if engaged in by one, yet illegal if performed in concert with others, but political expression is not one of them."')).

The First Amendment does not allow the Commission to target PR consultants and their clients—and restrict their public participation—simply because they have banded together to sway public opinion. *See Sampson*, 625 F.3d at 1254-55 (association rights

unlawfully burdened where "a single natural person is not subject to the disclosure or reporting requirements imposed on ballot-issue organizations"). The First Amendment *privileges* the association between consultants and their clients. *See Lerman v. Bd. of Elecs. in City of N.Y.*, 232 F.3d 135, 146-47 (2d Cir. 2000) ("The right to political association . . . 'is at the core of the First Amendment, and even practices that only potentially threaten political association are highly suspect.'" (quoting *Krislov v. Rednour*, 226 F.3d 851, 860 (2d Cir. 2000)). The Opinion strikes at the core of plaintiffs' associational rights. On this basis as well, it must be struck down.

**3. The Opinion Infringes on Plaintiffs' Right to Anonymous Speech**

*Third*, the Opinion fails First Amendment scrutiny because public relations firms and their clients have a First Amendment right to participate in discussions of government policy without reporting those discussions or their participation to the government. "The simple interest in providing voters [and office holders] with additional relevant information" about the identities of parties engaging in public discourse "does not justify a state requirement that a writer make statements or disclosures she would otherwise omit." *McIntyre*, 514 U.S. at 348.

Under our Constitution, the ability to engage in public speech on matters of public concern without filing reports on the speech with the government "is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent," *id*. at 357, and "citizens of this nation should not be required to account . . . for engaging in debate of political issues," *Cent. Long Island Tax Reform Immediately Comm.*, 616 F.2d at 54 (Kaufman, C.J., concurring). The government interest that justifies registration/disclosure requirements that, in turn, burden the speech and association rights of traditional lobbyists is, of necessity, different and much narrower than a mere "informational interest," *McIntyre*, 514 U.S. at 349. A vague wish for greater transparency cannot justify imposing significant burdens upon the political speech and

association rights of non-lobbyists like plaintiffs simply because they advocate on behalf of sometimes-anonymous clients.

Courts have consistently struck down laws that condition the right to public participation on public disclosure of such information. The rationale is simple: Such rules "operate as a proscription" on political association and free speech "unless the registration and disclosure requirements . . . [are] complied with." *Buckley*, 519 F.2d 821, 871 (D.C. Cir. 1975), *rev'd in unrelated part*, 424 U.S. 1; *see also Gibson v. Fla. Legislative Comm.*, 372 U.S. 539 (1963); *NAACP v. Button*, 371 U.S. 415 (1963).

Many public relations firms wish to preserve the confidentiality of their communications with reporters and editorial writers on behalf of clients; others wish to keep confidential their business and political associations, as does The November Team for example.[44] Such firms have legitimate reasons for such discretion—reasons that are constitutionally recognized by the courts.[45] They should not be required to disclose such contacts, since there is no legitimate reason proffered by the state for them to do so. "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] effective . . . restraint on freedom of association." *NAACP v. Alabama*, 357 U.S. at 462. That is this case. The Opinion must be struck down.

**4. The Opinion Unlawfully Discriminates Against Paid Speech**

*Fourth*, the Opinion fails First Amendment scrutiny because it unlawfully discriminates against paid speech. An average citizen who advocates a policy position to an editorial board is not a lobbyist. A paid PR consultant who does the same is now, by virtue of

[44] Ex. 7 (BerlinRosen Decl.) ¶ 5; Ex. 8 (RHC Decl.) ¶ 7; Ex. 9 (Mercury Decl.) ¶ 8.
[45] Ex. 7 (BerlinRosen Decl.) ¶ 5; Ex. 8 (RHC Decl.) ¶ 7; Ex. 9 (Mercury Decl.) ¶ 8.

the Opinion, a lobbyist. The former need not register but, under the Opinion, the latter must—and, in the process, must disclose sensitive information, pay fees, and potentially face penalties including criminal prosecution for failure to do so. This rule is not only irrational; it violates the First Amendment. The Commission may not burden the speech and association rights of individuals and entities simply because they use money to hire consultants to facilitate their speech.

Requiring disclosure of information "concern[ing] the giving and spending of money" between clients and their consultants, and "the joining of [their] organizations" entails a substantial "invasion of privacy and belief . . . , for financial transactions can reveal much about a person's activities, associations, and beliefs." *Buckley*, 424 U.S. at 66 (internal quotation marks and alteration omitted). At the same time, "funds are often essential if advocacy is to be truly or optimally effective." *Id.* at 65-66 (internal quotation marks omitted). The First Amendment does not permit, much less privilege, discrimination against those who use money to promote their political positions. *See United States v. Nat'l Comm. for Impeachment*, 469 F.2d 1135, 1142 n.15 (2d Cir. 1972) (government cannot permissibly burden speech simply because it is paid for). Indeed, "*[a]ll speakers*, including individuals and the media, use money amassed from the economic marketplace to fund their speech, and the First Amendment protects the resulting speech." *Citizens United*, 558 U.S. at 314 (emphasis added).

The Opinion privileges unpaid speech over paid speech, for no compelling (or even rational) reason. The Opinion should be struck down.

**5. The Opinion Infringes on Freedom of the Press**

*Fifth*, and finally, the Opinion fails First Amendment scrutiny because the Lobbying Act threatens plaintiffs' relationships with members of the press—a phenomenon that, in turn, inhibits the media in its constitutionally protected functions of informing the public and

participating in the public discourse. The Lobbying Act's disclosure requirements, and the threat of audits and investigations, would expose plaintiffs and their media contacts to government scrutiny, threatening journalists' ability to keep their sources and other newsgathering information confidential. This would cast a chill on media activities, an especially troubling prospect where pending government action, and potential criticism of government, are in play.

"The Constitution specifically selected the press . . . to play an important role in the discussion of public affairs." *Mills*, 384 U.S. at 219. It protects "the right of the press to praise or criticize governmental agents and to clamor and contend for or against change" without government interference—a right essential for "improv[ing] our society and keep[ing] it free." *Id*. Yet the Commission intends to pry into the workings of the press precisely when its members advocate or oppose changes in public policy.

The compelled disclosure of media communications and the threat of government investigations into press sources and communications violates the "paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters, an interest which has always been a principal concern of the First Amendment." *Baker v. F & F Inv.*, 470 F.2d 778, 782 (2d Cir. 1972) (citing *N.Y. Times v. Sullivan*, 376 U.S. 254 (1964)). This interest gives rise to the journalistic privilege, which protects members of the press from government prying into the "relationship between the journalist and his source," whether that source is "confidential or nonconfidential." *Von Bulow ex rel. Auersperg v. Von Bulow*, 811 F.2d 136, 142 (2d Cir. 1987).

It does not matter that the Opinion does not require disclosure directly from the press itself. "Freedom of the press may be stifled by direct or, more subtly, by indirect restraints.

Happily, the First Amendment tolerates neither, absent a concern so compelling as to override the precious rights of freedom of speech and the press." *Baker*, 470 F.2d at 785.

The government has no valid interest in requiring disclosure of activities aimed at influencing public opinion on matters of public concern. But, even if it did, that interest would be starkly diminished for communications that are filtered through the press. Contrary to the Commission's apparent belief, newspapers are not mere pawns of PR professionals. *See* Ex. 4 (Open Meeting) at 29:50 (PR consultants use media to feed "favorable newspaper stories or more likely editorials" directly to the public). Reporters who cover proposed or pending government action—including editorialists who must decide whether to urge, support, or oppose such action—may and, it is to be hoped, will contact the relevant stakeholders before opining on the subject. Their role, as journalists, is not to blindly adopt and parrot the stakeholders' positions, but to ensure that they understand all aspects of the issues they cover, and all arguments for and against the endorsements they may choose to make.

The Framers acknowledged and respected the press as an independent actor whose role includes evaluating arguments of public policy made by private actors. The First Amendment rightly values the media as a "vigorous, aggressive and independent" institution, *Baker*, 470 F.2d at 782, needed to facilitate the "'free flow of information to the public that is the foundation of the [journalistic] privilege.'" *Von Bulow ex rel. Auersperg*, 811 F.2d at 143 (quoting *United States v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir. 1980)). Rather than enhance the public's access to information, "the compelled disclosure of [media] sources . . . may substantially undercut [it]." *Id.*

The Opinion will undermine freedom of the press. For this fifth reason, the Opinion must be struck down.

### E. The Opinion Is Unconstitutionally Vague and Violates Due Process

The Opinion violates not only the First Amendment in myriad ways, but also the Due Process Clause. Because the Opinion leaves plaintiffs and other consultants with no way of knowing which of their activities must be reported to the Commission on pain of criminal prosecution, it is unconstitutionally vague.

#### 1. A Statute that Imposes Criminal Sanctions for Ill-Defined Conduct Violates Due Process

A statute that fails to provide a reasonable person with fair notice of what conduct it proscribes violates due process and must be invalidated. *Buckley*, 424 U.S. at 40-41; *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972); *ACLU of N.J.*, 509 F. Supp. at 1127. To withstand a vagueness challenge, a statute must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and must "provide explicit standards for those who apply them" to avoid "arbitrary and discriminatory enforcement." *Grayned*, 408 U.S. at 108-09. "A vague statute is not only an unfair guide to conduct, but 'impermissibly delegates basic policy matters to [government officials]'"—such as Commission members—"'for resolution on an ad hoc and subjective basis,'" *ACLU of N.J.*, 509 F. Supp. at 1128 n.12 (quoting *Grayned*, 408 U.S. at 108-09).

Vague statutes and regulations that impose criminal sanctions for activity protected by the First Amendment are particularly insidious. "[B]ecause First Amendment rights need breathing space to survive, a statute must have ascertainable standards of guilt so that persons will not be chilled in their exercise of constitutional rights because of their fear of criminal sanctions." *CICU*, 534 F. Supp. at 502 (citing *Button*, 371 U.S. at 433; *Cantwell v. Connecticut*, 310 U.S. at 301 (1940)).

The Constitution does not authorize the Commission "to set a net large enough" to capture all "possible" lobbyists under the Lobbying Act, then "leave it to the courts to step inside and say who could be rightfully [regulated], and who [could not]." *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999). The Opinion's threat of civil and criminal penalties and its pervasive vagueness together render it invalid as a whole. *Id.*

**2. It Is Impossible to Tell What Constitutes Reportable "Lobbying" Under the Opinion**

The Opinion's expansion of the Lobbying Act is undefined and potentially limitless. For this reason, among others, it is unconstitutionally vague and unenforceable. According to the Opinion, "*[a]ny* attempt by a consultant to induce a third-party—whether the public or the press—to deliver the client's lobbying message to a public official would constitute lobbying." Ex. 1 (Opinion) at 9 (emphasis added). The Opinion does not define what constitutes "deliver[ing]" a message "to a public official." *Id.* It provides only a few illustrations, which raise as many questions as they answer.

For example, according to the Commission, an effort to convince an editorial board to publicly support or oppose government action constitutes disclosable "lobbying"—as does merely "speak[ing] to a group to advance the client's lobbying message," Ex. 1 (Opinion) at 8—because airing the client's policy positions in public creates a *possibility* that the public statements will "ultimately . . . be heard and received by public officials" considering government action, Ex. 4 (Open Meeting) at 45:45. Under this reasoning, a pastor, paid more than $5,000 a year by a church, who in a Sunday sermon condemns abortion, birth control, or gay marriage, or who calls for government action caring for the poor, would be a lobbyist, advancing the church's "lobbying message," and required to register. Even Pope Francis's call for action on climate change could qualify as "lobbying." Likewise, a union organizer, paid

more than $5,000 a year by the union, who writes and distributes a pamphlet warning union members that a pending "right to work" law would threaten the survival of the union, would be deemed a lobbyist and would be required to register.

Moreover, while the intended targets of the Opinion are public relations consultants, nothing in the Opinion's language or logic limits its application to them. The Opinion "could be applied to 'compel disclosure by [any] groups that do no more than discuss issues of public interest,'" and "no group could ever be sure" that its speech on legislative, executive, or administrative actions "would not bring it within the [law's] reporting and disclosure requirements." *Acito*, 459 F. Supp. at 85 (quoting *Buckley*, 519 F.2d at 872). "Such a result would . . . be abhorrent," as "[a]ny organization would be wary of expressing any viewpoint lest under the Act it be required to register, file reports, disclose its contributors," and be criminally prosecuted if it failed to do so. *Nat'l Comm. for Impeachment*, 469 F.2d at 1135. The danger of prosecution "is especially acute when an official agency of government," like the Commission, "has been created to scrutinize the content of political expression, for such bureaucracies feed upon speech and almost inevitably come to view unrestrained expression as a potential 'evil' to be tamed, muzzled, or sterilized." *Cent. Long Island Tax Reform Immediately Comm.*, 616 F.2d at 54-55 (Kaufman, C.J., concurring) (citing *Nat'l Comm. for Impeachment*, 469 F.2d at 1142).

Even if it applied only to PR consultants, the Opinion is impossibly vague. At the January 26 Open Meeting, the Commissioners themselves could not decide which conversations between a reporter and PR consultant would be covered, and which would not. Some thought the Opinion would apply only when the PR consultant *initiated* contact with the press; others disagreed, but failed to identify any other determinative factors, or to offer a neutral principle for

drawing a distinction. *See supra* at 17. The Opinion states that a consultant who attempts "proactively [to] advance its client's interest through the media is required to register," Ex. 1 (Opinion) at 9, but according to the Commission's chair, the Opinion does not "suggest[] that a garden variety telephone conversation between a reporter or an editorial board and a consultant is necessarily considered to be lobbying." Ex. 4 (Open Meeting) at 28:25. What does that mean? What exactly is a "garden variety telephone conversation" with an editorial board? How does it differ from PR consultant's "attempts to advance [its] client's message"? And why should that even matter? If the Commissioners do not know what the Opinion means, how can plaintiffs and other PR professionals know?

Unsure whether or when the law requires them to register, plaintiffs "face an unattractive set of options . . . : refrain from engaging in protected First Amendment activity or risk civil," and even criminal, sanction for alleged unlawful conduct in failing to report. *Fla. League of Prof'l Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 459 (11th Cir. 1996) (citing *Abbott Lab. v. Gardner*, 387 U.S. 136, 152-53 (1967)). These risks are real. The Commission not only purports to interpret the law; it enforces the law. The Commission issues the fines. The Commission refers people for criminal prosecution. The Commission has *already* threatened that any person who fails to register as required under the Opinion will be deemed to have knowingly and intentionally violated the Lobbying Act and will be referred for criminal prosecution. Ex. 4 (Open Meeting) at 1:10:29.

"[B]ecause First Amendment rights need breathing space to survive, a statute must have ascertainable standards of guilt so that persons will not be chilled in their exercise of constitutional rights because of their fear of criminal sanctions." *CICU*, 534 F. Supp. at 502 (citing *Button*, 371 U.S. at 433; *Cantwell*, 310 U.S. at 301). The Opinion gives plaintiffs

precious little "breathing room;" indeed, it threatens to suffocate the speaker. Because plaintiffs and other public relations consultants are "not granted wide latitude to disseminate information without government interference, they will 'steer far wider of the unlawful zone,' thereby depriving citizens of valuable opinions and information." *Cent. Long Island Tax Reform Immediately Comm.*, 616 F.2d at 54 (Kaufman, C.J., concurring) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)). If the Lobbying Act, per the Opinion, were "to reach any sort of indirect activity which might ultimately impact upon the governmental decision-making process," it would be "too difficult for average citizens to evaluate their conduct in light of [the] statute." *CICU*, 534 F. Supp. at 502. This violates the Due Process Clause.

The Opinion is vague. Its potential scope is limitless. And the stakes for plaintiffs—and for this entire industry—are high. The Opinion violates the Due Process Clause and must be struck down.

## II. Plaintiffs' Claims Present a Fair Ground for Litigation, and the Balance of Hardships Tips in Their Favor

Insofar as this Court has any doubt that plaintiffs have demonstrated their likelihood of success in this case (it should not), plaintiffs overwhelmingly satisfy the alternative burden, *i.e.*, plaintiffs' claims present a fair ground for litigation.

The balance of hardships also tips decidedly in plaintiffs' favor. Without a preliminary injunction in place, the hardship to plaintiffs will be great: Plaintiffs will have to start guessing which of their activities are covered by the Opinion and immediately begin the arduous and expensive task of registration, in some cases hiring new staff or temporary workers to comply. They will have to publicize their business and political relationships, their financial arrangements, and their contracts. And the Commission will be free to penalize plaintiffs and even refer them for criminal prosecution for engaging in core political speech with the press.

On the other hand, the hardship to defendants of a preliminary injunction is non-existent: Plaintiffs merely seek to enjoin the Commission from dramatically expanding the reach of a lobbying statute for the first time in 40 years. An injunction will simply turn back the clock to January 25, 2016. It will preserve 63 years of unbroken case law. And it will return the Lobbying Act to its original, and constitutional, meaning.

## III. Absent an Injunction, Plaintiffs Will Suffer Irreparable Harm

Absent a preliminary injunction, defendants will continue to violate plaintiffs' First and Fourteenth Amendment rights. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable harm is necessary." *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (internal quotation omitted). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also NAACP v. Button*, 371 U.S. 415, 433 (1963) ("The threat of sanctions may deter [the exercise of First Amendment freedoms] almost as potently as the actual application of sanctions"). And the Second Circuit has held that allegations of First Amendment violations establish irreparable harm. *See*, *e.g.*, *Tunick v. Safir*, 209 F.3d 67, 70 (2d Cir. 2000); *Hsu ex rel. Hsu v. Roslyn Union Free Sch. Dist., No. 3*, 85 F.3d 839, 872 (2d Cir. 1996) (collecting cases).

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for a preliminary injunction should be granted.

Dated: March 8, 2016
New York, New York

EMERY CELLI BRINCKERHOFF
& ABADY LLP

Andrew G. Celli, Jr.
Ilann M. Maazel
Hayley Horowitz

600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

CENTER FOR COMPETITIVE POLITICS

/s
Allen Dickerson*

124 West S Street, Suite 201
Alexandria, VA 22314
(703) 894-6800

**Application for Admission Pro Hac Vice Pending*

*Attorneys for Plaintiffs*