# Exhibit 1

## STATE OF NEW YORK
## JOINT COMMISSION ON PUBLIC ETHICS

**Advisory Opinion No. 16-01:** **Reporting obligations under the Lobbying Act for a party who is compensated for consulting services in connection with lobbying activity**

### Introduction

Consultants offer a number of services that abut lobbying, but may not necessarily cross the line into lobbying. For example, consultants may offer services that may include communications and media relations, community organizing, coalition building, strategic planning, social media relations, grassroots advocacy, advertising, and electoral campaigns. However, despite the terms used to describe the services, some of this activity could constitute reportable lobbying under Legislative Law Article 1-A (the "Lobbying Act").

Principally, this analysis will address actions taken and roles played by consultants in two typical lobbying scenarios – as "facilitators" for direct lobbying to or before a public official, and as architects of grassroots lobbying campaigns to the public.

The State Temporary Commission on Lobbying (the "Lobbying Commission"), a predecessor agency of the New York State Joint Commission on Public Ethics ("JCOPE"), previously defined the activities under the Lobbying Act that may constitute grassroots lobbying through a series of Advisory Opinions discussed below. Since that time, however, the Lobbying Act has been amended more than once and the Lobbying Commission has been disbanded and ultimately replaced by JCOPE.

The Commission issues this Advisory Opinion in order to articulate when the Lobbying Act covers the services of consultants, and to clarify the test used to determine when grassroots advocacy constitutes reportable lobbying activity.

### Issues

I. When a consultant (or other paid representative) contacts a public official on behalf of a client, for the purpose of enabling or otherwise facilitating lobbying activity, is that initial contact, *i.e.*, the "door opening", reportable under the Lobbying Act?

II. When a consultant attends a meeting between a client (with or without a lobbyist) and a public official, is the consultant engaging in lobbying?

III. Must consultants who create and implement grassroots lobbying campaigns on behalf of clients themselves register as lobbyists?

## Conclusions

Pursuant to its authority under Lobbying Act § 1-d(f), the Commission renders its opinion that:

**I.** Reportable lobbying[1] includes preliminary contact made with public officials to enable or facilitate the ultimate advocacy.

**II.** Any direct interaction with a public official in connection with an advocacy campaign, including preliminary communications to facilitate or enable the eventual substantive advocacy, constitutes lobbying.

*Direct interaction* includes, but is not limited to: (i) verbal or written communications, including communications made for the purpose of facilitating access to a public official; (ii) attendance at a meeting with a public official; and (iii) presence on a phone call with a public official.

**III.** A grassroots communication constitutes lobbying if it:

1. References, suggests, or otherwise implicates an activity covered by Lobbying Act Section 1-c(c).
2. Takes a clear position on the issue in question; and
3. Is an attempt to influence a public official through a call to action, *i.e.*, solicits or exhorts the public, or a segment of the public, to contact (a) public official(s);

A consultant's activity on a grassroots campaign can be considered reportable lobbying if the consultant controlled the delivery and had input into the content of the message.

Control of the *delivery* of a grassroots communication involves participation in the actual delivery of the message.

Input on the *content* of a grassroots message means participation in the formation of the message.

## Discussion

### *History and Precedent*

Lobbying was first regulated in New York state in 1977 with the enactment of the "Regulation of Lobbying Act"(L. 1977, Ch. 937). The statute defined "lobbying" or "lobbying activity" as:

> [A]ttempts to influence the passage or defeat of any legislation by either house of the legislature or the approval or disapproval of any legislation by the governor, or the adoption or rejection of any rule or regulation having the force and effect of law or the

[1] *See* Lobbying Act § 1-c(c)(i)-(x)

outcome of any rate making proceeding by a state agency. *Section 3(b) of Ch. 937, L. 1977.*

This legislation also created the first iteration of the State's lobbying regulatory body, with the creation of the Temporary Commission on the Regulation of Lobbying. This Commission was subsequently reconstituted in 1981 as the similarly-named Temporary Commission on Lobbying, which would remain in place until 2007.[2]

These commissions are charged in their respective enabling statutes with the interpretation of the laws governing lobbying, through the issuance of advisory opinions.[3]

The definition of lobbying provides what kind of activity can be lobbying ("attempts to influence"), as well as the contexts in which it can occur (*i.e.*, legislation, rulemakings, and rate makings).

However, it was not until the Lobbying Commission's Opinion No. 21 (79-1) in 1979 that a New York state regulator addressed what specific conduct constituted an "attempt to influence" under the Act. In that opinion, a committee of the state bar association both: (1) challenged the "attempts to influence" language of the statute as vague and unqualified; and (2) asked whether this language included interactions other than "direct contact with legislators, the Governor, or regulatory agency decision makers".

On both questions the Lobbying Commission turned to the U.S. Supreme Court's seminal 1953 lobbying-related decision, United States v. Harriss (347 U.S. 612). *Harriss* upheld a constitutional challenge to the Federal Lobbying Act, the Court held that the definition of lobbying captured "direct pressures exerted by lobbyists themselves…or through an artificially stimulated letter campaign." *Harriss* at 620. Justifying the potential infringement of protected speech, the Court noted that "[Congress] has … merely provided for a modicum of information from those who for hire attempt to influence legislation or who collect or spend funds for that purpose. It wants only to know who is being hired, who is putting up the money, and how much…". TCOL Op. No. 21 (79-1), quoting *U.S. v. Harriss*.

The Lobbying Commission stated that it was acting to "conform with Federal case law", *i.e.*, *Harriss* and, as a result, "lobbying activity" under the New York state statute is through direct verbal, written, or printed communications with legislators, including "contacts with those staff members of the decision maker to whom authority to decide had been delegated and to those staff members upon whom the decision maker relies for informed recommendations on matters under consideration." Lobbying Commission Op. No. 21 (1979).

In the months immediately following the publication of this opinion, the Lobbying Commission notified the Commission on Independent Colleges and Universities ("CICU") of potential reporting obligations under the law, should [CICU] exceed the $1,000 lobbying spending

---

[2] The Lobbying Commission was merged with the State Ethics Commission in 2007, into the Commission of Public Integrity ("COPI"), as part of the Public Employee Ethics Reform Act, Ch. 14, L. 2007. COPI was subsequently replaced by the Joint Commission on Public Ethics in 2011's Public Integrity Reform Act, Ch. 399, L. 2011. All prior opinions referenced in this document were issued by the Lobbying Commission, unless otherwise noted.

[3] See § 4(c)(6), Ch. 937, L. 1977; § 4(c)(6), Ch. 1040, L. 1981; Legislative Law Article 1-A, § 1-d(f).

threshold then in effect. CICU subsequently registered as a lobbying organization and sought a declaratory judgment in the District Court that the lobbying statute was "in its entirety, null and void, unconstitutional and of no force and effect".[4] The constitutional challenge argued that the law was an overbroad constraint on the rights to speech, petition the government, and association, because it attempted to regulate "any action which could conceivably impact upon government action, no matter how remote".[5] The Court dismissed the plaintiffs' arguments, noting that the Supreme Court had limited the definition of lobbying in *Harriss* and pointed to the Lobbying Commission's decision to apply *Harriss* to its own activities.[6]

In applying *Harriss* to the New York lobbying laws, the *CICU* court ratified the boundaries that the Lobbying Commission had imposed on itself (in Op. No. 21). Further, an ensuing progeny of decisions by the Lobbying Commission created a series of general rules about what constituted lobbying activity under *Harriss* and state law, and applied the rules in the context of "grassroots" lobbying.

After CICU, the Commission issued the first opinion applying criteria to grassroots lobbying. The Commission found in Op. No. 36 (82-2) that **lobbying included not only the direct contacts with a public official, but also exhortations to the public to contact the public official, *i.e.*, a call to action**, with regard to specific pending legislation.

The Commission was later presented with the question whether a consultant that carries out the *mailing* function of a grassroots campaign (assuming the requisite "call to action" is present) is required to register as a lobbyist. The Commission found that **lobbying occurs when a consultant controls message delivery, and that control results in direct contact with a public official** ("A lobbyist cannot be allowed to avoid registering with the Commission simply by changing how contact with legislators is made. Any attempt by a lobbyist to influence the passage or defeat of any legislation…is lobbying irrespective of how contact is made.") [7] However, the Commission clarified that the consultant's activity must include participation in both the content and delivery of a grassroots lobbying campaign to trigger the disclosure requirements. In that case, the delivery of pamphlets – without input, editing, reviewing, or other connection to the content of the message – was not lobbying activity.

The Lobbying Commission further clarified that an advertisement that includes a public "call to action" need not necessarily identify a bill number for the advertisement to constitute lobbying. In evaluating radio advertisements encouraging the public to contact the Governor regarding proposed Indian casino gaming issues, the Commission wrote, "[t]he company's reliance on the omission of a bill number to avoid the requirement of disclosure is misplaced; it is the clear attempt to stimulate a grassroots lobbying effort in regard to pending legislation that controls the question." (Opinion No. 44 (00-3)). The Commission also articulates a three-part test for all lobbying – direct or grassroots: "**Lobbying, under New York law, occurs when the activity in**

---

[4] Commission on Independent Colleges and Universities v. New York Temporary State Commission on Regulation of Lobbying, 534 F. Supp. 489, 491, (N.D.N.Y 1982).
[5] *Id*. at 496.
[6] *Id*. at 497, citing Lobbying Commission Op. No. 39 (97-1).
[7] Lobbying Commission Op. No. 39 (97-1) (1997).

**question relates to pending legislation, a position is stated, and the activity is an attempt to influence decision makers**…Direct contact is not required."[8] (emphasis added)

Finally, and as discussed below, the definition of "lobbying" or "lobbying activities" has expanded from the initial 1977 version[9]: in 1999, the legislature added certain actions by municipalities to the contexts in which lobbying can occur; in 2005, the definition was expanded to cover attempts to influence governmental procurements and tribal-state compacts (or Class III gaming actions);[10] and most recently, in 2011, PIRA further amended the definition (to its current state) to specify that an attempt to influence passage or defeat of legislation included the introduction or intended introduction of such legislation.[11]

## Issue Analysis

I. *When a consultant (or other paid representative) contacts a public official on behalf of a client, for the purpose of enabling or otherwise facilitating lobbying activity, is that initial contact, i.e., the "door opening", reportable under the Lobbying Act?*

JCOPE is cognizant and respectful of the fact that the scope of the Lobbying Act is limited to those circumstances enunciated in Section 1-c(c) of the Lobbying Act. However, advocacy has evolved, requiring JCOPE to address activities that are clearly within the ambit of the Lobbying Act, but not been previously considered.

JCOPE finds that **reportable lobbying[12] includes preliminary contact** made with public officials to enable or facilitate the ultimate advocacy. This initial contact does not have to involve the substantive concerns of the client, but can simply be to schedule a future meeting for the client with the public official. It can also include a consultant introducing his client to a public official prior to a meeting.

While one may call himself a consultant, when that individual communicates with a public official (or her staff) on behalf of a client – for the purpose of enabling the client to explicitly advocate before the public official – the lobbying has begun. *But for the access* to the public official, the ensuing advocacy could not take place.

---

[8] *Id.*

[9] The original definition of lobbying covered "attempts to influence the passage or defeat of any legislation by either house of the legislature or the approval or disapproval of any legislation by the governor, or the adoption or rejection of any rule or regulation having the force and effect of law or the outcome of any rate making proceeding by a state agency".

[10] Ch. 15, L. 2005.

[11] Part D, Ch. 399, L. 2011.

[12] As discussed above, the Lobbying Act defines "lobbying" or "lobbying activities" as any attempt to influence the enumerated activities in Section 1-c(c)(i)-(x). However, lobbying requires reporting only if the potential lobbyist or client expends, incurs, or receives more than $5,000 in annual compensation and expenses for lobbying (hereinafter, "reportable lobbying"). For purposes of this opinion, all references to and discussions of the applicability of the Lobbying Act presume that the $5,000 monetary threshold has been met.

JCOPE is not attempting to regulate personal social conversation among those who happen to also work in and around government – but rather to ensure that those who are compensated for their political connections are exposed to the requisite sunlight.

To hold otherwise allows a class of individuals to operate in the same sphere as lobbyists, yet be exempted from specific statutes designed to promote transparency about attempts to influence public officials. For example, JCOPE holds that just as it is presumptively impermissible for a lobbyist to give a gift to a public official,[13] a consultant who "opens doors" should be subject to the same restrictions. Similarly, the prohibition on a lobbyist receiving a fee contingent on the success of the lobbying[14] should apply to a consultant as well. **[15]**

**For these reasons, JCOPE finds that anyone who makes contact with a public official, including preliminary communications to facilitate or enable the eventual substantive advocacy, is engaging in lobbying.**

A consultant must report these activities if he *knows or has reason to know* that lobbying will occur before the public official. The consultant cannot employ a "willful blindness" strategy in order to create plausible deniability as to any lobbying that follows.

II. *When a consultant attends a meeting between a client (with or without a registered lobbyist) and a public official, is the consultant engaging in lobbying?*

As noted above, reportable lobbying begins on first contact with the public official, even if that contact is only an introduction or securing a future meeting for a client. However, the question remains whether a consultant's attendance at a lobbying meeting (or participation on a call), even if only to make initial introductions or observe, constitutes reportable lobbying activity. Based on the new rules above, it follows that an individual who subsequently has *direct interaction* with a public official in connection with reportable lobbying may also be required to register as a lobbyist.[16]

> *For purposes of this opinion,* direct interaction *includes, but is not limited to (i) verbal or written communications, including communications made for the purpose of facilitating access to a public official; (ii) attendance at a meeting with a public official; and (iii) presence on a phone call with a public official.*

Just as JCOPE determined, *supra*, that using a consultant's *access* to facilitate advocacy is part of lobbying, **it is also the case that a consultant's *presence* can be part of lobbying.** These situations are all part and parcel of trading on relationships and influence. To be clear,

---

[13] Lobbying Act Section 1-m
[14] Lobbying Act Section 1-k
[15] Regardless of whether the registration requirements – and thus these prohibitions – apply, consulting services procured as part of a lobbying campaign will be disclosed as reportable expenses in the filings submitted by another lobbyist or client.
[16] This should not be interpreted to require clerical or administrative staff who make scheduling calls for consultants to be listed as additional lobbyists. The activity is attributed to the consultant – the actions of clerical staff are a reportable non-lobbying salary expense (which can be reported in the aggregate).

consultants should not be barred from these practices – the Legislature clearly found lobbying to be part of a fundamental exercise of rights under the Constitution[17]; but, at the same time, these transactions should merit that "modicum of information from those who for hire attempt to influence legislation" that the Supreme Court called for in *Harriss*. **To that end, a consultant who has direct interaction (as defined above) with a public official at any point in the reportable lobbying effort is subject to the Lobbying Act.**

There may be individuals who attend meetings with public officials, *e.g.*, architects, scientists, or engineers, to address technical questions. They have no role in the strategy, planning, messaging, or other substantive aspect of a meeting. Since these attendees are not trading on access, influence, or relationships, they are not subject to the attendant lobbying reporting rules.

III. *Must consultants who create and implement grassroots lobbying campaigns on behalf of clients themselves register as lobbyists?*

**Grassroots Lobbying**

As noted above, the Lobbying Commission's adoption of *Harriss* (via Lobbying Commission Opinion No. 21) first determined that lobbying activity can occur via direct contact with public officials, or through what the *Harriss* court called "artificially stimulated letter campaigns".

However, the Lobbying Commission continued to refine its position on these indirect methods of lobbying. For example, the Lobbying Commission stated that a communication that addresses specific pending legislation, takes a position on the issue, and solicits the public to contact a public official, *i.e.*, includes a call to action, constitutes lobbying activity.[18]

Further, it stated that a communication that included the following attributes would constitute lobbying activity, specifically that the communication:

(1) related to pending legislation;

(2) took a position; and

(3) was an attempt to influence decision makers. [19]

Finally, the Lobbying Commission found that an individual or organization that participates in the formation of the content and delivery of such a communication may be lobbying ("Lobbying activity requires some participation in both message content and delivery. A company that has complete control over mailing in furtherance of a grassroots lobbying effort would be a lobbyist

[17] Section 1 of Ch. 937, Laws of 1977 ("…the operation of responsible democratic government requires that the fullest opportunity be afforded to the people to petition their government for the redress of grievances and to express freely to appropriate officials their opinions on legislation and government operations").
[18] Lobbying Commission Op. No. 36 (82-2).
[19] Lobbying Commission Op. No. 44 (00-3).

only if that company participated in the formation of the message itself or was given some control over reviewing or editing the client's message.")[20]

Since these opinions were published, however, the statutory reach of the Lobbying Act has increased. In PIRA, the Lobbying Act was expanded to cover not only attempts to influence the passage, defeat, enactment, or veto of legislation, but also the "introduction or intended introduction of legislation".

This opinion attempts to account for this expanded scope by forming a new grassroots lobbying test, as well as a determination of the applicability of the Lobbying Act to consultants who participate in these grassroots lobbying campaigns.

The existing requirements for a communication to: (1) include call to action; (2) take a position on an issue; and (3) attempt to influence decision makers are still applicable regardless of the breadth of covered activities under Section 1-c(c) However, given the expansions to the statutory definition of "lobbying", the "current pending legislation" element must be redefined.

JCOPE finds that the communication need only *relate to a Section 1-c(c) activity*. It need not reference a bill number, but a bill (or its defeat) must be the intended byproduct of the lobbying. Similarly, it need not identify an executive order or regulation, but it must be clear that an executive order or regulation is the subject of the lobbying. In sum, a grassroots communication constitutes lobbying if it:

1. **References, suggests, or otherwise implicates an activity covered by Lobbying Act Section 1-c(c).**
2. **Takes a clear position on the issue in question; and**
3. **Is an attempt to influence a public official through a call to action, *i.e.*, solicits or exhorts the public, or a segment of the public, to contact (a) public official(s);**

**Application to Consultants**

With the above grassroots criteria in mind, JCOPE **affirms while clarifying the position of its predecessor from Op. No. 39**, and finds that a consultant's activity on a grassroots campaign can be considered reportable lobbying if the consultant **controlled the delivery of the message and had input into its content**.

**Control of the delivery** of a grassroots communication requires participation in the *actual* delivery of the message to the audience, whether verbally or in writing. The delivery can be either to a targeted audience, or to the public in general, *e.g.*, as a spokesperson.

The speaker/author should be identifiable as a person/entity distinct from their client, who is speaking for the client's benefit. A public relations consultant who speaks to a group to advance the client's lobbying message would be participating in actual delivery of a message. Further, a public relations consultant who contacts a media outlet in an attempt to get it to advance the client's message in an editorial would also be delivering a message. That said, this is in no way

[20] Lobbying Commission Op. No. 39 (97-1).

intended to restrict a reporter's ability to gather information or to seek comment from representatives of advocacy groups as part of reporting the news. Rather, this is intended to generate transparency in the activities of paid media consultants who are hired to proactively advance their client's interests through the media. Any attempt by a consultant to induce a third-party – whether the public or the press – to deliver the client's lobbying message to a public official would constitute lobbying under these rules.

**Input into the content** of a grassroots communication means participation in forming the message. The determining factor is shaping the content of the communication. It involves more than mere proofreading, but at the same time does not require full decision-making authority, *i.e.*, a client having the "final say" in a work product does not exempt the role played by the consultant in creating the message.

If a consultant's participation in a grassroots campaign constitutes control over delivery and input into content, the activity becomes reportable lobbying for the consultant and may require registration and reporting.

*Exceptions*

In reiterating that the conduct must involve participation in both the content and delivery, JCOPE notes that each of the following activities or roles would not alone be lobbying under this test:

1. Billboard or sign owners;
2. Copy editing;
3. Advertisement writers;
4. Storyboard artists;
5. Film crews;
6. Photographers;
7. Video editors;
8. Website managers, hosts, or internet service providers;
9. Media outlets or broadcasters; [21]
10. Media buyers or placement agents;
11. Secretaries, clerical, and ministerial staff.

Additionally, existing exceptions and limitations in the Lobbying Act would also apply, ensuring that attorneys who draft opinions, research, or memos[22]; non-lobbying staff; or others are not unnecessarily captured by the law.

## Conclusion

JCOPE has identified a class of participants in lobbying efforts who, while potentially engaging in lobbying activities, have called themselves something other than lobbyists. Through this opinion, JCOPE has means to clarify the criteria when those activities require registration and

[21] See also Lobbying Act Section 1-c(c)(B).
[22] Lobbying Act Section 1-c(c)(A).

reporting under the Lobbying Act, and when those activities need only be disclosed as expenses incurred by another lobbyist.