# Exhibit 2

EMERY CELLI BRINCKERHOFF & ABADY LLP

ATTORNEYS AT LAW
600 FIFTH AVENUE AT ROCKEFELLER CENTER
10TH FLOOR
NEW YORK, NEW YORK 10020

RICHARD D. EMERY
ANDREW G. CELLI, JR.
MATTHEW D. BRINCKERHOFF
JONATHAN S. ABADY
EARL S. WARD
ILANN M. MAAZEL
HAL R. LIEBERMAN
O. ANDREW F. WILSON
ELIZABETH S. SAYLOR
DEBRA L. GREENBERGER
ZOE SALZMAN
SAM SHAPIRO
ALISON FRICK
DAVID LEBOWITZ
HAYLEY HOROWITZ
THEODOR O. OXHOLM
R. ORION DANJUMA

TELEPHONE
(212) 763-5000
FACSIMILE
(212) 763-5001
WEB ADDRESS
www.ecbalaw.com

CHARLES J. OGLETREE, JR.
DIANE L. HOUK

July 10, 2015

***By E-mail and Regular Mail***

Martin Levine
Director of Lobbying and FDS Compliance and Senior Counsel
N.Y. State Joint Commission on Public Ethics
540 Broadway
Albany, New York 12207
martin.levine@jcope.ny.gov

*Re: Informal Comments on Proposed Guidance Related to Scope of the Lobbying Act*

Dear Mr. Levine:

This firm represents four public affairs/public relations firms—Anat Gerstein, Inc., BerlinRosen, Risa Heller Communications, and Stu Loeser & Co. (collectively, "the Firms"). We write on the Firms' behalf to offer comments on the proposed guidance (the "Guidance") issued by the New York State Joint Commission on Public Ethics (the "Commission") regarding the scope of the definition of "lobbying" in the Lobbying Act (Legislative Law Article 1-A).

New York has long been a leader in the field of lobbying disclosure, having enacted one of the very first lobbying disclosure regimes in the country over a hundred years ago. The Firms fully support the Lobbying Act, its scope, and its purposes as currently implemented. The Firms also fully support the Commission's proposed definition of "direct lobbying" as set forth in the Guidance. That definition comports with our understanding of the Lobbying Act's language and purpose and transgresses no constitutional limitations. Indeed, in our view, the Guidance's definition of "direct lobbying" advances the goal of robust disclosure of both lobbying activities and lobbying expenses by clarifying the scope and contours of the rule. The Firms strongly believe that full disclosure of lobbying activities is essential to transparency and fairness in a democratic system, particularly in these times when so many citizens express cynicism about or outright distrust of the government process.

That said, the definition of "grassroots lobbying" as proposed in the Guidance is profoundly troubling. In our view, it unconstitutionally extends the Lobbying Act's application to individuals from whom the State has no constitutionally valid interest to require disclosure, and whose connection with true lobbying activity is attenuated at best. For example, public relations firms, advertising agencies, and other service providers whose clients are involved in public issues or controversies are hired to *assist* clients in *their* lobbying efforts, communications, and press activities. In so doing, these service providers engage in activities that involve neither direct lobbying nor direct exhortations for the public to lobby, as grassroots lobbying is traditionally defined. Nonetheless, the proposed definition of "grassroots lobbying" would sweep such conduct into the disclosure regime for no valid government purpose and at significant expense to parties who would not otherwise be subject to it.

For these reasons, we urge the Commission to revise its definition of "grassroots lobbying" to require registration only by individuals or entities **at whose direction, by whose authority, and on whose behalf "call to action" communications to the public are made**.

<u>Background of the Firms</u>

Before turning to the specifics of the Guidance, a brief overview of the Firms and their work is in order.

The four Firms on whose behalf this letter is submitted share one important characteristic: They are all in the business of providing public relations services (i.e., communications and press-related services) to individuals and entities involved in public issues. Whether advising a large institution on how to publicize its latest expansion efforts, assisting a business client in creating awareness of the impact of new rules and regulations, or working with an advocacy group to win "earned media" for its cause, the four Firms serve as advisors, offering communications-related services to clients who, in turn, operate in the public arena. This work can take many forms: drafting op-ed pieces and press releases for their clients to issue; writing speeches and crafting talking points for their clients' public appearances; interfacing with reporters to encourage coverage of their clients' activities; or scripting text and audio messages for paid media (television, radio, and internet broadcasts). In *all* of the scenarios, it is the clients who decide upon, direct, and authorize the messages being put forward; the Firms merely assist those clients in determining how best to state and communicate those messages to the press and to the public.

Notably, none of the four Firms engages in lobbying, i.e., representing clients in direct communications with public officials on legislation, executive orders, and procurements, or working to stimulate members of the public to themselves contact public officials about covered issues (pending legislation or an executive order, for example) by an express "call to action" (e.g., "contact your legislator"). All of the Firms strongly support registration and disclosure under the Lobbying Act under *both* circumstances.

The Proposed Definition of "Grassroots Lobbying" Exceeds Constitutional Limitations on Reporting Requirements

First principles first: Under the First Amendment, speech relating to government and its processes—whether it is the legislative process, executive power, or elections and ballot initiatives—is accorded the highest value.[1] As a consequence, courts grant political speech the highest level of constitutional protection.[2] Any legal regime that touches upon political speech must be constructed and implemented with extreme care; as a matter of course, it will be subject to the strictest scrutiny by the courts.

Lobbying, on the one hand, and public relations around political issues (i.e., issues advocacy without a specific "call to action"), on the other, are both forms of political speech. In the case of lobbying, as distinct from public relations work, courts have long permitted the imposition of disclosure requirements on persons and entities that lobby for compensation in order to further other constitutional values, such as transparency and the prevention of corruption. Disclosure of lobbying agreements and activities is seen as a limited incursion of First Amendment principles, justified on a narrow basis.

The courts are quite specific about what constitutes a valid justification for this intrusion: Compelled disclosure of lobbying activities is constitutionally permissible only if it serves to unmask the true "*sources* of pressure on government officials"[3] when such pressure "masquerade[es]" as "the voice of the people" but in truth originates with "special interest groups seeking favored treatment."[4] Hence, in a line of jurisprudence that "has remained untouched for more than five decades,"[5] courts have upheld laws and regulations requiring disclosure by two groups of individuals: *first*, those who directly petition government officials as the paid employees or agents of others ("direct lobbyists"), and *second*, those who direct or supervise efforts to spur *others* to directly petition government officials via "calls to action" ("grassroots lobbyists").[6] In both circumstances, the government interest that justifies the disclosure requirements is to "help[] the public" and their elected representatives "to understand the constituencies" that are ultimately "behind" the demands placed on public officials.[7]

The Commission's proposed definition of "grassroots lobbying" reaches far beyond these legitimate government purposes. By defining as a "lobbyist" *anyone* who somehow

---

[1] *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548 (2001).

[2] *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995).

[3] *Comm'n on Indep. Colls. & Univs. v. N.Y. Temp. State Comm'n on Regulation of Lobbying*, 354 F. Supp. 489, 494-95 (N.D.N.Y. 1982) (emphasis added).

[4] *United States v. Harriss*, 347 U.S. 612, 625 (1954).

[5] William R. Maurer, "The Regulation of Grassroots Lobbying," 11 *Engage: J. Federalist Soc'y Prac. Groups* 73, 74 (March 2010).

[6] *See, e.g., Harriss*, 347 U.S. at 620 (registration requirements constitutional as limited to require "disclosure of . . . direct pressures, exerted [on lawmakers] by the lobbyist themselves or through their hirelings or through an artificially stimulated letter campaign"); *Comm'n on Indep. Colleges & Univs.*, 534 F. Supp. at 495 (same).

[7] *Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 14 (D.C. Cir. 2009).

"influence[s]" or "participate[s] in the formation" of *any* message to the public that attempts to influence government action in *any* way, the proposed definition sweeps in vast classes of people who neither speak directly to government officials themselves nor call upon members of the public to do so. For example, the definition would extend to virtually all public relations firms, as well as other service providers like advertising agencies that serve clients involved in public issues, in virtually all aspects of their work—whether it be drafting talking points, offering ideas on a letter to the editor, or scripting television and radio ads. Public relations firms, advertising agencies, television directors, video editors, light designers, or scriptwriters who are hired to "review[] or edit[] the communication[s]"and "participate in the formation" of the communications concerning public issues are deemed "lobbyists" under the proposed definition and would be required to file registration statements under threat of criminal penalties if the Guidance were adopted.[8]

But when public relations firms issue press releases, publicizing the messages of their clients regarding prospective legislation or other government action, they do not exert pressure on public officials in the same way that lobbyists do—directly (through button-holing in the halls of the Capitol, for instance) or by getting others to pressure them directly (with artificially generated public interest created by "calls to action").[9] Rather, such work simply serves to facilitate their clients' participation in the broad public discussion of issues and controversies that is the very essence of political discourse. More importantly, the issuance of such public communications in no way obscures the source of the message being delivered—namely, the public relations firms' *clients* rather than the firms themselves. Indeed, the attribution of information to a particular client—i.e., gaining for a client public acknowledgement for a particular position or outcome—is typically a key goal of a public relations effort. Reporting the involvement of a particular public relations firm in the "formation" of a press release or other communication issued by a client serves no more legitimate informational purpose than would announcing the name of a set designer who worked on a political television ad.[10]

**Put simply, a public relations firm's editing of press releases, talking points, and op-eds is not grassroots lobbying, especially when those communications will in fact be delivered by the firm's clients.**

Public relations professionals are neither the speakers nor the sources of messages. It is not their role to create or control broad public messages. The messages belong to the *clients*—and, when they appear in press releases, advertisements, op-eds, or speeches, they are delivered by the clients themselves. Hence, the entire rationale for requiring, and desiring, disclosure does not apply to such professionals. Because the vast majority of public relations work in this area

---

[8] Because the terms "participation in" and "some influence over" are extremely imprecise terms, and the number of individuals who "participat[e] in the formation of . . . communication[s] or [exert] some influence over reviewing or editing" them is potentially exceptionally vast, the Guidance also invites challenges for unconstitutional vagueness.

[9] *See Harriss*, 347 U.S. at 625 (disclosure requirements constitutional where they apply to "direct pressures, exerted by the lobbyists themselves or through their hirelings or through [others]").

[10] *See Buckley v. Valeo*, 424 U.S. at 67-68 (disclosure requirements justified where required to enable voters to understand who is driving an initiative).

constitutes constitutionally protected political speech, requiring registration where the underlying rationale of *Harriss* is not satisfied is constitutionally suspect at the very least.

The Supreme Court has flatly rejected imposition of disclosure requirements on parties, like the Firms, that assist principals with delivering messages to the public that they themselves do not direct or control.[11] In *Buckley v. American Constitutional Law Foundation, Inc.*, the Court considered a state law that, among other things, imposed reporting requirements on proponents of ballot initiatives.[12] The law required disclosures not only by those sponsoring and financing initiatives, but by individuals who were paid to circulate the petitions. The Court distinguished between the two groups. It held constitutional the disclosure requirements as applied to the sponsors and financers because exposure of those individuals' identities and activities would allow voters to understand the *source* of the proposed measures. It rejected the disclosure requirements as applied to the paid circulators because the "added benefit" of such requirements was "hardly apparent."[13] When public relations professionals draft and issue press releases or draft op-eds and speeches to be delivered by their clients, they are like the petition circulators in *Buckley*, not the petition originators or funders.[14] It is not the "voice" of those firms that lawmakers must be alerted to behind the calls and emails of constituents inspired by grassroots lobbying efforts, but rather the "voice" of those firms' *clients*, who initiate, direct and drive the lobbying efforts.[15] Indeed, the firms' clients are required to report their lobbying activities, so that the actual moving forces behind such grassroots campaigns are *already* subject to a disclosure requirement and will continue to be, even if the proposed definition of "grassroots lobbying" is not adopted to extend reporting requirements to public relations firms, advertising firms, and other background advisors, editors, and "particip[ants]" in the process of "reviewing or editing . . . communication[s]."

When both (a) direct lobbyists, who speak directly to public officials on behalf of their clients; and (b) those initiating and driving (rather than merely assisting with) grassroots lobbying efforts are fully disclosed, both lawmakers and the public can see who is truly exerting pressure upon public officials. Compelling the registration and disclosure of every assistant, advisor, agent, and PR professional involved in someone else's grassroots campaigns—parties who emphatically who do not control the message and do not speak on their own behalf—does nothing to further the transparency rationale underlying *Harriss* and its progeny. A rule that serves no legitimate purpose yet touches upon the sacrosanct area of political speech is unconstitutional.

---

[11] Of course, where the firms are hired to communicate directly with public officials rather than with members of the public, they are direct lobbyists and must disclose their activities so that officials and the public understand that they do not speak for themselves as citizens but on behalf of the entities that hired them.

[12] 525 U.S. 182 (1999)

[13] *Id.* at 202-03.

[14] *See* supra n.8 & n.9 & accompanying text.

[15] *Harriss*, 347 U.S. at 625 (disclosure alerts lawmakers to the true nature of "the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal").

The Proposed Definition Does Not Limit "Grassroots Lobbying" to "Initiating Propaganda"

The proposed definition of "grassroots lobbying" is impermissibly overbroad also because it does not explicitly limit itself to messages that expressly exhort the public to contact government officials regarding pending laws, rules, or regulations—so-called "calls to action." Aside from *direct* communications with policymakers, regulated lobbying may constitutionally include only "artificially stimulated letter campaign[s]" [16] and their equivalent, *i.e.* "initiating propaganda," or "campaign[s] to stimulate the public to directly contact legislators by letters or telegrams, etc."[17] Indeed, one federal district court has already found the Lobbying Act's definition of "lobbying" and "lobbying activities" constitutional only insofar as it governs direct communications with policymakers and initiating propaganda.[18]

However, the Lobbying Act's definition of "lobbying activities" is not self-evidently so limited in that, by its terms, it applies to *all* "attempts to influence" policymaking, and not only to those communications that contain an express "call to action."[19] The proposed Guidance exacerbates the potential overbreadth of the statutory provision. By simply incorporating the statutory provision by reference, the proposed Guidance defines "grassroots lobbying" to include control over the delivery of any communication that solicits the public to *attempt to influence* policymaking, without specifying that that "attempt to influence" must be in the form of initiating propaganda, including by containing a "call to action." Under the proposed definition, therefore, "grassroots lobbying" might include delivering a message to the public that it should vote a particular way, "take a stand" on a given issue, participate in a rally, "tell Albany," or even vote in an election, as any of these activities could be construed as "attempts to influence" the adoption or defeat of laws, rules, or regulations. Because none of these activities involves directly contacting legislators, exhorting members of the public to engage in them cannot lawfully be regulated as lobbying.

The Definition of "Grassroots Lobbying" Must Apply Only to Those Who Ultimately Direct and Authorize "Initiating Propaganda" Campaigns

For the reasons set forth above, the Commission should not and indeed cannot regulate as a lobbyist anyone who does not either (a) communicate directly with public officials in an effort to influence policymaking or (b) initiate a campaign exhorting members of the public to themselves communicate directly with public officials regarding pending laws, rules, or regulations.[20] The proposed definition of "direct" lobbyist coheres with the first category, but the Commission's proposed definition of "grassroots" lobbyists far exceeds the second for two reasons: *first*, because its conception of who "controls" grassroots lobbying efforts is overbroad; and *second*, because it extends to classes of public communications that are well outside the ambit of "initiating propaganda." The Commission must address each problem.

---

[16] *Harriss*, 347 U.S. at 625.

[17] *Comm'n on Indep. Colleges & Univs.*, 534 F. Supp. at 495 n.6.

[18] *Id.* at 496-97.

[19] Lobbying Law § 1-c(c).

[20] *See* supra n.4, 12-14 & accompanying text.

First, we submit that the Commission should revise the definition of an individual or entity that "controls" relevant communications to the public to include *only* individuals **at whose direction, by whose authority, and on whose behalf** such communications are made. This definition conforms with the only valid government purpose in regulating grassroots lobbying—to "help[] the public to understand the constituencies behind legislative or regulatory proposals"[21]—as well as the common-sense definition of the word "control."

Second, instead of simply referencing Section 1-c(c) in the proposed definition of "grassroots lobbying," the Commission should clarify that an individual or entity engages in "grassroots lobbying" only when it controls the content and delivery of a message that solicits the public to engage in "direct interaction" with public officials as that term is already defined by the proposed Guidance—i.e., communications that contain an express "call to action." This revision, which is consistent with the limitations imposed by the law, will clarify once and for all that the statute applies only to "initiating propaganda" and not to communications to the public that do not encourage applying pressure to public officials through direct communication.

These recommended revisions to the definition of "grassroots lobbying" will avoid imposing burdensome, unnecessary, and unconstitutional obligations on members of the public and will correct those aspects of the guidance that are both misguided and illegal.

* * * * *

On behalf of the Firms, we thank the Commission for its consideration of these comments and we invite any questions that the Commission may have.

Respectfully submitted,

Andrew G. Celli, Jr.
Hayley Horowitz

[21] Taylor, 582 F.3d at 14; *see also id.* at 9 (lobbying regulations allowed to help public understand who is truly "endeavoring to influence the political system"); *Valeo*, 424 U.S. at 67-68 (disclosure requirements' purpose is to allow voters to understand which persons and entities drive political initiatives).