# Exhibit 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE NOVEMBER TEAM, INC.; ANAT GERSTEIN, INC., BERLINROSEN PUBLIC AFFAIRS, LTD.; RISA HELLER COMMUNICATIONS LLC; and MERCURY LLC,

Plaintiffs,

-against-

NEW YORK STATE JOINT COMMISSION ON PUBLIC ETHICS; and DANIEL J. HORWITZ, DAVID ARROYO, HON. JOSEPH COVELLO, MARVIN E. JACOB, SEYMOUR KNOX IV, HON. EILEEN KORETZ, GARY J. LAVINE, HON. MARY LOU RATH, DAVID A. RENZI, MICHAEL A. ROMEO, HON. RENEE R. ROTH, MICHAEL K. ROZEN, DAWN L. SMALLS, and GEORGE H. WEISMAN, in their official capacities as members of the New York State Joint Commission on Public Ethics,

Defendants.

No. 16 Civ. _____

**DECLARATION OF THE NOVEMBER TEAM, INC. IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

William O'Reilly, on behalf of The November Team, Inc. ("The November Team"), declares the following to be true under penalty of perjury:

1. I am a Principal of The November Team, Inc. I am personally familiar with the facts and circumstances in this action. I submit this Declaration in support of the plaintiffs' application for a temporary restraining order and a preliminary injunction, as set forth in the accompanying Order to Show Cause and Memorandum of Law.

2. In this action, The November Team and the other plaintiffs seek a declaration that Advisory Opinion 16-01 ("AO-1601" or the "Advisory Opinion") of the New York State Commission on Public Ethics ("JCOPE") is invalid and insofar as it construes the Lobbying Law to apply to public relations consultants and others who do not engage in lobbying as traditionally defined, and an order enjoining JCOPE from taking any enforcement action based on such Advisory Opinion.

**My Firm and Our Work**

3. Along with my partner Jessica Proud, I founded The November Team in 2013 as small PR shop with a penchant for creativity and clever tactics. Today, we have two partners, Jessica and me, and one employee, we provide our clients with services in several areas: Issue Campaigns; Corporate Positioning; Traditional Public Relations and Publicity; Electoral Campaigns; and Public Affairs Campaigns.

4. In general, we don't advertise who our clients are, but we do actively promote them in the news media. We proudly say that we have managed to get our clients interviewed by virtually every major media outlet in the country, and we have personally interacted with thousands of reporters and editorial writers over the years to advance the causes and issues that our clients care about. This is the essence of our "earned media" efforts – which is core to what we do for our clients.

5. "Earned" media refers to news stories or editorials that media outlets produce about our client's issues, with our input and, often, at our urging. To win "earned media," Jessica and I contact members of the press – both news reporters and editorial writers – or respond to inquiries from them, and seek to persuade them to report or, in the case of editorial writers, to adopt or give a fair hearing to the positions that our client wishes to advance.

"Earned" media communications can include everything from issuing press releases, holding press conferences, and organizing press availabilities (making spokespersons or the client available to speak with reporters or editorial writers), to sending personalized letters or emails, or making dedicated calls, to specific reporters or editorial writers to discuss issues of concern to the clients.

6. When we contact reporters or editorial writers on behalf of a client, they either are immediately told, or they invariably ask, on whose behalf we are speaking and what that client's "angle" or interest is in the issue. This is part of a reporter's or editorial writer's evaluation of a "story" or editorial pitch. As they consider a proposal or perspective on its merits, they also want to know, and have a right to know, who is advancing that issue and why. There is no such phenomenon as a PR professional pitching story idea and not telling the reporter why or on whose behalf the professional is speaking. That just doesn't happen.

**The Firm Does Not Engage in Lobbying; Regulatory Compliance Would Be Burdensome**

7. As a rule, The November Team does not engage in lobbying, as that term has long been defined by New York State law – i.e., either engaging in direct contacts with public officials ("button-holing"), or undertaking efforts to inveigle members of the public to directly contact government officials through a "call to action."

8. One of the main reasons that we don't "lobby" is that New York State has a burdensome and intrusive regulatory regime for person or entities who lobby, and we do not wish to subject ourselves to that regime. The New York system, which is operated by JCOPE, requires lobbyists to disclose the names and activities of their clients, their political goals, their financial arrangements, and their expenditures in a lobbying effort. It also requires multiple filings each calendar year, and the maintenance of certain files for certain periods of time.

9. Compliance with the New York system would be costly; in our case, we have dozens of clients, many projects going at any one time, and no support staff. Compliance with the New York lobbying rules would require us to hire staff or outside temp workers to track these clients and projects and make sure that filing fees are paid to JCOPE, forms are filled out, and records are maintained.

10. Some months ago, I learned that JCOPE was considering extending the definition of "lobbying" to include services that are provided by PR firms, but that involve neither direct contacts with public officials, nor "grassroots lobbying." Concerned about the impact such an expansion would have on my firm and my clients, I spoke out publicly against it, in numerous interviews and press statements. When AO 16-01 was adopted, I even tried to FOIL government documents concerning how this opinion was created, and why.

11. One of the main reasons I am so resistant to the change reflected in AO 16-01 is that most of my work, by nature of the state's political makeup, is in opposition to the sitting government. In having to reveal clients, I would genuinely fear retribution from the Office of the Governor (the "Second Floor"), which holds enormous sway over so many New York industries. A single phone call from the Second Floor can lose us a corporate client. This is not paranoia on my part; I believe that this has already happened.

12. In my judgment, AO 16-01 will significantly burden my firm's ability to provide PR services, and in particular to win "earned media" for clients. In the first place, AO 16-01 means that The November Team and its many clients will both have to register with JCOPE, and be subject to oversight, as "lobbyist" and "clients" respectively. Compliance with the Lobbying Law's and JCOPE's rules will cost my firm money, and will require me to disclose sensitive information about my business and my clients' interests and goals, even though we will

not be "button-holing" public officials or engaging in "grassroots lobbying." I am also very concerned about what might happen if we fail to register for a specific client. I understand that failure to file can have criminal or civil consequences, to say nothing of the reputational injury we would suffer if we were found to have violated any rule. Such a finding would be very harmful to my firm and to its clients.

Dated: March 6, 2016

New York, New York

William F. B. O'Reilly