# Exhibit 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE NOVEMBER TEAM, INC.; ANAT GERSTEIN, INC., BERLINROSEN PUBLIC AFFAIRS, LTD.; RISA HELLER COMMUNICATIONS LLC; and MERCURY LLC,

Plaintiffs,

-against-

NEW YORK STATE JOINT COMMISSION ON PUBLIC ETHICS; and DANIEL J. HORWITZ, DAVID ARROYO, HON. JOSEPH COVELLO, MARVIN E. JACOB, SEYMOUR KNOX IV, HON. EILEEN KORETZ, GARY J. LAVINE, HON. MARY LOU RATH, DAVID A. RENZI, MICHAEL A. ROMEO, HON. RENEE R. ROTH, MICHAEL K. ROZEN, DAWN L. SMALLS, and GEORGE H. WEISMAN, in their official capacities as members of the New York State Joint Commission on Public Ethics,

Defendants.

No. 16 Civ. _____

**DECLARATION OF ANAT GERSTEIN, INC. IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

Anat Gerstein, on behalf of Anat Gerstein, Inc., ("AGI"), declares the following to be true under penalty of perjury:

1. I am the Founder, President, and Principal of Anat Gerstein, Inc. I am personally familiar with the facts and circumstances in this action. I submit this Declaration in support of the plaintiffs' application for a temporary restraining order and a preliminary injunction, as set forth in the accompanying Order to Show Cause and Memorandum of Law.

2. In this action, AGI and the other plaintiffs seek a declaration that Advisory Opinion 16-01 ("AO-1601" or the "Advisory Opinion") of the New York State Commission on Public Ethics ("JCOPE") is invalid and insofar as it construes the Lobbying Law to apply to public relations consultants and others who do not engage in lobbying as traditionally defined, and an order enjoining JCOPE from taking any enforcement action based on such Advisory Opinion.

**My Firm and Our Work**

3. I founded AGI in 2010 as small public relations shop dedicated to serving nonprofit institutions, large and small. Today, we have eight PR professionals, and we provide effective communications and marketing services that include: press relations, online marketing, annual reports and promotional materials, donor communications, and overall communications coordination.

4. Our clients are nonprofit institutions. Current and past clients include: The New York AARP, the Kleinman Holocaust Education Center, Asphalt Green, the Nonprofit Coordinating Committee of New York, and the Girl Scouts of Greater New York. I have personally interacted with thousands of reporters and editorial writers over the years to advance the causes and issues that our clients care about. This is the essence of our "earned media" efforts – which is core to what we do for our clients.

5. "Earned" media refers to news stories or editorials that media outlets produce about our clients' issues, with our input and, often, at our urging. To win "earned media," our team contacts members of the press – both news reporters and editorial writers – or respond to inquiries from them, and seeks to persuade them to report or, in the case of editorial writers, to adopt or give a fair hearing to the positions that our clients wish to advance. "Earned"

media communications can include everything from issuing press releases, holding press conferences, and organizing press availabilities (making spokespersons or the client available to speak with reporters or editorial writers), to sending personalized letters or emails, or making dedicated calls, to specific reporters or editorial writers to discuss issues of concern to the clients.

6. When we contact reporters or editorial writers on behalf of a client, they either are immediately told, or they invariably ask, on whose behalf we are speaking and what that client's "angle" or interest is in the issue. This is part of a reporter's or editorial writer's evaluation of a "story" or editorial pitch. As they consider a proposal or perspective on its merits, they also want to know, and have a right to know, who is advancing that issue and why. There is no such phenomenon as a PR professional pitching story idea and not telling the reporter why or on whose behalf the professional is speaking. That just doesn't happen.

7. Many of our clients receive funding from government sources, via contracts or grants. They often wish to advance their views on the important issues of the day – everything from how to address the income inequality and racial and gender disparities, to the level of funding for underserved communities and the housing crisis – and not every client wishes its interests, goals and associations to be publicly identified and discussed. There are many legitimate reasons for this, some philosophical, some political, some strategic, and some tactical. The most straightforward one is fear that taking certain positions openly will lead to retaliation on the funding side. For this reason, there are times when we speak to reporters of the record and ask them not to publish our clients' statements.

**The Firm Does Not Engage in Lobbying; Regulatory Compliance Would Be Burdensome**

8. As a rule, AGI does not engage in lobbying, as that term has long been defined by New York State law – i.e., either engaging in direct contacts with public officials

("button-holing"), or undertaking efforts to inveigle members of the public to directly contact government officials through a "call to action."

9. One of the main reasons that we don't "lobby" is that New York State has a burdensome and intrusive regulatory regime for person or entities who lobby, and we do not wish to subject ourselves to that regime. The New York system, which is operated by JCOPE, requires lobbyists to disclose the names and activities of their clients, their political goals, their financial arrangements, and their expenditures in a lobbying effort. It also requires multiple filings each calendar year, and the maintenance of certain files for certain periods of time.

10. Compliance with the New York system would be costly; in our case, we have dozens of clients, many projects going at any one time, and no support staff. Compliance with the New York lobbying rules would require us to hire staff or outside temp workers to track these clients and projects and make sure that filing fees are paid to JCOPE, forms are filled out, and records are maintained. As a small PR shop, it would be very difficult for us to comply with these requirements.

11. Some months ago, I learned that JCOPE was considering extending the definition of "lobbying" to include services that are provided by PR firms, but that involve neither direct contacts with public officials, nor "grassroots lobbying." Concerned about the impact such an expansion would have on my firm and my clients, AGI was one of four PR firms to oppose this expansion in two letters to JCOPE written by our lawyers at Emery Celli Brinckerhoff & Abady LLP. These efforts were unsuccessful: JCOPE issued AO 16-01 on January 26, 2016. In response, I authored an op-ed piece on why the new Advisory Opinion was particularly problematic for my firm and our clients. A copy of this piece can be found at http://nynmedia.com/news/will-state-ethics-reforms-silence-nonprofits.

12. In my judgment, AO 16-01 will significantly burden my firm's ability to provide PR services, and in particular to win "earned media" for clients. In the first place, AO 16-01 means that AGI and its many clients will both have to register with JCOPE, and be subject to oversight, as "lobbyist" and "clients" respectively. Compliance with the Lobbying Law's and JCOPE's rules will cost my firm money, and will require me to disclose sensitive information about my business and my clients' interests and goals, even though we will not be "button-holing" public officials or engaging in "grassroots lobbying." I am also very concerned about what might happen if we fail to register for a specific client. I understand that failure to file can have criminal or civil consequences, to say nothing of the reputational injury we would suffer if we were found to have violated any rule. Such a finding would be very harmful to my firm and to its clients.

Dated: March 7, 2016

New York, New York

Anat Gerstein