# Exhibit 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE NOVEMBER TEAM; ANAT GERSTEIN, INC., BERLINROSEN PUBLIC AFFAIRS, LTD., RISA HELLER COMMUNICATIONS LLC; and MERCURY LLC,

Plaintiffs,

-against-

NEW YORK STATE JOINT COMMISSION ON PUBLIC ETHICS; and DANIEL J. HORWITZ, DAVID ARROYO, HON. JOSEPH COVELLO, MARVIN E. JACOB, SEYMOUR KNOX IV, HON. EILEEN KORETZ, GARY J. LAVINE, HON. MARY LOU RATH, DAVID A. RENZI, MICHAEL A. ROMEO, HON. RENEE R. ROTH, MICHAEL K. ROZEN, DAWN L. SMALLS, and GEORGE H. WEISMAN, in their official capacities as members of the New York State Joint Commission on Public Ethics,

Defendants.

No. 16 Civ. _____

**DECLARATION OF BERLINROSEN PUBLIC AFFAIRS, LTD. IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

JONATHAN ROSEN, on behalf of BerlinRosen Public Affairs, LTD. (“BerlinRosen”), declares the following to be true under penalty of perjury:

1. I am a Co-Founder and Principal of BerlinRosen Public Affairs, Inc. I am personally familiar with the facts and circumstances in this action. I submit this Declaration in support of the plaintiffs’ application for a temporary restraining order and a preliminary injunction, as set forth in the accompanying Order to Show cause and Memorandum of Law.

2. In this action, BerlinRosen and the other plaintiffs seek a declaration that Advisory Opinion 16-01 (“AO-1601” or the “Advisory Opinion”) of the New York State

Commission on Public Ethics ("JCOPE") is invalid and unconstitutional insofar as it construes the Lobbying Law to apply to public relations consultants and others who do not engage in lobbying as traditionally defined, and an order enjoining JCOPE from taking any enforcement action based on such Advisory Opinion.

**My Firm, Our Work, Our Clients, and Earned Media**

3. Along with my partner Valerie Berlin, I founded BerlinRosen in 2005 as an integrated public relations/public affairs firm. Today, we have over 80 employees, including 74 PR professionals, working out of offices in New York, Los Angeles, and Washington DC. Berlin/Rosen provides its clients with services in six integrated areas: Strategic Communications and Media Relations, Public Affairs, Campaign Consulting, Creative Services, Digital & Social Media, and Media Training.

1. BerlinRosen has hundreds of clients at any one time. These clients include everything from small, local not-for-profit organizations (for instance, Coalition for the Homeless, Urban Justice Center) to large "Fortune 500" companies (for example, Samsung Electronics America, Google). In addition, we represent individuals who are seeking public office or, in some cases, who already hold public office. Many of our clients, and perhaps most of them, come to us because they are interested, for various ideological, business, or other reasons, in being part of "the public conversation" about matters of government and politics. For instance, educating the public about a particular issue e.g. criminal justice reform or homelessness.

2. Our most important and popular suites of services are Strategic Communications and Media Relations and Public Affairs. Whether our clients are not-for-profit institutions, private business, or individuals, virtually all of them come to us seeking such

services. At the core of our work is helping clients develop a coherent media message around whatever issue they are facing or wish to advance, and assisting them with furthering that message in the media, both paid (via commercials on television and radio, by mail, or on social media) and unpaid (or so-called "earned" media).

3. "Earned" media refers to news stories or editorials that media outlets produce about our client's issues, with our input and, often, at our urging. To win "earned media," Berlin/Rosen's professionals contact members of the press – both news reporters and editorial writers – or respond to inquiries from them, and seek to persuade them to report or, in the case of editorial writers, to adopt the positions that our client wishes to advance. "Earned" media communications can include everything from issuing press releases, holding press conferences, and organizing press availabilities (making spokespersons or the client available to speak with reporters or editorial writers), to sending personalized letters or emails, or making dedicated calls, to specific reporters or editorial writers to discuss issues of concern to the clients.

4. When we contact reporters or editorial writers on behalf of a client, they either are immediately told, or they invariably ask, on whose behalf we are speaking and what that client's "angle" or interest is in the issue. This is part a reporter's or editorial writer's evaluation of a "story" or editorial pitch. As they consider a proposal or perspective on its merits, they also want to know, and have a right to know, who is advancing that issue and why. There is no such phenomenon as a PR professional pitching story idea and not telling the reporter why or on whose behalf the professional is speaking. That just doesn't happen.

5. That said, while it is our rule that we reveal to reporters who our clients are when speaking on their behalf, there are many situations in which we ask reporters to provide us and our clients with confidentiality, and that is respected. This is important because there are

often times when our clients wish to bring information or arguments to a reporters' attention, but do not wish to be quoted or identified in a particular article. There are many legitimate reasons for this, some philosophical, some political, some strategic, and some tactical. To use a simple example, some political clients may want their role in a particular issue obscured for fear of retaliation by those in government who disagree with their positions and resent their opposition.

6. There is also an open question of when, precisely, disclosure is required under the Advisory Opinion. It's really quite unclear. For instance, if we have a client who asks us to direct reporters covering policy proposals in a given area, such as homelessness or lack of supportive housing, to a research report that bears on the subject, is that a covered activity requiring registration? Likewise, what if we pitch an editorial writer to come out in favor of, say, more affordable housing in New York City, but we don't mention any particular bill or state program that would allow that. Is that "lobbying"? The Advisory Opinion suggests that the answer to both of these questions is "yes," but it's not totally clear to me. Where the rule isn't clear, my inclination would be to register – just to avoid a problem later on – or not to engage in the media communication to avoid having to report.

**The Firm Does Not Engage in Lobbying; Regulatory Compliance Would Be Burdensome**

7. As a rule, BerlinRosen does not engage in lobbying, as that term has long been defined by New York State law – i.e., either engaging in direct contacts with public officials ("button-holing"), or undertaking efforts to inveigle members of the public to directly contact government officials through a "call to action."

8. One of the main reasons that we don't "lobby" is that New York State has a burdensome and intrusive regulatory regime for person or entities who lobby, and we do not wish to subject ourselves to that regime. The New York system, which is operated by JCOPE,

requires lobbyists to disclose the names and activities of their clients, their political goals, their financial arrangements, and their expenditures in a lobbying effort. It also requires multiple filings each calendar year, and the maintenance of certain files for certain periods of time.

9. Compliance with the New York system would be costly; in our case, we have hundreds of clients, many with multiple projects going at any one time. Compliance with the New York lobbying rules would require some significant staff time to track these clients and projects and make sure that filing fees are paid to JCOPE, forms are filled out, and records are maintained.

10. Some months ago, I learned that JCOPE was considering extending the definition of "lobbying" to include services that are provided by PR firms, but that involve neither direct contacts with public officials, nor "grassroots lobbying." Concerned about the impact such an expansion would have on my firm, I spoke to other PR professionals and, together, we engaged the law firm of Emery Celli Brinckerhoff & Abady, LLP ("ECBA") to express our views to JCOPE. ECBA sent two letters to JCOPE on our behalf, both pointing out the dangers and constitutional infirmities of an expanded definition of "lobbying." See letters dated July 10, 2015 and December 1, 2015, annexed to the Declaration of Andrew G. Celli, Jr. as Exhibits 2 and 3. Those letters seem to have been ignored, because, on January 26, JCOPE adopted AO 16-01.

11. In my judgment, AO 16-01 will significantly burden my firm's ability to provide PR services, and in particular to win "earned media" for clients. In the first place, AO 16-01 means that Berlin/Rosen and its many clients will both have to register with JCOPE, and be subject to oversight, as "lobbyist" and "clients" respectively. Compliance with the Lobbying Law's and JCOPE's rules will cost my firm money, and will require me to disclose sensitive

information about my business and my clients' interests and goals, even though we will not be "button-holing" public officials or engaging in "grassroots lobbying." I am also very concerned about what might happen if we fail to register for a specific client. I understand that failure to file can have criminal or civil consequences, to say nothing of the reputational injury we would suffer if we were found to have violated any rule. Such a finding would be very harmful to my firm and to its clients.

Dated: March 7th, 2016

New York, New York

Jonathan Rosen