# Exhibit 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE NOVEMBER TEAM, INC.; ANAT GERSTEIN, INC., BERLINROSEN PUBLIC AFFAIRS, LTD.; RISA HELLER COMMUNICATIONS LLC; and MERCURY LLC,

Plaintiffs,

-against-

NEW YORK STATE JOINT COMMISSION ON PUBLIC ETHICS; and DANIEL J. HORWITZ, DAVID ARROYO, HON. JOSEPH COVELLO, MARVIN E. JACOB, SEYMOUR KNOX IV, HON. EILEEN KORETZ, GARY J. LAVINE, HON. MARY LOU RATH, DAVID A. RENZI, MICHAEL A. ROMEO, HON. RENEE R. ROTH, MICHAEL K. ROZEN, DAWN L. SMALLS, and GEORGE H. WEISMAN, in their official capacities as members of the New York State Joint Commission on Public Ethics,

Defendants.

No. 16 Civ. _____

**DECLARATION OF RISA HELLER COMMUNICATIONS, LLC, IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

Risa Heller, on behalf of Risa Heller Communications ("RHC"), declares the following to be true under penalty of perjury:

1. I am a Principal of Risa Heller Communications, Inc. I am personally familiar with the facts and circumstances in this action. I submit this Declaration in support of the plaintiffs' application for a temporary restraining order and a preliminary injunction, as set forth in the accompanying Order to Show Cause and Memorandum of Law.

2. In this action, RHC and the other plaintiffs seek a declaration that Advisory Opinion 16-01 ("AO-1601" or the "Advisory Opinion") of the New York State Commission on Public Ethics ("JCOPE") is invalid and insofar as it construes the Lobbying Law to apply to public relations consultants and others who do not engage in lobbying as traditionally defined, and an order enjoining JCOPE from taking any enforcement action based on such Advisory Opinion.

**My Firm and Our Work**

3. I founded Risa Heller Communications after a long career in government, including as a Communications Director for both Sen. Charles Schumer and Gov. David Paterson. RHC is a very small operation – made up of only me and four colleagues. Our focus is providing communications services to businesses and individuals, both in crisis situations, and when there are long-term strategic goals such as promoting a particular business or sector in the public eye.

4. In general, we don't advertise who our clients are, but we do actively promote them in the news media. I can proudly say that we have managed stories in nearly every kind of media outlet imaginable and that we have personally interacted with thousands of reporters and editorial writers over the years to advance the causes and issues that our clients care about. This is the essence of our "earned media" efforts – which is core to what we do for our clients.

5. "Earned" media refers to news stories or editorials that media outlets produce about our clients' issues, with our input and, often, at our urging. To win "earned media," I contact members of the press – both news reporters and editorial writers – or respond to inquiries from them, and seek to persuade them to report or, in the case of editorial writers, to

adopt or give a fair hearing to the positions that our clients wish to advance. "Earned" media communications can include everything from issuing press releases, holding press conferences, and organizing press availabilities (making spokespersons or the client available to speak with reporters or editorial writers), to sending personalized letters or emails, or making dedicated calls, to specific reporters or editorial writers to discuss issues of concern to the clients.

6. When I contact reporters or editorial writers on behalf of a client, they either are immediately told, or they invariably ask, on whose behalf we are speaking and what that client's "angle" or interest is in the issue. This is part a reporter's or editorial writer's evaluation of a "story" or editorial pitch. As they consider a proposal or perspective on its merits, they also want to know, and have a right to know, who is advancing that issue and why. There is no such phenomenon as a PR professional pitching a story idea and not telling the reporter why or on whose behalf the professional is speaking. That just doesn't happen.

7. That said, not every client wishes its interests, goals and associations to be publicly identified and discussed. There are many legitimate reasons for this, some philosophical, some political, some strategic, and some tactical. To use a simple example, some clients don't wish to be known as being supportive of a particular proposal, because that support will be read in their competitive environment as a clue about their future business intentions. Likewise, some clients may want their role in a particular issue obscured so that they can effectively negotiate compromises with other players in the political system.

**The Firm Does Not Engage in Lobbying; Regulatory Compliance Would Be Burdensome**

8. As a rule, RHC and I do not engage in lobbying, as that term has long been defined by New York State law – i.e., either engaging in direct contacts with public

officials ("button-holing"), or undertaking efforts to inveigle members of the public to directly contact government officials through a "call to action."

9. One of the main reasons that we don't "lobby" is that New York State has a burdensome and intrusive regulatory regime for persons or entities who lobby, and we do not wish to subject ourselves to that regime. The New York system, which is operated by JCOPE, requires lobbyists to disclose the names and activities of their clients, their political goals, their financial arrangements, and their expenditures in a lobbying effort. It also requires multiple filings each calendar year, and the maintenance of certain files for certain periods of time.

10. Compliance with the New York system would be costly; in my case, I have dozens of clients, many projects going at any one time, and almost no support staff. Compliance with the New York lobbying rules would require us to hire staff or outside temp workers to track these clients and projects and make sure that filing fees are paid to JCOPE, forms are filled out, and records are maintained.

11. Some months ago, I learned that JCOPE was considering extending the definition of "lobbying" to include services that are provided by PR firms, but that involve neither direct contacts with public officials, nor "grassroots lobbying." Concerned about the impact such an expansion would have on my firm and my clients, I joined with other similarly situated PR firms and retained Emery Celli Brinckerhoff & Abady, LLP to write letters to JCOPE opposing the expansion. This effort was unsuccessful: AO 16-01 was adopted on January 26, 2016.

12. In my judgment, AO 16-01 will significantly burden my firm's ability to provide PR services, and in particular to win "earned media" for clients. In the first place, AO 16-01 means that RHC and its many clients will both have to register with JCOPE, and be

subject to oversight, as "lobbyist" and "clients' respectively. Compliance with the Lobby Act's and JCOPE's rules will cost my firm money, and will require me to disclose sensitive information about my business and our clients' interests and goals, even though we will not be "button-holing" public officials or engaging in "grassroots lobbying." I am also very concerned about what might happen if we fail to register for a specific client. I understand that failure to file can have criminal or civil consequences, to say nothing of the reputational injury we would suffer if we were found to have violated any rule. Such a finding would be very harmful to my firm and to its clients.

Dated: March 7, 2016

New York, New York

Risa Heller