# Exhibit 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE NOVEMBER TEAM, INC.; ANAT GERSTEIN, INC., BERLINROSEN PUBLIC AFFAIRS, LTD.; RISA HELLER COMMUNICATIONS LLC; and MERCURY LLC,

Plaintiffs,

-against-

NEW YORK STATE JOINT COMMISSION ON PUBLIC ETHICS; and DANIEL J. HORWITZ, DAVID ARROYO, HON. JOSEPH COVELLO, MARVIN E. JACOB, SEYMOUR KNOX IV, HON. EILEEN KORETZ, GARY J. LAVINE, HON. MARY LOU RATH, DAVID A. RENZI, MICHAEL A. ROMEO, HON. RENEE R. ROTH, MICHAEL K. ROZEN, DAWN L. SMALLS, and GEORGE H. WEISMAN, in their official capacities as members of the New York State Joint Commission on Public Ethics,

Defendants.

No. 16 Civ. _____

**DECLARATION OF MERCURY LLC. IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

MICHAEL F. MCKEON, on behalf of Mercury LLC ("Mercury"), declares the following to be true under penalty of perjury:

1. I am a partner of Mercury LLC. I am personally familiar with the facts and circumstances in this action. I submit this Declaration in support of the plaintiffs' application for a temporary restraining order and a preliminary injunction, as set forth in the accompanying Order to Show Cause and Memorandum of Law.

2. In this action, Mercury and the other plaintiffs seek a declaration that Advisory Opinion 16-01 ("AO-1601" or the "Advisory Opinion") of the New York State Commission on Public Ethics ("JCOPE") is invalid and unconstitutional insofar as it construes the Lobbying Law to apply to public relations consultants and others who do not engage in lobbying as traditionally defined, and an order enjoining JCOPE from taking any enforcement action against plaintiffs based on such Advisory Opinion.

**My Firm, Our Work, Our Clients, and Earned Media**

3. Mercury was founded in 1996 as a public relations and public strategy firm. Today, we have approximately 140 employees, including dozens of PR professionals, working out of eighteen offices in New York and worldwide. Mercury provides its clients with services and expertise in, among other areas, media relations, public affairs campaigns, and crisis communication.

4. Mercury has hundreds of clients at any one time. These clients include everything from small, local not-for-profit organizations to large "Fortune 500" companies. In addition, we represent individuals who are seeking public office or, in some cases, who already hold public office. Many of our clients, and perhaps most of them, come to us because they are interested, for various ideological, business or other reasons, in being part of "the public conversation" about matters of government and politics. For instance, Mercury was retained by a coalition of businesses to wage a public information campaign against a move to allow wine sales in grocery stores; some smaller members of the coalition preferred that their customers not know that they were part of that effort.

5. Whether our clients are not-for profit institutions, private business, or individuals, virtually all of them come to us seeking strategic communications and media

relations services. At the core of our work is helping clients develop a coherent media message around whatever issue they are facing or wish to advance, and assisting them with furthering that message in the media, both paid (via commercials on television and radio, by mail, or on social media) and unpaid (or so-called "earned" media).

6. "Earned" media refers to news stories or editorials that media outlets produce about our clients' issues, with our input and, often, at our urging. To win "earned media," Mercury's professionals contact members of the press—both news reporters and editorial writers—or respond to inquiries from them, and seek to persuade them to report or, in the case of editorial writers, to adopt the positions that our client wishes to advance. "Earned" media communications can include everything from issuing press releases, holding press conferences, and organizing press availabilities (making spokespersons or the client available to speak with reporters or editorial writers) to sending personalized letters or emails, or making dedicated calls, to specific reporters or editorial writers to discuss issues of concern to the clients.

7. When we contact reporters or editorial writers on behalf of a client, they either are immediately told, or they invariably ask, on whose behalf we are speaking and what that client's "angle" or interest is in the issue. This is part a reporter's or editorial writer's evaluation of a "story" or editorial pitch. As they consider a proposal or perspective on its merits, they also want to know, and have a right to know, who is advancing that issue and why. There is no such phenomenon as a PR professional pitching story idea and not telling the reporter why or on whose behalf the professional is speaking. That just doesn't happen.

8. That said, not every client wishes its interests, goals and associations to be publicly identified and discussed. There are many legitimate reasons for this, some philosophical, some political, some strategic, and some tactical. To use a simple example, some

clients don't wish to be known as being supportive of a particular proposal, because that support will be read in their competitive environment as a clue about their future business intentions. Likewise, some political clients may want their role in a particular issue obscured so that they can effectively negotiate compromises with other players in the political system.

9. There is also an open question of when, precisely, disclosure is required under the Advisory Opinion. It's really quite unclear. For instance, if a newspaper runs an article concerning a particular bill in the State Legislature that my client supports, and misconstrues its provisions in a way likely to make it less popular, is my firm engaged in a covered activity requiring registration if it contacts the publication to urge it to run a correction? Similarly, if a reporter writing an article or editorial about a proposed agency action contacts my firm to ask how a the action will affect the business of one of its clients, and the firm responds that the action would be either helpful or harmful to the client, has the firm engaged in covered activity requiring registration? The Advisory Opinion suggests that the answer to both of these questions is "yes," but it's not totally clear to me. Where the rule isn't clear, my inclination would be to register—just to avoid a problem later on—or to avoid the communication altogether so as not to have to register.

**For Some Clients, the Firm Does Not Engaxgxe in Lobbying; Regulatory Compliance in These Cases Would Be Burdensome and Intrusive**

10. For some clients, but not for others, Mercury engages in traditional lobbying activities—i.e., either engages in direct contacts with public officials ("button-holing"), or undertakes efforts to inveigle members of the public to directly contact government officials through a "call to action." When it is hired by clients to engage in traditional lobbying and to use paid media to target legislators, it duly registers its activities under the Lobbying Act.

11. But AO 16-01 would extend the Lobbying Act's burdensome and intrusive registration requirements to Mercury's activities even when the *only* thing it does on behalf of a client is to discuss legislation or executive or agency action with reporters. Even with respect to those activities, Mercury would be required to disclose the names and activities of its clients, their political goals, their financial arrangements, and their expenditures related to public information campaigns. Mercury would also have to make multiple filings each calendar year, and maintenance certain files for certain periods of time.

12. Compliance with the New York system, as expanded by AO 16-01 would be costly; in our case, we have hundreds of clients and thousands of pure PR, non-lobbying projects going at any one time. Compliance with the New York lobbying rules for these clients would require significant staff time to track our activities, make sure that filing fees are paid to JCOPE, forms are filled out, and records are maintained.

13. In my judgment, AO 16-01 will significantly burden my firm's ability to provide PR services, and in particular to win "earned media" for clients. In the first place, AO 16-01 means that Mercury and its many pure PR clients will both have to register with JCOPE, and be subject to oversight, as "lobbyist" and "clients" respectively. Compliance with the Lobbying Law's and JCOPE's rules will cost my firm money, and will require me to disclose sensitive information about my business and my clients' interests and goals, even though we will not be "button-holing" public officials or engaging in "grassroots lobbying."

14. Moreover, reporting Mercury's communications with the media to the government would inhibit our discourse with reporters on matters of public importance, particularly with respect to clients who want to bring their perspectives to the press, and the public's, attention, but who do not want to lose their anonymity by doing so.

15. I am also very concerned about what might happen if we fail to register for a specific client. I understand that failure to file can have criminal or civil consequences, to say nothing of the reputational injury we would suffer if we were found to have violated any rule. Such a finding would be very harmful to my firm and to its clients.

Dated: March 2, 2016

New York, New York

Michael F. McKeon